ACCEPTED
13-15-00506-CV
THIRTEENTH COURT OF APPEALS
CORPUS CHRISTI, TEXAS
12/17/2015 5:34:25 PM
Dorian E. Ramirez
CLERK

**Oral Argument Requested**

# NO. 13-15-00506-CV

FILED IN
13th COURT OF APPEALS
CORPUS CHRISTI/EDINBURG, TEXAS
12/17/2015 5:34:25 PM
DORIAN E. RAMIREZ
Clerk

## IN THE COURT OF APPEALS
## FOR THE THIRTEENTH DISTRICT OF TEXAS

**Scripps NP Operating, LLC, a Wisconsin Limited Liability Company, Successor in Interest to Scripps Texas Newspapers, LP d/b/a *Corpus Christi Caller-Times*, and The E.W. Scripps Company,** *Appellants*,

**v.**

**Terry Carter,** *Appellee*

On Appeal from the 214th Judicial District Court, Nueces County, Texas
(Hon. Jose Longoria, Presiding)

## APPELLANTS' BRIEF

Jorge C. Rangel
State Bar No. 16543500
Jaime S. Rangel
State Bar No. 24033759
Joseph M. Marcum
State Bar No. 12973000
THE RANGEL LAW FIRM, P.C.
615 N. Upper Broadway, Suite 2020
Corpus Christi, Texas 78401
(361) 883-8500 / (361) 883-2611 fax
Email: jorge.c.rangel@rangellaw.com
Email: jaime.rangel@rangellaw.com
Email: joe.marcum@rangellaw.com

Paul C. Watler
State Bar No. 20931600
Andrew D. Graham
State Bar No. 24041002
JACKSON WALKER, LLP
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
(214) 953-6000 / (214) 953-5822 fax
Email: pwatler@jw.com
Email: agraham@jw.com

*Attorneys for Appellants*

**IDENTITY OF PARTIES AND COUNSEL**

**Appellants:**

**Scripps NP Operating, LLC, a Wisconsin Limited Liability Company, Successor in Interest to Scripps Texas Newspapers, LP d/b/a** *Corpus Christi Caller-Times*, **and The E.W. Scripps Company**

| | |
|---|---|
| Lead Appellate Counsel: | Appellate Counsel: |
| Jorge C. Rangel | Paul C. Watler |
| State Bar No. 16543500 | State Bar No. 20931600 |
| Jaime S. Rangel | Andrew D. Graham |
| State Bar No. 24033759 | State Bar No. 24041002 |
| Joseph M. Marcum | JACKSON WALKER, LLP |
| State Bar No. 12973000 | 2323 Ross Avenue, Suite 600 |
| THE RANGEL LAW FIRM, P.C. | Dallas, Texas 75201 |
| 615 N. Upper Broadway, Suite 2020 | (214) 953-6000 / (214) 953-5822 fax |
| Corpus Christi, Texas 78401 | Email: pwatler@jw.com |
| (361) 883-8500 / (361) 883-2611 fax | Email: agraham@jw.com |
| Email: | |
| jorge.c.rangel@rangellaw.com | |
| Email: jaime.rangel@rangellaw.com | |
| Email: joe.marcum@rangellaw.com | |

**Appellee:**

**Terry Carter**

| | |
|---|---|
| Lead Appellate Counsel: | Appellate Counsel: |
| Rene Rodriguez | Craig Smith |
| State Bar No. 17148400 | State Bar No. 18553570 |
| LAW OFFICE OF RENE | Law Offices of Craig S. Smith |
| RODRIGUEZ | 14493 S.P.I.D. Suite A; P.M.B. 240 |
| 433 S. Tancahua Street | Corpus Christi, Texas 78418 |
| Corpus Christi, Texas 78401 | (361) 728-8037 |
| (361) 882-1919 / (361) 882-2042 fax | Email:  csslaw@stx.rr.com |

Email:  rene.rodriguez@rdrlaw.com

Appellate Counsel:
Angelica E. Hernandez
State Bar No. 24027279
AEH Law Firm
410 Peoples Street
Corpus Christi, Texas 78401
(361) 726-0054 / (866) 759-9272 fax
Email:  aehlawfirm@yahoo.com

**TABLE OF CONTENTS**

IDENTITY OF PARTIES AND COUNSEL ..................................................2

INDEX OF AUTHORITIES ....................................................................6

STATEMENT OF THE CASE ................................................................11

ISSUES PRESENTED ...........................................................................12

STATEMENT OF FACTS .....................................................................16

A.  Introduction..........................................................................16

B.  Chamber Treasurer Raises Questions about Carter............17

C.  Carter Takes Tape; Bentley Denied Access. .......................23

D.  Issues presented to Chamber Board of Directors................24

E.  Chamber Leaders and Members Publicly Petition for
    Special Meeting.....................................................................28

F.  Lawsuits Filed; Carter Placed on Paid Leave.......................28

G.  Chamber Adjustments to 2007 Financials ...........................29

H.  Carter Resigns from the Chamber .......................................29

I.  Chamber Obtains Audit of 2007 Financials...........................30

J.  *Caller-Times* Articles Report on the Chamber Events as
    They Unfold ..........................................................................30

STANDARDS OF REVIEW ..................................................................35

A.  Elements of Libel .................................................................35

B.  Traditional Summary Judgment Standard............................36

C.  No-Evidence Summary Judgment Standard .........................37

D.  Standard of Review in Media Libel Cases............................37

SUMMARY OF ARGUMENT ...............................................................38

ARGUMENT.......................................................................................39

A.  The Articles Are Not Defamatory of Carter.........................39

B.  The Articles Are True or Substantially True .......................45

C.  The Articles Are Non-Actionable Opinion...........................56

D. The March 19, 20 and May 29, 31 Articles Are Privileged Fair Reports of Judicial Proceedings Under Common Law and Texas Statute....................................................58

E. Article-by-Article Analysis Shows the *Caller-Times* Appellants Are Entitled to Summary Judgment. ................59

F. The Articles Were Published Without Negligence .............83

G. Carter Cannot Recover Exemplary Damages Because the Articles Were Published Without Actual Malice ................85

H. Tag-Along Tort Claims Also Fail ...........................................90

I. Appellant E.W. Scripps Has No Publisher Liability ...........91

PRAYER........................................................................................................91

CERTIFICATE OF SERVICE ........................................................................93

CERTIFICATE OF COMPLIANCE ...............................................................94

APPENDIX...................................................................................................95

# INDEX OF AUTHORITIES

## Cases

*Ackly v. Bartlesville Examiner-Enter.*,
   No. 06-CV-529-TCK-PJC, 2007 U.S. Dist. LEXIS 87897 (N.D.
   Okla. Nov. 29, 2007) ................................................................................51

*AMS Constr. Co. v. Warm Springs Rehab. Found.*,
   94 S.W.3d 152 (Tex. App.—Corpus Christi 2002, no pet.) ...................54, 55

*Assoc. Press v. Cook*,
   17 S.W.3d 447 (Tex. App—Houston [1st Dist.] 2004, no pet.) .............56, 58

*Belo Corp. v. Publicaciones Paso del Norte, S.A. de C.V.*,
   243 S.W.3d 152 (Tex. App.—El Paso 2007, pet. denied)............................38

*Bentley v. Bunton*,
   94 S.W.3d 561 (Tex. 2002)..............................................................53, 57, 58

*Bich Ngoc Nguyen v. Allstate Ins. Co.*,
   404 S.W.3d 770 (Tex. App.—Dallas 2013, pet. denied).............................56

*Burbage v. Burbage*,
   447 S.W.3d 249 (Tex. 2014)....................................................................37, 86

*Church of Scientology Int'l v. Time Warner, Inc.*,
   903 F. Supp. 637 (S.D.N.Y. 1995), *aff'd*, 238 F.3d 168 (2d Cir.
   2001) .......................................................................................................87

*City of San Antonio v. Pollock*,
   284 S.W.3d 809 (Tex. 2009).....................................................................55

*Coastal Transp. Co. v. Crown Cent. Pet. Corp.*,
   136 S.W.3d 227 (Tex. 2004).....................................................................55

*Coronado v. Freedom Commc'ns, Inc.*,
No. 13-13-00525-CV, 2015 Tex. App. LEXIS 10128 (Tex. App.—Corpus Christi, Sept. 30, 2015, no pet.) (mem. op.)........................58

*Danevang Farmers Coop. Soc'y v. Indeco Prods., Inc.*,
No. 13–04–445–CV, 2006 WL 2885058 (Tex. App.—Corpus Christi Oct. 12, 2006, no pet.) (mem. op.) ......................................................55

*Dolcefino v. Randolph*,
19 S.W.3d 906 (Tex. App.—Hou. [14th Dist.] 2000, pet. denied) ................................................................................38, 49, 89

*Farias v. Garza*,
426 S.W.3d 808 (Tex. App.—San Antonio 2014, pet. filed)........................61

*Foster v. Laredo Newspapers, Inc.*,
541 S.W.2d 809 (Tex. 1976)..........................................................84, 85, 86

*Freedom Commc'ns Corp. v. Salinas*,
No. 13-13-00702-CV, 2015 Tex. App. Lexis 10129 (Tex. App.—Corpus Christ, Sept. 30, 2015, no pet.) ............................................42

*Freedom Newspapers v. Cantu*,
168 S.W.3d 847 (Tex. 2005)....................................................................89, 91

*Global Relief Found. v. New York Times Co.*,
390 F.3d 973 (7th Cir. 2004)..............................................................51, 52, 57

*Hancock v. Variyam*,
400 S.W.3d 59 (Tex. 2013).................................................................40, 41, 45

*Hearst Corp. v. Skeen*,
159 S.W.3d 633 (Tex. 2005)..........................................................................53, 90

*Hearst Newspaper P'ship, LP v. Macias*,
283 S.W.3d 8 (Tex. App.—San Antonio 2009, no pet.) ...............................48

*Henry v. Nat'l Ass'n of Air Traffic Specialists, Inc.*,
   836 F. Supp. 1204 (D. Md. 1993), *aff'd*, 34 F.3d 1066 (4th Cir.
   1994) ........................................................................................................87

*Holly v. Cannady*,
   669 S.W.2d 381 (Tex. App.—Dallas 1984, no pet.) ....................................85

*Hotze v. Miller*,
   361 S.W.3d 707 (Tex. App.—Tyler 2012, pet. denied) ..........................38, 39

*Huckabee v. Time Warner Entm't Co. L.P.*,
   19 S.W.3d 413 (Tex. 2000).................................................................*passim*

*KTRK Television, Inc. v. Robinson*,
   409 S.W.3d 682 (Tex. App.—Houston [1st Dist.] 2013, pet.
   denied) ................................................................................................43, 45

*Laidlaw Waste Systems (Dallas) v. City of Wilmer*,
   904 S.W.2d 656 (Tex. 1995)...................................................................55

*Liberty Lobby, Inc. v. Dow Jones & Co.*,
   838 F.2d 1287 (D.C. Cir. 1988)..............................................................88

*In re Lipsky*,
   460 S.W.3d 579 (Tex. 2015)...............................................................45, 53

*Lohrenz v. Donnelly*,
   350 F.3d 1272 (D.C. Cir. 2003)...............................................................90

*Main v. Royall*,
   348 S.W.3d 381 (Tex. App.—Dallas 2011, no pet.) ....................38, 39, 41, 46

*McIlvain v. Jacobs*,
   794 S.W.2d 14 (Tex. 1990)...............................................................46, 49

*Means v. ABCABCO, Inc.*,
   315 S.W.3d 209 (Tex. App.—Austin 2010, no pet.) ....................................61

*Milkovich v. Lorain Journal Co.,*
  497 U.S. 1 (1990)..................................................................................57, 58

*Musser v. Smith Protective Serv., Inc.,*
  723 S.W.2d 653 (Tex. 1987)..............................................................41

*Neely v. Wilson,*
  418 S.W.3d 52 (Tex. 2013)........................................................*passim*

*New Times, Inc. v. Isaacks,*
  146 S.W.3d 144 (Tex. 2004)....................................................40, 41, 45

*NW Commc'n of Tex., Inc. v. Power,*
  No. 05-99-01641-CV, 2000 WL 1036327 (Tex. App.—Dallas
  July 28, 2000, pet. denied) ..........................................................44, 47

*Randall's Food Mkts., Inc. v. Johnson,*
  891 S.W.2d 640 (Tex. 1995)..............................................................37

*Rogers v. The Dallas Morning News, Inc.,*
  889 S.W.2d 467 (Tex. App.—Dallas 1994, writ denied)............................91

*Ryland Group, Inc. v. Hood,*
  924 S.W.2d 120 (Tex. 1996)....................................................46, 54, 55

*Scripps Tex. Newspaper, LP v. Carter,*
  No. 13-09-00655-CV, 2012 WL 5948955 (Tex. App.—Corpus
  Christi Nov. 21, 2012, pet. denied) (mem. op.)..........................................37

*Scripps Tex. Newspapers, L.P. v. Belalcazar,*
  99 S.W.3d 829 (Tex. App.—Corpus Christi 2003, pet. denied) ................85

*Shipp v. Malouf,*
  439 S.W.3d 432 (Tex. App.—Dallas June 24, 2014, no pet.) ......................45

*Shunta v. Westergren,*
  No. 01-08-00715-CV, 2010 WL 2307083 (Tex. App.—Houston
  [1st Dist.] June 10, 2010, no pet.)..........................................................91

*Stewart v. Sanmina Texas L.P.*,
   156 S.W.3d 198 (Tex. App.—Dallas 2005, no pet.) ......................................55

*Stone v. Midland Multifamily Equity REIT*,
   334 S.W.3d 371 (Tex. App.—Dallas 2011, no pet.) ......................................55

*Tex. Monthly, Inc. v. Transamerican Nat. Gas Corp.*,
   7 S.W.3d 801 (Tex. App.—Houston [1st Dist.] 1999, no pet.) ....................37

*Vice v. Kasprzak*,
   318 S.W.3d 1 (Tex. App.—Houston [1st Dist.] 2009, pet.
   denied) ..........................................................................................................44

*Wal-Mart Stores, Inc.*, 313 S.W.3d 837 (Tex. 2010) (*per curiam*)........................44

**Statutes**

Tex. Civ. Prac. & Rem. Code §§ 73.002(a)........................................................59

Tex. Civ. Prac. & Rem. Code § 73.002(b)(1)(A) ................................................79

Tex. Civ. Prac. & Rem. Code § 73.002(b)(1)(D) ..........................................78, 81

**Other Authorities**

Restatement (Second) of Torts § 611 (1977).......................................................59

Tex. R. Civ. P. 166a(c) ......................................................................................37

Tex. Const. art. I, § 8.........................................................................................75

Tex. R. App. P. 9.4(i)(2)(B)................................................................................95

U.S. Const. amend. I .............................................................................57, 75, 90

## STATEMENT OF THE CASE

**Nature of the Case**

Appellee Terry Carter, former president and CEO of the Corpus Christi Chamber of Commerce, filed suit against Appellants Scripps NP Operating, LLC, a Wisconsin Limited Liability Company, successor in interest to Scripps Texas Newspapers, LP d/b/a *Corpus Christi Caller-Times*, and the E.W. Scripps Company alleging libel and related non-libel claims based on 25 articles published in the newspaper in 2008.[1]

**Trial Court Disposition**

Appellants filed their second motion for final summary judgment[2] on all claims against them and Carter responded.[3] The trial court denied the summary judgment motion.[4] Appellants timely perfected this interlocutory appeal pursuant to Tex. Civ. Prac. & Rem. Code § 51.014(a)(6).[5]

---

[1] CR801-16.

[2] CR41–1225.

[3] 2CR1228–6CR12703.

[4] 6CR12748.

[5] 6CR12743–747.

11

## ISSUES PRESENTED

Did the trial court err in denying Appellants' second motion for final summary judgment?

1. Did the trial court err because the Articles were not defamatory of Carter?

2. Did the trial court err because there is no evidence that the Articles were defamatory of Carter?

3. Did the trial court err because the Articles were substantially true?

4. Did the trial court err because there was no evidence that the Articles were not substantially true?

5. Did the trial court err because the Articles are non-actionable opinion?

6. Did the trial court err because there was no evidence that the Articles were not opinion?

7. Did the trial court err because certain Articles were privileged fair reports of judicial proceedings?

8. Did the trial court err because there was no evidence that certain Articles were not privileged fair reports of judicial proceedings?

9. Did the trial court err because the Articles were published without negligence?

10. Did the trial court err because there was no evidence that the Articles were published with negligence?

11. Did the trial court err in denying summary judgment on Carter's exemplary damage claim because the Articles were published without actual malice?

12. Did the trial court err in denying summary judgment on Carter's exemplary damage claim because there was no evidence that the Articles were published with actual malice?

13. Did the trial court err in denying summary judgment on Carter's non-libel claims?

14. Did the trial court err in denying summary judgment because there was no evidence to support Carter's non-libel claims?

15. Did the trial court err in denying summary judgment to Appellant E.W. Scripps Company because it did not publish the Articles?

16. Did the trial court err in denying summary judgment to Appellant E.W. Scripps Company because there was no evidence that it published the Articles?

**REFERENCES TO THE RECORD**

**CR301**        Volume 1, Clerk's Record (filed October 28, 2015), page 301

**2CR1268**        Volume 2, Clerk's Record (filed October 28, 2015), page 1268 (Volume number included only in citations to volumes 2-6).

**STATEMENT REGARDING ORAL ARGUMENT**

Appellants request oral argument because it will assist the Court in a case which implicates freedom of speech and press. Although Appellants believe the legal principles entitling them to summary judgment are well-settled and readily applied here, oral argument is appropriate as this libel suit impacts the role of the news media in reporting on leadership controversies at institutions vital to the economic well-being of the community.

## STATEMENT OF FACTS

### A.    Introduction

In early 2008, the treasurer and two executive committee members of the Corpus Christi Chamber of Commerce raised concerns over the financial stewardship and management of the organization by Terry Carter, president and CEO.[6]

The questions arose in the course of the executive committee considering an annual raise and bonus for Carter.  Because the controversy about Carter and the Chamber was newsworthy and a matter of public concern, the *Caller-Times* covered it in 24 news articles and an editorial (collectively, the "Articles"), published February 15, 2008 through June 13, 2008.[7]  The Articles are the basis of Carter's libel suit against the *Caller-Times* Appellants.[8]

---

[6]  CR299–308.

[7]  *See* CR461-62, CR523, CR535-37, CR566-67 (copies of the Articles attached to the reporters' affidavits).  The Articles are also found at Appendix Tab 1.

[8]  In his petition and discovery responses, Carter identified certain statements from the Articles as allegedly containing defamatory, false statements about him. CR669-96; CR807-09. Appellants moved for summary judgment on all such Articles and statements.

### B.    Chamber Treasurer Raises Questions about Carter

#### 1.    Chamber leadership conducts Carter's annual review.

In January 2008, the Chamber asked its executive committee to conduct Carter's 2007 annual performance review.[9]   That month, Carter presented financials to the Chamber showing a profitable year in 2007. [10]

Chamber chairman Freddie Martinez[11] requested treasurer Damon Bentley, a local business owner, to review the 2007 financials in connection with Carter's request for a raise, performance bonus, and contract extension.[12]

That review led Bentley and executive committee members Judy Hawley and Sylvia Whitmore[13] to demand an emergency executive committee meeting to address issues related to the 2007 financials.[14]

---

[9]  Mtg. minutes, CR116; Hawley Deposition (hereafter "Dep."), CR1006–07.

[10]  Martinez Dep., CR1047–48.

[11]  Martinez, a local business owner, had served on the Chamber board since 2005 and as chairman since March 2007.  Martinez Dep., CR1037–38.

[12]  Martinez Dep., CR1043, 1048–49; Bentley letter to Chamber board, CR301; Bentley Dep., CR842–44; Trevino Dep., CR1125.  Bentley's letter to Chamber board is also found at Appendix Tab 2.

[13]  Hawley is a former state representative, port commissioner, Chamber board member, and Chamber executive committee member. Hawley Dep., CR1004–06. Whitmore is a former chair of the Chamber. Whitmore Dep., CR1192–93.

[14]  Martinez Dep., CR1040, 1049–50, 1057.

## 2. Financials linked to Carter's performance review are questioned.

On February 15, Bentley and others addressed serious financial and management concerns about Carter to the executive committee.[15] The meeting was audio-recorded.[16]

Bentley stated that Carter's performance measures were "directly linked to the performance of the [2007] financials" but that a salary deferral by Carter in 2007 altered the Chamber financials by "minus $19,992."[17] Bentley also revealed that Carter had asked a senior staff member "to forego his pay in October because we were under a financial strain."[18] Bentley summarized that the "big picture is we were presented" financial statements reflecting $40,000 in net income for 2007 but which was really "zero or a minus, and maybe even a really big minus."[19]

Bentley said he was concerned that Chamber expenses were charged to the Chamber's foundation, that money from the building fund was

---

[15] Tape, CR324; Bentley Dep., CR 850-51, 854-55; Martinez Dep., CR1041, 1054.

[16] Tape, CR324-25; transcript of tape, CR705-94; Martinez Dep., CR1041, 1052; Trevino Dep., CR1127-29.

[17] Transcript, CR717-19; Trevino Dep., CR1121-22.

[18] Transcript, CR 721-23; Trevino Dep., CR1124.

[19] Transcript, CR721-23, 732-33, 744-46.

shifted to the foundation, and that the Chamber accrued 2008 membership dues in year 2007.[20]   Bentley discussed that special events were accounted for "off the books" and reported to the board only on a net basis.[21]   Bentley stated that checks were not signed by the treasurer as required by the Chamber's bylaws.[22]

Carter's responsibility for the Chamber's financial performance and the link to his bonus had been provisions of his employment since he was hired in 2004.[23]   His employment contract vested him with responsibility for the Chamber's finances and called for a "performance" bonus "based on the attainment of financial goals for the Chamber."[24]   Although Carter's contract was later amended as to his bonus,[25] his annual reviews consistently reflected a link between the financial performance of the Chamber and his compensation.[26]   Whitmore, Hawley, Martinez, and

---

[20]  Transcript, CR724-33; Trevino Dep., CR1123-24.

[21]  Transcript, CR734-36.  *See also* Bentley's PowerPoint, CR168, 171; Carter Dep., CR901; FY2007 audit report, CR252; Martinez Dep., CR1039; Hawley Dep., CR1011-12, 1017. Bentley's PowerPoint is also found at Appendix Tab 3.

[22]  Transcript, CR738; Chamber bylaws, CR292.

[23]  Carter's contract, CR122; Carter Dep., CR879.

[24]  CR125, 130; *see also* CR133-36; Carter Dep., CR909.

[25]  CR134, 136.

[26] Carter's performance reviews, CR137-45.

Bentley understood that Carter's bonus was based on the Chamber's financial performance,[27] and Carter acknowledged the connection.[28]

Bentley attributed the 2007 financial issues to Carter, stating, "I've lost trust in him, and I don't think he should be the CEO of the Chamber of Commerce."[29] Whitmore, Hawley and Martinez also recognized the matter as an issue of trust between Carter and the Chamber leadership.[30]

Bentley recommended an audit for 2007 and other executive committee members agreed.[31] Chair-elect Gonzalez summarized: "I think all of us in this room agree that we have to have the financials correct, and they have to be reviewed."[32]

Toward the end of the meeting, Darrell Thompson, the Chamber's outside CPA, was asked whether the concerns endangered the Chamber

---

[27] Whitmore Dep., CR1194, 1204-05; Hawley Dep., CR1010; Martinez Dep., CR1044, 1048; Bentley Dep., CR847, 851; transcript, CR717-19; mtg. minutes, CR116.

[28] Carter Dep., CR951-53; Carter and Waller emails, CR152; Carter and Martinez emails, CR268.

[29] Transcript, CR743-47, 749-51.

[30] *Id.*; *see also* Whitmore letter, CR314; Whitmore Dep., CR1200; Hawley Dep., CR1009. Whitmore's letter is also found at Appendix Tab 6.

[31] Transcript, CR747, 749, 758; Carter Dep., CR893; Bentley Dep., CR862-63; Whitmore Dep., CR1194-96, 1202; Hawley Dep., CR1011.

[32] Transcript, CR747.

foundation's 501(c)(3) nonprofit status.[33]   Thompson explained the main concern would be "individual inurement" where an individual "benefit[s] personally from a donation" made to a nonprofit organization.[34]   Applied to the Chamber, Thompson said:  "Now, if I say, Terry, if you'll keep us on budget, I'll give you a share of whatever the bottom line is.  If your bonuses are going to be based on how well you do, which it is for us, okay, you may have a problem."[35]

**3.    Carter takes part in effort to remove Hawley and Whitmore.**

Before the February 15 meeting began, Carter took part in an effort to remove Hawley and Whitmore from the executive committee.   Carter asked Bentley to wait outside the meeting in a hallway.[36]   Carter and Martinez then met with Hawley and Whitmore to inform them that they were no longer eligible to serve on the executive committee, and thus,

---

[33]  Transcript, CR791-92.

[34]  Transcript, CR792.

[35]  Transcript, CR792-93; *see also* Thompson Dep., CR1141, 1147, 1152-53.

[36]  Carter Dep., CR891-92; Bentley Dep., CR861.

could not take part in its recommendation to the board regarding Carter's contract and compensation.[37]

Despite this, Whitmore and Hawley decided to stay and assist Bentley with his report.[38]

### 4.    Carter participates in contentious meeting.

Carter's participation in the meeting was contentious.[39]  As Chamber employee Lucy Reta would tell *Caller-Times*' reporter Elvia Aguilar, she heard Carter and another man shouting from the meeting room.[40]

Whitmore testified that Carter got loud and was yelling at Bentley.[41] Chairman Martinez stated "voices were raised and volume levels increased."[42]  Whitmore testified that Carter stood over her, pointed his finger at her, and spoke loudly to her.[43]  Bentley testified that Carter "blew

---

[37] Carter Dep., CR880-81, 891, 902, 913-14; Martinez Dep., CR1040-41; transcript, CR752; Whitmore Dep., CR1197, 1206; Hawley Dep., CR1007-08.

[38] Transcript, CR709-17; Hawley Dep., CR1008.

[39] Transcript, CR711-13, 751; Hawley Dep., CR1009; Trevino Dep., CR1129.

[40] Reta Dep., CR1096-97, 1099-1100.

[41] Whitmore Dep., CR1197-98, 1203-04, 1209.

[42] Martinez Dep., CR1041.

[43] Whitmore Dep., CR1209.

22

up on him" and had an aggressive attitude and body language.[44] Carter was eventually asked to leave so that Bentley, Hawley, and Whitmore could present their concerns to Martinez and Gonzalez.[45]

### C. Carter Takes Tape; Bentley Denied Access.

Carter admits he took a tape recording of the meeting from the building.[46] Bentley made several attempts to obtain the tape without success.[47] Indeed, the tape was not produced until ordered released by the trial court after Bentley filed a lawsuit.[48] Bentley was also told by Chamber staff that he must go through Carter to request financial information. [49]

---

[44] Bentley Dep., CR849-50. Carter, a former U.S. Army colonel (CR703), called Bentley "lieutenant commander," indicating he outranked Bentley in military hierarchy. *See* Lieutenant Commander, Wikipedia, https://en.wikipedia.org/wiki/Lieutenant_commander (last visited July 6, 2015). Carter was known for an "aggressive" leadership style. Martinez Dep., CR1047.

[45] Transcript, CR714-15; Martinez Dep., CR1041.

[46] Carter Dep., CR896; *see also* Bentley Dep., CR850; Martinez Dep., CR1042, 1045; Whitmore Dep., CR1198, 1204; Bentley letter to board, CR301.

[47] *Id.*; *see also* Carter Dep., CR897-98; Bentley letter to board, CR301-02, 314, 316-20; Martinez Dep., CR1052-53.

[48] CR360-61.

[49] Bentley Dep., CR861-62; *see also* Waller Dep., CR1172.

23

## D.    Issues presented to Chamber Board of Directors.

Two days after the executive committee meeting, Carter sent a letter to the Chamber board giving his account of the issues.[50]

On February 20, the Chamber board met to consider the matter.[51] Carter himself described it as an "issue raised regarding <u>misappropriation</u> of funds."[52]  Carter advised the board that Chamber CPA Thompson no longer wanted the engagement "due to high risk."[53] A board member questioned Carter if a complete audit had been performed for the past year and he acknowledged it had not—only a review.[54]

Bentley addressed the board on "irregularities in financials he found in the month of December" and stated that the "issue was regarding the performance of the CEO."[55]  He made a PowerPoint presentation regarding his concerns and findings.[56]  Among other things, Bentley explained that

---

[50] CR240-43.  Carter's letter to the Chamber board is also found at Appendix Tab 5.  *See also* Bentley Dep., CR859; Carter Dep., CR882; Trevino Dep., CR1131.

[51] Mtg. minutes, CR117-20.

[52] CR119 (emphasis added).

[53] *Id.*

[54] *Id.*; *see also* Thompson Dep., CR1138, 1141, 1147.

[55] *Id.*; *see also* Martinez Dep., CR1042.

[56] CR156-72.  Bentley's PowerPoint to Chamber board is also found at Appendix Tab 4. Mtg. minutes, CR119; Bentley Dep., CR858-59.

the building fund had been used without board approval, which was potentially a "serious problem" for 501(c)(3) status according to CPA Thompson.[57] Bentley's presentation also included a "summary of 2007 adjustments in which the 'original NOI [net operating income]' of positive $40,425 compared to 'adjusted NOI' of negative $61,782 produced a '$102,207 swing.'"[58]

Martinez presented the executive committee's recommendation to "postpone review of CEO until annual audit of finance is complete to include 2006-07."[59] The board then voted to conduct the audit.[60]

Bentley believed Carter's February 17 letter to the board[61] had "misrepresented both the intent and the facts presented in the treasurer's report" at the board meeting and he responded with his own letter to the board on February 26, 2008.[62] In his letter, Bentley described discovering a

---

[57] Bentley's PowerPoint, CR162-64; Thompson Dep., CR1155-56; Carter Dep., CR883-84.

[58] *Id.*; *see also* Bentley letter to board, CR304-07; Bentley Dep., CR862.

[59] Mtg. minutes, CR119.

[60] *Id.*; Trevino Dep., CR1130.

[61] Carter letter to board, CR240-43.

[62] CR299-08; Bentley Dep., CR859.

"crucial problem with the use of building fund dollars to supplement the Chamber's operating expense account."[63] Bentley wrote:

> It is undeniable the financials for 2007 as presented to the executive committee and board are inaccurate, inconsistent with the process used in previous years and a misrepresentation of the Chamber's bottom line.[64]

Bentley stated that he "suspected irregularities in booking expenses and revenues" had "created the 'Net Operating Income' for 2007" and that "these irregularities had the effect of justifying a performance bonus under [Carter's] contract."[65]

Bentley then identified three main areas of concern in the Chamber's 2007 financials:

- Carter deferred his pay for November and December 2007 without booking it as an expense, resulting in $19,992.00 gain for 2007.[66]

- Carter used building fund dollars to pay for certain Chamber expenses, resulting in $18,312.00 gain for 2007. The "CEO should have never shifted the building fund

---

[63] CR301; Bentley Dep., CR845.

[64] CR302-03.

[65] CR303.

[66] CR303-04; *see also* email from Waller to Carter, CR154-55; Waller Dep., CR1168-69, 1172.

26

from the Chamber books to the foundation books for the use of supplementing the Chamber's financials."[67]

- The Chamber accrued January 2008 membership renewals in 2007, resulting in $63,903.00 gain for 2007.[68]

On February 28, former Chamber chair Sylvia Whitmore sent a letter to the board stating that Bentley's "concerns are very credible, and appeared to be mostly ignored."[69] She also stated that Carter's letter to the board "gloss[ed] over financial irregularities and the declining membership numbers."[70] Whitmore also expressed concerns with the "interpretation that I am not officially a member of the executive committee," "denying the treasurer access to critical information and advise (sic) of financial professionals," and "refusal of Chamber staff to cooperate . . . and refusal of Chamber CEO to release the tape of the Executive Committee meeting[.]"[71]

---

[67] CR304; *see also* FY2007 adjustments, CR179-83; FY2007 audit report, CR244-66; Whitmore Dep., CR1195; Carter Dep., CR895, 899; Thompson Dep., CR1145.

[68] CR303-05.

[69] CR314. Whitmore's letter also appears at Appendix Tab 7.

[70] *Id.*

[71] *Id.*; Whitmore Dep., CR1202, 1205.

### E. Chamber Leaders and Members Publicly Petition for Special Meeting

Carol Scott and other Chamber members eventually petitioned the Chamber for a special meeting to provide more information to its members.[72] For example, Scott experienced difficulty obtaining accurate membership lists to assess the declining membership and the number of signatures needed for the petition.[73]

On March 3, 2008, a news conference was attended by 11 former chairs of the Chamber and 60 Chamber members to obtain signatures and support for the petition asking the Chamber to address financial and other concerns.[74]

### F. Lawsuits Filed; Carter Placed on Paid Leave

On March 18, Bentley filed a petition in the 214th District Court and was granted a temporary restraining order preventing Carter and the Chamber from destroying the tape recording of the February 15 meeting.[75]

---

[72] Aguilar Aff., CR458; Scott Dep., CR1112. Aguilar's Affidavit is also found at Appendix Tab 5.

[73] Scott Dep., CR1107-09; Whitmore Dep., CR1199; Hawley Dep., CR1016, 1018. From Dec. 31, 2006 to Mar. 31, 2008, the Chamber lost 257 members. *Compare* CR215-39 *with* CR184-214.

[74] Aguilar Aff., CR457-58; CR 472-75, 515-17; Scott Dep., CR1112, 1114-15.

[75] CR337-40.

The next day, Carter filed this lawsuit seeking damages against the Chamber, Bentley, Hawley, Whitmore, the *Caller-Times* and others.[76]

On March 26, at a special meeting of the Chamber board, Carter was placed on administrative leave with pay.[77]

### G. Chamber Adjustments to 2007 Financials

On March 25, 2008, the Chamber adjusted its 2007 financials from those presented in January.[78] The adjustment changed the positive $40,425.48 net operating income reported in January 2008 to a negative $95,377.76 NOI, reflecting a total decrease in 2007 NOI of $135,803.24.[79] Adjustments were made for special events, accrual of Carter's salary from 2007 and shifting back money removed from the building fund.[80]

### H. Carter Resigns from the Chamber

After reaching a severance agreement with the Chamber, Carter resigned effective April 30, 2008.[81]

---

[76] CR341-53.

[77] Aguilar Aff., CR457; CR481; Chamber's interrog. resp., CR799.

[78] FY2007 adjustments, CR179-83; Thompson Dep., CR 1139, 1149-50.

[79] *Id.*

[80] *Id.*; *see also* CR180-83; Waller Dep., CR1171, 1173-74.

[81] Martinez Dep., CR1046, 1053-54, 1061; Carter's resignation CR641-45; Carter Dep., CR885-86, 969.

### I.     Chamber Obtains Audit of 2007 Financials

On August 27, 2008, the Chamber retained an independent CPA to audit the financial statements for the year ended December 31, 2007.[82]

On November 12, 2008, the CPA issued his report, which included the following findings:

- "The misstatements detected as a result of audit procedures and corrected by management were material, either individually or in the aggregate, to the financial statements as a whole."[83]

- Various expenditures of the building fund totaling $95,982.00 were "a breach of the intended purpose of the funds."[84]

- Various weaknesses on internal control over financial reporting, including a "very high possibility of management override."[85]

### J.     *Caller-Times* Articles Report on the Chamber Events as They Unfold

#### 1.     Community leader tips newspaper

On the morning of February 15, 2008, *Caller-Times* reporter Jaime Powell received a news tip about the Chamber from Ruben Bonilla,

---

[82] CR258.

[83] CR260-65.

[84] CR265.

[85] CR264.

chairman of the Port of Corpus Christi.[86]  Bonilla was a well-known and highly respected local attorney and community leader who had been a reliable source of information during the years for Powell.[87]  Veteran business editor Tom Whitehurst assigned business reporter Elvia Aguilar to assist Powell with investigating the matter.[88]

## 2. Newsworthy developments reported

Whitehurst and other editors and reporters pursued the story because it was "newsworthy in that it pertained to one of our community's most important local organizations, the Chamber of Commerce, and its CEO and president, Carter."[89]  "The fact that high-ranking Chamber officials were raising questions regarding the CEO and president of the Chamber made the matter newsworthy."[90]  The news was "published in

---

[86] Whitehurst Aff., CR617-18; Powell Aff., CR585; Powell Dep., CR1088.

[87] Powell Aff., CR 585.

[88] Whitehurst Aff., CR 617-18; Averyt Aff., CR621-22; Aguilar Dep., CR820.

[89] *Id.*; *see also* Powell Aff., CR587; Aguilar Aff., CR459.  Publisher Birmingham was not involved in deciding news coverage about the controversy.  Birmingham Dep., CR873-74; Averyt Dep., CR836.

[90] Whitehurst Aff., CR618-19.

good faith for the purpose of providing information to the public on a matter of public interest and concern."[91]

The Articles informed viewers of the controversy involving Carter that erupted among leadership of the Chamber.[92] The *Caller-Times* reported allegations by Bentley and others; the newspaper itself did not originate any allegations about Carter.[93]

### 3. Articles balanced with Carter's explanations

The Articles included numerous items favorable to Carter. For example, in the first Article published February 15 the newspaper described the "financial questions" involving Carter "as business practice-related, not improprieties."

The Articles also provided readers with Carter's version of events in context. For example, the February 27 Article informed readers in detail about Carter's February 17 letter to the Chamber board that disputed Bentley's assertions and provided his own explanation, including that:

---

[91] Carter concedes the Articles "involved a public matter." CR415; CR805; *see also* Trevino Dep., CR1123; Whitehurst Aff., CR 618-19; Averyt Aff., CR622.

[92] *See* Aguilar Aff., CR454-60; Averyt Aff., CR 620-23; Birmingham Aff., CR624-28; Cavazos Aff., CR518-22; Chirinos Aff., CR 530-34; Contreras Aff., CR636-40; Jimenez Aff., CR 562-65; Malan Aff., CR 608-11; Powell Aff., CR 584-88; Reta Aff., CR451-53; Whitehurst Aff., CR 616-19; Wilson Aff., CR 612-15.

[93] *Id.*

32

- "Carter, in a Feb. 17 letter to board members, said he deferred part of his salary in 2006 and 2007 for tax purposes."

- Carter said in his "letter that the failure to record his salary deferral as a 2007 expense was a bookkeeping error."

- Carter's "letter says including the January 2008 revenue was consistent with the chamber's accounting method approved by the board in September 2004."

- Carter's letter "says he discussed the move with Thompson and Bentley before shifting the funds" between the Chamber and the foundation.

- "The foundation has operated with overhead provided by the chamber and chamber had never been reimbursed for these expenses, according to Carter's letter."[94]

The March 20 Article likewise presented Carter's position at length in reporting on the filing of this lawsuit by him, including that:

- Carter "was seeking damages against Bentley, the chamber, the *Caller-Times* and others."

- Carter accused the *Caller-Times* Appellants of "false and defamatory" statements "without regard to the truth."

- Carter "disputes Bentley's assertions that Carter deferred a portion of his salary and transferred funds among accounts in manner that showed a surplus when according to Bentley the chamber should have shown a deficit."

---

[94] CR241-43.

- "Carter also disputes Bentley's statements that Carter's bonus was linked to the chamber's financial performance."

- Carter disputed that his "shifting of funds among chamber accounts jeopardized the chamber foundation's non-profit status."

- Carter "offers justification for the Chamber accounting method questioned by Bentley."

- Carter's position was that "his bonus would not have been related to any Chamber condition or status."[95]

At all times during the editing process, Whitehurst directed the reporters to attempt to reach Carter and other Chamber officials for comment.[96] Carter, his attorney, or his lawsuit were quoted or cited 21 times in the Articles.[97] Carter declined to comment or to return calls at least 10 times.[98] Aguilar alone attempted without success to contact Carter on eight separate occasions, and twice she spoke to his attorney, who declined to comment.[99] Moreover, *Caller-Times*' sources included high-ranking

---

[95] *Compare* March 20 Article, 2CR1519, *with* Carter's Orig. Pet. CR341-53.

[96] Whitehurst Aff., CR618.

[97] Aguilar Aff., CR457-58, 481-82, 488-90, 498-500; Cavazos Aff., CR520, 525, 527; Chirinos Aff., CR 532-33, 536-38, 541.

[98] Aguilar Aff., CR456; Chirinos Aff., CR532.

[99] Aguilar Aff., CR457; *see also* Carter Dep., CR909 (agreeing he never returned calls from reporters). The *Caller-Times*' investigated, reported, edited and published the Articles with diligence, balance and in accordance with common journalistic practice.

Chamber officials who were in a position to be knowledgeable about the matters at issue.[100]

The *Caller-Times* reviewed and relied on documentary evidence such as the letters and email by Carter, Bentley and Whitmore to the Chamber board.[101] Editorial writer Nick Jimenez reviewed seven Articles for the editorial.[102]

Carter never contacted the *Caller-Times* to point out that any statement in the Articles was incorrect. [103]

## STANDARDS OF REVIEW

### A. Elements of Libel

To maintain a libel cause of action against a media defendant, a plaintiff must prove that the defendant (1) published a statement; (2) that

---

*See* Pederson Report, CR665; Pederson Dep., CR1068, 1070-79; Aguilar Aff., CR454-60, 462-96, 498-517; Cavazos Aff., CR518-22, 524-27, 529; Chirinos Aff., CR 530-34, 536-43, 545-61; Jimenez Aff., CR562-65, 567, 569-81, 583; Malan Aff., CR608-11; Powell Aff., CR584-88, 590-95, 597-607; Wilson Aff., CR612-15; Whitehurst Aff., CR616-19; Birmingham Aff., CR624-28, 630, 632, 634-35; Contreras Aff., CR637-40; Averyt Aff., CR621-23.

[100] Whitehurst Aff., CR618; Aguilar Aff., CR459; Powell Aff., CR587.

[101] Whitehurst Aff., CR617-19; Aguilar Aff., CR458; Powell Aff., CR586.

[102] Jimenez Aff., CR562-64, 569-81.

[103] Whitehurst Aff., CR619; Aguilar Aff., CR459; Powell Aff., CR587; Chirinos Aff., CR533; Cavazos Aff., CR521; Malan Aff., CR610; Wilson Aff., CR614; Birmingham Aff., CR627; Averyt Aff., CR622; *see also* Carter Dep., CR971.

defamed the plaintiff; (3) while acting with negligence regarding the truth of the statement, if the plaintiff was a private individual.[104] A private-figure plaintiff must prove actual malice to recover punitive damages from a media defendant.[105]

## B. Traditional Summary Judgment Standard

A defendant is entitled to a traditional summary judgment upon establishing that no material fact issue exists and that it is entitled to judgment as a matter of law.[106] To meet this burden, a defendant must conclusively negate at least one essential element of the cause of action or establish each element of an affirmative defense.[107] The burden then shifts

---

[104] *Neely v. Wilson*, 418 S.W.3d 52, 61 (Tex. 2013) (*citing WFAA-TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998)). This Court previously affirmed denial of summary judgment to Appellants on the issue of Carter's status as a public figure. *See Scripps Tex. Newspaper, LP v. Carter*, No. 13-09-00655-CV, 2012 WL 5948955, at *5 (Tex. App.—Corpus Christi Nov. 21, 2012, pet. denied) (mem. op.). For this appeal, Appellants assume but do not concede that Carter is a private-figure not required to prove actual malice as an element of his *prima facie* case.

[105] *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014) (private figure plaintiff who does not prove actual malice may recover only damages for actual injury) (*citing Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974)).

[106] Tex. R. Civ. P. 166a(c).

[107] *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 644 (Tex. 1995); *Tex. Monthly, Inc. v. Transamerican Nat. Gas Corp.*, 7 S.W.3d 801, 805 (Tex. App.—Houston [1st Dist.] 1999, no pet.).

to the plaintiff to produce evidence creating a fact issue on an element or defense in order to defeat the summary judgment.[108]

### C.    No-Evidence Summary Judgment Standard

A no-evidence summary judgment is essentially a pretrial directed verdict.[109]  The moving party must specifically state the elements as to which there is no evidence.[110]  The burden then shifts to the non-movant to produce evidence raising a genuine issue of material fact regarding each element challenged.[111]

### D.    Standard of Review in Media Libel Cases

The denial of summary judgment to a media libel defendant is reviewed on interlocutory appeal under the same standards applicable to the granting of summary judgment.[112]  On appeal, the court conducts a *de*

---

[108]  *Hotze v. Miller,* 361 S.W.3d 707, 712 (Tex. App.—Tyler 2012, pet. denied); *Dolcefino v. Randolph*, 19 S.W.3d 906, 916 (Tex. App.—Hou. [14th Dist.] 2000, pet. denied) (non-movant bears shifted burden to raise material fact issue to defeat summary judgment).

[109]  *Hotze*, 361 S.W.3d at 712; *Belo Corp. v. Publicaciones Paso del Norte, S.A. de C.V.*, 243 S.W.3d 152, 157 (Tex. App.—El Paso 2007, pet. denied).

[110]  *Belo Corp.*, 243 S.W.3d at 158; Tex. R. Civ. P. 166a(i).

[111]  *Hotze*, 361 S.W.3d at 712; *Main v. Royall,* 348 S.W.3d 381, 389 (Tex. App.—Dallas 2011, no pet.).

[112]  *Hotze*, 361 S.W.3d at 712.

*novo* review of a trial court's decision to deny the motion for summary judgment by the media libel defendant.[113]

## SUMMARY OF ARGUMENT

On July 22, 2015, the *Caller-Times* filed their Second Motion for Final Summary Judgment (the "Motion").[114]   Appellants were entitled to final summary judgment on the grounds and defenses that the Articles are not defamatory, are true or substantially true, are non-actionable opinion, are statutorily privileged as fair reports of judicial proceedings and public meetings, and were published without negligence or actual malice.  There is no evidence that the Articles are defamatory of Carter or that the *Caller-Times* published any false statement of fact about Carter, and no evidence of negligence or actual malice. In addition, Appellant E.W. Scripps—a separate entity from the *Caller-Times*—did not publish the Articles or any allegedly defamatory statements concerning Carter and there is no evidence of such publication by that Appellant. Further, Carter's non-libel claims fail on one or more essential elements as they are based on the same

---

[113]  *Id.*; *Main*, 348 S.W.3d at 389.

[114]  CR41-96.

statements and actions underlying his libel claims, and there is no evidence in support of the non-libel claims.[115]

Carter filed a response to the Motion on August 28, 2015, which offered three reasons for denial: (1) the *Caller-Times* allegedly published the statements with actual malice; (2) Carter's affidavit details alleged false statements; and (3) an expert deposition for the plaintiff allegedly details damage to Carter's reputation.[116] Carter failed, however, to offer competent or legally sufficient evidence to raise any fact issue on the grounds and defenses in the Motion. His arguments fail as a matter of law.

## ARGUMENT

### A. The Articles Are Not Defamatory of Carter

#### 1. Standard for Determining Defamatory Meaning

An initial question for the court in a libel case is whether a statement is reasonably capable of a defamatory meaning from the perspective of an ordinary reader in light of the surrounding circumstances.[117] If the

---

[115] CR42-44 (setting out summary judgment grounds).

[116] 2CR1229. Because this case may be disposed of on grounds other than damages, that issue is not discussed herein.

[117] *Hancock v. Variyam*, 400 S.W.3d 59, 66 (Tex. 2013) (*citing Musser v. Smith Protective Serv., Inc.*, 723 S.W.2d 653, 655 (Tex. 1987)). *See also New Times, Inc. v. Isaacks*, 146 S.W.3d

statement is not reasonably capable of a defamatory meaning, the statement is not defamatory as a matter of law and the claim fails.[118] Likewise, the determination of whether a statement is defamatory *per se* is an initial inquiry for the court.[119]

Courts must give words their ordinary meaning as read by persons of ordinary intelligence.[120] The hypothetical ordinary reader is "no dullard."[121] The focus must be on the "words used" in the publication, not plaintiff's characterization of them.[122]

### 2. The Articles are not reasonably capable of the defamatory meaning claimed by Carter.

#### a. The Articles do not charge Carter with crime or fraud.

Statements are defamatory *per se* if they expressly charge the plaintiff with crime, dishonesty, or fraud.[123] The Articles do not state that Carter committed a crime or fraud, or that such conduct is suspected. There are

---

144, 154 (Tex. 2004) (*citing Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000); *Musser*, 723 S.W.2d at 655).

[118] *Hancock*, 400 S.W.3d at 66.

[119] *Id.*

[120] *See Musser*, 723 S.W.2d at 655.

[121] *New Times, Inc.*, 146 S.W.3d at 157 (internal citation omitted).

[122] *See Musser*, 723 S.W.2d at 655; *see also New Times, Inc.*, 146 S.W.3d at 154.

[123] *Main*, 348 S.W.3d at 390.

no references to police or prosecutors and no use of such words as "stolen," "theft," "misappropriation," "malfeasance," "fraud," "felony," "embezzlement," "corrupt," or the like.

> **b.      The Articles may not reasonably be read to imply or impute a crime by Carter.**

The first of the Articles—published February 15, 2008—states that the "financial questions" at issue are "business practice-related, <u>not improprieties</u>."[124]      Similarly, other Articles, particularly those from February 27 and March 20 as well as the editorial, extensively convey Carter's explanations.  Such balanced reporting dispels any implication of dishonest or criminal conduct and clarifies that the matter is a civil dispute over accounting practices and executive compensation, not a criminal matter.  Thus, an ordinary reader may not reasonably interpret the Articles to ascribe criminal acts to Carter.[125]

---

[124]  CR462 (emphasis added).

[125]  *See, e.g., Freedom Commc'ns Corp. v. Salinas*, No. 13-13-00702-CV, 2015 Tex. App. Lexis 10129 (Tex. App.—Corpus Christ, Sept. 30, 2015, no pet.) (news report not expressly stating plaintiff was arrested would not cause ordinary person to infer that plaintiff was involved in criminal wrongdoing).

41

A more direct accusation of financial malfeasance was recently held not to falsely impute criminal behavior.[126]   A Houston television station reported that a school's charter was revoked by the State because "millions of dollars in State funding … was not accounted for," that the State didn't know "how [the school] spent \$3 million of taxpayer money," and that the school "did not provide proper financial records."[127]   The operator of the school sued the station, contending the statements "insinuate that she embezzled over \$3 million and thereby falsely imputed criminal behavior to her."[128]   The First Court of Appeals rejected the argument:

> There is nothing intrinsically defamatory about KTRK's reports on the State's investigation into [the school's] mismanaged funds.  The reports did not say or imply that the entire \$3 million in state funds had been misappropriated or embezzled.  Rather, the statements speak to the insufficiency of financial records to account for spent state funds.[129]

---

[126]   *KTRK Television, Inc. v. Robinson*, 409 S.W.3d 682, 690-91 (Tex. App.—Houston [1st Dist.] 2013, pet. denied).

[127]   *Id.* at 690.

[128]   *Id.*

[129]   *Id.* at 691.

Likewise, there is nothing intrinsically defamatory in reporting concerns by Chamber leaders over financial management and accounting practices under Carter's watch.

Carter's own reading of the Articles—that they falsely "implied financial malfeasance" and "implied or insinuated that I committed violations of the Penal Code"—does not supply the requisite defamatory meaning.[130] A plaintiff's characterization that statements make accusations of criminal conduct is not reasonable when, as here, no such language appears in the publication.[131] Likewise, Carter's resort in his affidavit to comments posted on-line by third-party readers also fails to show the Articles are defamatory because the proper inquiry is objective, not

---

[130] Carter Aff., 6CR12165.

[131] *See Vice v. Kasprzak,* 318 S.W.3d 1, 21 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (characterization of statement as accusing plaintiff of "embezzlement" not reasonable when no such language appears in the publication); *NW Commc'n of Tex., Inc. v. Power*, No. 05-99-01641-CV, 2000 WL 1036327, at *34 (Tex. App.—Dallas July 28, 2000, pet. denied) (media defendant not liable for subjective impressions from statements not actually charging intentional or criminal conduct).

subjective.[132]  Further, since the comments are extrinsic to the Articles, they do not demonstrate the alleged defamatory meaning on their face.[133]

### c. The Articles do not injure Carter in his profession.

A publication is defamatory *per se* if it accuses a person of lacking a peculiar or unique skill necessary for his profession or occupation.[134]  Here, viewed in context, the Articles amount only to general criticism applicable to a person in any profession or occupation and, therefore, are not actionable *per se*.[135]

For example, accurately reporting that Carter allegedly "shifted funds" is, at most, a disparagement equally discreditable to a person in any business or occupation.[136]  Likewise, "seizing" a tape recording at a meeting or "shouting" during a meeting does not disparage Carter

---

[132]  *See New Times, Inc.*, 146 S.W.3d at 157 ("the question is not whether some actual readers were misled, as they inevitably will be, but whether the hypothetical reasonable reader could be").

[133]  *See Robinson*, 409 S.W.3d at 691 (defamatory nature must be apparent on face of publication without reference to extrinsic facts or innuendo).

[134]  *Hancock*, 400 S.W.3d at 66-67.

[135]  *See Hancock*, 400 S.W.3d at 67 (Statement charging physician with "lacking veracity" was not defamatory *per se* because statement was equally discreditable to persons in any profession.).

[136]  *See Shipp v. Malouf,* 439 S.W.3d 432, 441 (Tex. App.—Dallas June 24, 2014, no pet.), *disapproved on other grounds, In re Lipsky*, 460 S.W.3d 579, 587 (Tex. 2015) (false allegation of personal bankruptcy did not injure dentist in his profession).

regarding a particular quality or trait peculiar to his occupation. Carter's conclusory affidavit statements of injury to his reputation are legally insufficient to establish that any statement in the Articles was defamatory.[137] Therefore, the trial court erred in denying summary judgment to Appellants because the Articles are not defamatory.[138]

## B. The Articles Are True or Substantially True

### 1. The Articles were not more damaging than a literally truthful account.

A media defendant is entitled to summary judgment upon a showing of the substantial truth of an allegedly libelous publication.[139] The Articles are substantially true because they are not more damaging to Carter's reputation than a truthful statement would have been.[140]

If the *Caller-Times* had published the complete record of the controversy instead of the Articles, it would not have had a more favorable impact on Carter's reputation. For example, publishing Bentley's letter or PowerPoint presentation in full would not have caused the ordinary reader

---

[137] *See Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) (conclusory affidavit statements are not competent summary-judgment evidence).

[138] If articles are not capable of a defamatory meaning, the court need not consider whether they are false or not substantially true. *See Main*, 348 S.W.3d at 389.

[139] *Neely*, 418 S.W.3d at 63; *McIlvain v. Jacobs*, 794 S.W.2d 14, 15-16 (Tex. 1990).

[140] *Neely*, 418 S.W.3d at 63; *McIlvain*, 794 S.W.2d at 16.

to form a better impression of Carter than would the Articles. Likewise, publishing the entire tape of the February 15 meeting, including demeaning remarks by Carter to "Lt. Commander" Bentley, statements by Hawley that she had "a big problem" with Carter's leadership, and Whitmore's questions about "trust" of his leadership, certainly would not have cast Carter in a more favorable light. Verbatim inclusion in the Articles of Carter's February 17 letter or his original petition in this suit would have no better effect, as those accounts were fairly summarized in the Articles and do not alter the gist of the reports.[141]

Carter contends that an audit issued in November 2008 establishes that the "2007 financial statements had been 'fairly presented in conformity with U.S. generally accepted accounting principles.'"[142] But the complete record of the audit report included findings that "misstatements" corrected in the financials were "material."[143] Likewise, accounting adjustments by

---

[141] *See NW Commc'n of Tex., Inc.*, 2000 WL 1036327, at *25 (publishing plaintiff's verbatim account would not have been less damaging because the central facts remained undisputed).

[142] 2CR1240.

[143] CR264.

the Chamber were greater even than those identified by Bentley.[144] Publishing such adjustments and final audit would not have been less damaging to Carter's reputation than the Articles. Therefore, the Articles were substantially true.[145]

### 2. The gist of the Articles is true.

The "gist" of an allegedly libelous publication is the meaning a person of ordinary intelligence would give it when read as a whole in context.[146] A publication that correctly conveys the gist, even if it errs in details, is substantially true.[147] Here, the gist of the Articles in relation to Carter's libel claims is that serious questions had been raised by certain Chamber officials concerning the financial performance and management practices of the Chamber under Carter's leadership. The Articles correctly conveyed this gist and, therefore, are substantially true.

---

[144] FY2007 adjustments, CR180 (showing positive $40,425.00 reported in January 2008 under Carter ending in negative $95,377.76 after adjustments of March 25, 2008).

[145] The November 2008 audit was not available to the newspaper during the time it published the Articles and, even if the audit is given the spin presented by Carter, it does not dispute substantial truth. *See Hearst Newspaper P'ship, LP v. Macias*, 283 S.W.3d 8, 14 (Tex. App.—San Antonio 2009, no pet.) (audit report allegedly exonerating plaintiff but not available to newspaper did not raise fact issue on substantial truth).

[146] *Neely*, 418 S.W.3d at 63-64.

[147] *Id*. at 64.

### 3. Items of secondary importance do not defeat substantial truth.

Carter claims that he was defamed because the Articles reported he "seized" a tape, could be heard "shouting," or that he excluded others from a meeting.[148] But these are items of secondary importance that do not factor into the substantial-truth analysis.[149] The gist of the Articles is not that Carter "seized" a tape recording or "shouted" during a meeting. Reporting such details, even if incorrect, does not undermine the gist of the matter that serious questions had been raised by certain Chamber officials concerning the financial performance and management practices of the Chamber under Carter's leadership.[150]

### 4. There is no omission or juxtaposition.

A news report "can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-

---

[148] CR24-25.

[149] *See McIlvain*, 794 S.W.2d at 16; *Dolcefino*, 19 S.W.3d at 919 (whether media defendant "learned" of or "instigated" an investigation may be disregarded as of secondary importance).

[150] Although the items are of secondary importance to the gist of the Articles, they are in fact substantially true as demonstrated in the article-by-article discussion below.

defamatory."[151] Here, there is no material omission or suggestive juxtaposition as readers were provided a lengthy account of Carter's version of events, which *Caller-Times* personnel consistently sought to obtain.[152]

Carter's case is easily contrasted to that of *Neely v. Wilson.* There, the Supreme Court found a fact issue on whether the news report created a more damaging impression by omitting the material fact that the plaintiff-physician had not been disciplined by the medical board for use of controlled substances during surgery.[153] But here, the Articles did not omit information that would place Carter in a more favorable light since the *Caller-Times* included his explanations for the actions questioned by Bentley.

### 5. The Articles are substantially true reports of allegations.

In *Neely*, the Supreme Court noted but did not resolve whether in some cases involving allegation reporting, substantial truth may be established by showing the defendant accurately relayed the allegations of

---

[151] *Neely*, 418 S.W.3d at 64 (*quoting Turner*, 38 S.W.3d at 114).

[152] *See supra* notes 93-102 and accompanying text.

[153] *Neely*, 418 S.W.3d at 64-69.

a third party.[154]  Such a case is presented here, at least to the extent that Carter claims the Articles are false because third-party allegations accurately reported by Appellants were not true.

Where a media defendant accurately reports third-party allegations against a plaintiff, while including the plaintiff's denials and without stating a conclusion of guilt, the reports are substantially true even if the plaintiff disputes the third-party allegations.[155]  The defendant is not held to proving the truth of the third-party allegations in order to be entitled to the defense of substantial truth.[156]

Here, for instance, the February 15 and 27 Articles provided an accurate account of allegations concerning Carter that were presented by Bentley and others to the Chamber executive committee and board. Indeed, Carter does not dispute that the Articles accurately reported these

---

[154]  418 S.W.3d at 65 (*citing Global Relief Found. v. New York Times Co.*, 390 F.3d 973, 985-87 (7th Cir. 2004).

[155] *See Global Relief Found.*, 390 F.3d at 985-87.

[156] *Id.*; *accord Ackly v. Bartlesville Examiner-Enter.*, No. 06-CV-529-TCK-PJC, 2007 U.S. Dist. LEXIS 87897, at *8 (N.D. Okla. Nov. 29, 2007) ("when assessing the truth of a report concerning an investigation, a defendant is under no requirement to show that the allegations against the plaintiff are true, but must only show that the allegations were made and that the allegations themselves were accurately recited").

third-party statements.[157] Instead, Carter rests his case on conclusory affidavit testimony that the allegations are false. However, because the *Caller-Times* accurately reported the third-party allegations and did not state or imply Carter's guilt, Appellants not need additionally prove the allegations were valid in order to obtain judgment as a matter of law on substantial truth.[158] In such instances, substantial truth is measured only by whether the *Caller-Times* accurately relayed the allegations of a third party, which is undisputed here.[159]

### 6. Carter failed to raise a fact issue on substantial truth.

Once the *Caller-Times* established that the Articles were substantially true, as shown by the foregoing discussion, Carter had the burden as non-movant to produce evidence creating a fact issue on that element in order to defeat summary judgment.[160]

---

[157] *See, e.g.*, Carter Dep., CR900-01 (Carter admits that the statements reported in the 2/27/08 article came from Bentley's letter), CR904-05 (Carter admits that statements reported in the 2/29/08 article came from Whitmore's letter), CR908 (Carter stipulates that Whitmore made the statement at issue in the 3/4/08 article).

[158] *See Global Relief Found.*, 390 F.3d at 985-87.

[159] *See Neely*, 418 S.W.3d at 65.

[160] *See Huckabee v. Time Warner Entm't Co. L.P.*, 19 S.W.3d 413, 420 (Tex. 2000).

### a. Alleged proof of actual malice does not prove falsity.

Carter's response concentrated on the issue of actual malice due to his mistaken position that it is dispositive.[161] Substantial truth and actual malice, however, are distinct aspects of a libel case.[162] A finding of actual malice does not imply that a statement was false.[163] For a summary judgment in a private-figure libel case, "whether [the plaintiff] raised a fact issue regarding the truth or falsity of the underlying statements is the primary issue in [the] appeal."[164]

### b. Carter's affidavit raises no fact issue on substantial truth.

The only specific evidence that Carter pointed to in his response to show alleged falsity is his affidavit of August 28, 2015.[165] The affidavit, however, fails as summary judgment proof because it is rife with substantive defects that make it legally insufficient.

---

[161] 2CR1240.

[162] *In re Lipsky,* 460 S.W.3d at 593 (referencing falsity and actual malice as separate elements); *Huckabee,* 19 S.W.3d at 420 (same); *Hearst Corp. v. Skeen,* 159 S.W.3d 633, 636-37 (Tex. 2005) (same). *See also supra* note 103 (cases listing defamatory statement and negligence as separate elements).

[163] *Bentley v. Bunton,* 94 S.W.3d 561, 587 (Tex. 2002)

[164] *Neely,* 418 S.W.3d at 63.

[165] 2CR1229.

Carter's affidavit declares that certain statements in the Articles "implied or insinuated" he committed felony violations of the penal code or "financial malfeasance" but that he "never violated the penal code" or "engaged in any financial malfeasance."  But such conclusory statements and opinions "cannot support a judgment."[166]  Conclusory statements in affidavits are not competent summary judgment evidence because they are not credible and are susceptible to being readily controverted.[167]  Thus, the Carter affidavit does not meet the basic requirement to "set forth such facts as would be admissible in evidence."[168]

Appellants made substantive objections to a host of other statements in Carter's affidavit, including that specified statements were improper attempts to offer expert testimony, prohibited by TRE 702, improper legal conclusions, lacking personal knowledge, speculation, and improper

---

[166] *Wal-Mart Stores, Inc.*, 313 S.W.3d 837, 839 (Tex. 2010) (*per curiam*).  *See also AMS Constr. Co. v. Warm Springs Rehab. Found.*, 94 S.W.3d 152, 156 (Tex. App.—Corpus Christi 2002, no pet.) (Affidavit must set forth facts establishing witness competency, expertise, or personal knowledge to support opinions or conclusions in order to constitute competent summary judgment evidence.).

[167] *See Ryland Group, Inc.*, 924 S.W.2d at 122.

[168] *See AMS Constr. Co.*, 94 S.W.3d at 156.

opinion.[169] Such substantive evidentiary defects are not waived by the trial court's failure to rule on the objections but, on appeal, are legally insufficient to raise a fact issue.[170]

Further, this Court need not concern itself with the voluminous document dump that Carter included with his response. Carter repeatedly makes blanket references to the prior appellate record but fails to quote, cite, or point the Court to any evidence raising a fact issue.[171]  As a matter of law, that approach cannot raise a fact issue on substantial truth or any other essential element of Carter's libel claim because courts are "not

---

[169]  6CR12708-15.

[170]  *See Laidlaw Waste Systems (Dallas) v. City of Wilmer*, 904 S.W.2d 656, 661 (Tex. 1995) (substantive objection to summary judgment evidence not waivable); *Stone v. Midland Multifamily Equity REIT*, 334 S.W.3d 371, 374 (Tex. App.—Dallas 2011, no pet.) (same). *See*, *e.g.*, *City of San Antonio v. Pollock*, 284 S.W.3d 809, 816-17 (Tex. 2009) (testimony based on unsubstantiated speculation is legally insufficient to support summary judgment); *Coastal Transp. Co. v. Crown Cent. Pet. Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) (speculative or conclusory expert opinion may be challenged on appeal as legally insufficient to raise fact issue on summary judgment); *Ryland Group, Inc. v. Hood*, 924 S.W.2d 120, 122 (Tex. 1996) (objection that affidavit includes opinions constitutes substantive defect and may be raised on appeal); *Danevang Farmers Coop. Soc'y v. Indeco Prods., Inc.*, No. 13–04–445–CV, 2006 WL 2885058, at *3 (Tex. App.—Corpus Christi Oct. 12, 2006, no pet.) (mem. op.) (lack of personal knowledge and conclusory statements were substantive defects to summary judgment evidence); *Stewart v. Sanmina Texas L.P.*, 156 S.W.3d 198, 207 (Tex. App.—Dallas 2005, no pet.) (unsubstantiated legal or factual conclusion was substantive defect to affidavit); *AMS Constr. Co.*, 94 S.W.3d at 156 ("An objection that an affidavit is conclusory is an objection to the substance of the affidavit that can be raised for the first time on appeal.").

[171]  *See, e.g.*, 2CR1228, 1233, 1241, 1267-70.

required to sift through voluminous" records to identify evidence raising a fact issue.[172]

In addition, Carter's benign explanations in his affidavit of accounting practices under his leadership at the Chamber[173] do not render the Articles untrue.[174] A libel plaintiff's self-serving account that his actions were in good faith are irrelevant to whether a news organization misstated the facts.[175]

Thus, resting merely on conclusions and legal insufficiencies, the affidavit raises no fact issue on substantial truth.

### c. Concealed truth does not controvert substantial truth.

Carter may not dispute substantial truth by suggesting that the newspaper should have withheld publication since he does not have a legally protected right to a reputation based on the concealment of the

---

[172] *Bich Ngoc Nguyen v. Allstate Ins. Co.,* 404 S.W.3d 770, 776–77 (Tex. App.—Dallas 2013, pet. denied) (*quoting Aguilar v. Morales,* 162 S.W.3d 825, 838 (Tex. App.—El Paso 2005, pet. denied).

[173] 6CR12168, 12170.

[174] Again, Carter's explanations were included in the Articles. *See supra* notes 93 - 102 and accompanying text.

[175] *See Assoc. Press v. Cook*, 17 S.W.3d 447, 453-54 (Tex. App—Houston [1st Dist.] 2004, no pet.) (Plaintiff's explanation that court testimony was incorrect because he relied on misinformation from a colleague was irrelevant to whether newspaper misstated the facts of his testimony.).

facts.[176] Indeed, the full record on the Chamber's financials is <u>worse</u> than reported by the *Caller-Times* (e.g., adjusted March 25 to negative $95,377.76, as compared to February 27 Article reporting treasurer Bentley presentation of negative $61,782).[177] Truth—not just known truth—is a complete defense.[178]

## C.     The Articles Are Non-Actionable Opinion

### 1.     Constitutional protection for statements not capable of objective proof as conveying actual facts.

There are "constitutional limits on the type of speech" that is subject to a defamation action.[179] The First Amendment and Texas law require that a plaintiff prove that a media defendant published a false, defamatory statement of fact rather than an unverifiable opinion.[180] A statement that is not capable of objective proof as true or false, or that cannot be read as

---

[176]  *Global Relief Found.*, 390 F.3d at 989.

[177]  CR162-64; Bentley Dep., CR862; Bentley letter to board, CR304-07; FY2007 adjustments, CR179-183; Thompson Dep., CR1139, 1149-50.

[178]  *Global Relief Found.*, 390 F.3d at 989.

[179]  *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16 (1990).

[180]  *See id.* at 19-20; *Bentley*, 94 S.W.3d at 580-82.

conveying actual facts about an individual, is protected opinion.[181]

Whether a statement is one of fact or opinion is a question of law.[182]

### 2. Statements of opinion in the Articles

Numerous expressions of non-actionable opinion appear throughout the Articles. For instance, references in the March 2 editorial to Carter's "highly questionable stewardship of the financial affairs of the chamber," "intimidation, secrecy and duplicity," attempts to bring "transparency and accountability" to the Chamber and a "question mark" over Carter are constitutionally protected opinions, not statement of facts.[183]

Protected statements of opinion in the Articles also include:

- February 15, 16, 27 and 29 Articles that Carter could be heard "shouting";[184]

- February 27 and 29 Articles that Carter "seized the tape";[185]

---

[181]   *See Milkovich*, 497 U.S. at 18-21; *Bentley*, 94 S.W.3d at 580-81. *See also Coronado v. Freedom Commc'ns, Inc.*, No. 13-13-00525-CV, 2015 Tex. App. LEXIS 10128, at*7 (Tex. App.—Corpus Christi, Sept. 30, 2015, no pet.) (Statement must constitute an assertion of an "objectifiably verifiable" fact in order to constitute actionable defamation.) (mem. op.).

[182]   *Bentley*, 94 S.W.3d at 579-80.

[183]   *See Assoc. Press*, 17 S.W.3d at 454 (statement that Texas Ranger captain was a "blight on law enforcement" was constitutionally protected opinion).

[184]   CR462-65, 468-71.

[185]   CR468-71.

- February 27 Article reference to "off the books" accounting, and a "red flag";[186]

- March 2 Editorial as a whole;[187]

- March 4 Article references to "lack of financial transparency" and not "transparent";[188] and

- May 31 Article references to a "heated exchange" and "contentious exchange" and "findings of fact."[189]

**D. The March 19, 20 and May 29, 31 Articles Are Privileged Fair Reports of Judicial Proceedings Under Common Law and Texas Statute.**

The March 19, 20 and May 29, 31 Articles consisted of fair, true and impartial accounts of judicial proceedings; namely, judicial proceedings involving a petition by Bentley and this lawsuit by Carter. Such "fair reports" of judicial proceedings are privileged against a libel claim by common law and Texas statute.[190]

---

[186] CR468-69.

[187] CR567.

[188] CR474-75.

[189] CR526. *See also infra* Part I. (article-by-article analysis regarding non-actionable opinion).

[190] Restatement (Second) of Torts § 611 (1977); Tex. Civ. Prac. & Rem. Code §§ 73.002(a), 73.002(b)(1)(A).

**E.** **Article-by-Article Analysis Shows the *Caller-Times* Appellants Are Entitled to Summary Judgment.**

Examining each Article and allegedly defamatory statement shows they are non-defamatory, substantially true, non-actionable opinion and privileged as fair reports. Carter's response failed to raise a fact issue on these grounds and defenses.[191]

**1.** **February 15, 2008 Article: <u>Financial, Management Questions Raised at CC Chamber</u>.**

**a.** **The Article is not reasonably capable of the defamatory meaning claimed by Carter.**

The February 15 Article does not impute commission of a crime by Carter and is not reasonably capable of that defamatory meaning claimed by Carter. Indeed, the Article expressly disclaims that any "financial questions" involved "improprieties."

**b.** **The Article is substantially true.**

The gist of the February 15 article is that three high-ranking Chamber officials raised serious financial and management issues at a meeting of the Chamber's executive committee. This statement is indisputably true.[192]

---

[191] *See supra* notes 158-172 and accompanying text.

[192] *See supra* notes 15-35 and accompanying text. *See also* mtg. minutes, CR118; FY2007 audit report, CR244-66; LRGlobal contract, CR279-86; Chamber bylaws, CR287-94; FY2006 financials, CR295-98; Bentley email to Carter, CR309-12; Bentley Dep., CR859-60,

### c.    Statement 2/15-1:

*"However, they were asked to present their information in a meeting that lasted most of Friday morning and from which Chamber President could be heard shouting."*

### i.    Not Defamatory

The statement is not defamatory as a matter of law. It does not state or imply that Carter committed a crime. Shouting in a business meeting is certainly legal.[193] It may be unflattering to Carter to report that he shouted, but that does not make it actionable in defamation.[194]

### ii.    Substantial Truth

It is undisputed that Chamber employee Lucy Reta told reporter Aguilar that she heard Carter shouting from the meeting room, an account corroborated by Whitmore, Bentley, and Martinez, all of whom were present.[195]

---

863-64; Carter Dep., CR888-90; Hawley Dep., CR1010-14, 1017, 1019-20; Martinez Dep., CR1049-50, 1053; Powell Dep., CR1088-90; Thompson Dep., CR1141, 1143, 1144-48, 1151-52, 1154, 1156; Whitmore Dep., CR1201-02, 1205-08; Thompson letter, CR438-39.

[193] *See Means v. ABCABCO, Inc.*, 315 S.W.3d 209, 214 (Tex. App.—Austin 2010, no pet.) (*citing Musser*, 723 S.W.2d at 655) (statement that a person has done what he has a legal right to do is not defamatory).

[194] *See Farias v. Garza*, 426 S.W.3d 808, 816 (Tex. App.—San Antonio 2014, pet. filed) (a statement that is merely unflattering is not actionable).

[195] *See supra* notes 39-45 above and accompanying text.

### iii.    Opinion

As Carter testified in his deposition, whether a person is shouting is a matter of opinion.[196]

#### d.    Statement 2/15- 2:

*"We agreed from a statement standpoint to say we are continuing the process of our evaluation and that there are both serious financial and management issues that we need to address, according to Bentley."*

Bentley and others testified to the accuracy of the statement attributed to him.[197]

### 2.    February 16 Article:    <u>Corpus Christi Chamber of Commerce Pulls Two Off Panel</u>.

The February 16 Article as a whole is not defamatory of Carter and is substantially true.

#### i.    Statement 2/16-1:

*"Before their grievances could be voiced, two of the three, Judy Hawley and Sylvia Whitmore, were told they no longer are eligible to serve on the committee, meaning they can't participate in the committee's recommendation to the full board on matters involving Carter's contract."*

The statement is non-defamatory and substantially true.[198]

---

[196]  Carter Dep., CR903.

[197]  *See* Bentley Dep., CR863; Hawley Dep., CR1010-11, 1013-14, 1017; Martinez Dep., CR1042, 1053; Whitmore Dep., CR1201-02, 1205-08.

### ii.   Statement 2/16-2:

*"Carter could be heard shouting during portions of the meeting."*

The statement is substantially true and non-defamatory as discussed above and herein.[199]

### iii.   Statement 2/16-3:

*"Bentley was outside in a hallway when Hawley and Whitmore were dismissed because Carter had denied him entrance to the meeting."*

The statement is substantially true and non-defamatory.[200]

### iv.   Statement 2/16-4

*"We agreed from a statement standpoint to say we are continuing the process of our evaluation and that there are both serious financial and management issues that we need to address, according to Bentley."*

The statement is substantially true and non-defamatory.[201]

---

[198] *See supra* notes 36-38 and accompanying text. *See also* Carter Dep., CR890-91, 902-03; Whitmore Dep., CR1197; Hawley Dep., CR1021; Martinez Dep., CR1040-41; CR326-36; CR341-53.

[199] *See* Carter Dep., CR891; Whitmore Dep., CR1208. *See also* Part I.1.c.iii.c. discussing Statement 2/15-1.

[200] *See* Carter Dep., CR891-92; Whitmore Dep., CR1208; Hawley Dep., CR1021; Bentley Dep., CR861.

[201] *See* Carter Dep., CR892. *See also* Part I.1.c.iii.d. discussing Statement 2/15-2.

### 3. February 20 Article: <u>CC Chamber Meeting to Discuss Financial Irregularities</u>.

> *"The Corpus Christi Chamber of Commerce executive committee is meeting to discuss financial irregularities discovered during a performance review of President Terry Carter after a raise and bonus for Carter had been proposed. The financial questions led to a decision to conduct a full audit."*

The brief February 20 Article—set out in its entirety above—is non-defamatory and substantially true.[202] It is undisputed that Carter used the term "misappropriation" in discussions of the Chamber's financials with executive committee members at the February 20 meeting while Bentley referred to financial "irregularities" in the same meeting, as shown by the minutes.[203] Carter's affidavit testimony that "there were no financial irregularities"[204] is a mere conclusion and legally insufficient to raise a fact issue.[205]

---

[202] Mtg. minutes, CR118-20; Bentley Dep., CR862-63; Carter Dep., CR892-93.

[203] CR117-20.

[204] 6CR12166.

[205] *See Wal-Mart Stores, Inc.*, 313 S.W.3d at 840.

**4.** **February 21 Article: <u>Chamber of Commerce: Financial</u> <u>Questions Lead to Call for Audit</u>.**

    **i.** **Statement 2/21-1:**

*"The audit decision occurred at a special called meeting of the executive committee."*

The statement is non-defamatory and substantially true.[206]

Carter's affidavit assertion that the Article's statement is false that "Carter and Huseman informed two of three [executive committee members] that they were no longer eligible to serve"[207] raises no fact issue because he does not dispute that he met with the two when they were informed of their alleged ineligibility.[208] Reporting that Carter "participated" in informing the two of their alleged ineligibility rather than that Carter "informed" them himself would have no lesser effect on his reputation.

---

[206] Carter Dep., CR893.

[207] 6CR12167.

[208] *See supra* notes 36-38 and accompanying text.

64

**5.** **February 27 Article:** <u>**Chamber CEO Shifted Funds, Letter Says**</u>.

The February 27 Article is non-defamatory and substantially true.[209]

The February 27 article presents an accurate account of dueling letters to the Chamber board by Bentley and Carter regarding the Chamber's financial status, accounting practices and Carter's role.

### i.     Statement 2/27-1:

> *"The Corpus Christi Chamber of Commerce chief executive, whose bonus is based on financial performance, shifted funds to make a loss look like a profit, according to a letter by the Chamber's treasurer."*

The statement is non-defamatory and substantially true.[210]  Bentley's letter, obtained by reporter Aguilar, states, "CEO [Carter] … <u>shifted</u> the Building Fund from the Chamber's books for the use of supplementing the Chamber's financials."[211]  Carter admits he transferred funds from one account to another.[212]  This "shift[ing]" of funds made a "loss look like a

---

[209]  Aguilar Aff., CR458; Aguilar Dep., CR822-24; Bentley letter to board, CR303-04; Bentley PowerPoint, CR156-72; Bentley Dep., CR852-53; Thompson Dep., CR1145.

[210]  Carter Dep., CR894-95, 899, 939, 951-953; Martinez Dep., CR1044, 1048; Thompson Dep., CR1145; Thompson letter, CR432-36; Bentley letter to board, CR303-04; Bentley Dep., CR 851-52, 854-55, 862; Whitmore Dep., CR1194, 1204-05; Hawley Dep., CR1010; Carter's review, CR137-40, 143-45, 148-50; Carter's contract, CR121-36; transcript, CR717-18.

[211]  Aguilar Aff., CR458; Bentley letter to board, CR303-04 (emphasis added).

[212]  Carter Dep., CR894-95, 899.

profit" because the effect of the transactions was a swing of more than $100,000; that is, a stated $40,000 profit versus a loss of more than $60,000.[213] Carter also admits a connection between his bonus and Chamber finances.[214]

Carter's affidavit asserts the statement is false because his amended employment contract did not link his bonus to the Chamber's financial performance.[215] However, the Article does not base the statement on his contract and the affidavit does not dispute that executive members understood Carter's bonus was based on financial performance.[216]

### ii.    Statement 2/27-2:

> *"Bentley disclosed his concern about the Chamber's books at a Feb. 15 meeting of the Chamber executive committee that included a shouting match with Carter."*

The statement is non-defamatory and substantially true.[217]

### iii.    Statement No. 2/27-3:

> *"During the meeting, which was tape-recorded, Carter seized the tape and left the building."*

---

[213] Bentley Dep., CR862.

[214] Carter Dep., CR951-53; Carter and Waller emails, CR152; Carter and Martinez emails, CR268.

[215] 6CR12167-68.

[216] *See* CR468-69; CR12165-172. *See also supra* notes 16-30 above and accompanying text.

[217] *See* Carter Dep., CR896; *see also* Part. I.1.c.iii.c. discussing Statement 2/15-1.

The statement is non-defamatory and substantially true.[218] Bentley's letter to the Chamber board states the "CEO [Carter] took the tape and immediately left the premises" and describes unsuccessful efforts over a number of days by him to obtain the tape. [219] Carter's affidavit testimony that the statement is "blatantly false"[220] is a mere conclusion and legally insufficient to raise a fact issue.[221]

### iv.    Statement No. 2/27-4:

*"The link between Carter's bonus and the Chamber's financial performance was a red flag for the Chamber's accountant, Darrell Thompson, according to Bentley's letter."*

The statement is non-defamatory and substantially true.[222] Although Bentley's letter did not use the term "red flag," Thompson testified that he agreed with that characterization.[223] Bentley's letter relates that the Chamber's CPA confirmed that the treasurer's questions about financial adjustments were valid concerns and that the link between the bonus and

---

[218] *See supra* notes 46-49 above and accompanying text.

[219] CR301.

[220] 6CR12168.

[221] *Wal-Mart Stores, Inc.*, 313 S.W.3d at 840.

[222] Thompson letter, 434-35; Thompson Dep., CR1152-53; Bentley letter to board, CR300-08; tape, CR325; transcript, CR791-93; Carter Dep., CR896, 922-31.

[223] Thompson Dep., CR1152-53.

Chamber's financial performance could possibly forfeit the Foundation's 501(c)(3) status.[224] Stating the link was a "red flag" rather than a "concern" has no greater impact on Carter's reputation and thus is substantially true.[225]

### v. Statement No. 2/27-5:

*The accountant told the Chamber executive committee that "use of Building Fund dollars to supplement the Chamber operating expenses could possibly forfeit the (Chamber) foundation's (nonprofit) status because of the link between the CEO's bonus to the financial performance of the Chamber."*

The statement is non-defamatory, substantially true and protected opinion.[226]

### vi. Statement No. 2/27-6:

*"Bentley also sought but never received a copy of the tape seized by Carter."*

The statement is non-defamatory and substantially true. Carter admits that as of the date of the article, Bentley had called him to request a copy of the tape, Carter never returned the call, and Bentley had not

---

[224] Tape, CR325; transcript, CR791-93; Thompson letter, CR434-35.

[225] *See supra* notes 23-28 above and accompanying text regarding the link between Carter's bonus and the Chamber's financial performance.

[226] Thompson letter, CR435; Thompson Dep., CR324-25; transcript, CR791-93; Bentley Dep., CR847-48; Carter Dep., CR896-97.

received a copy of the tape.[227]   Bentley's letter recounts his unsuccessful

efforts over several days to obtain the tape.[228]

### vii.   Statement No. 2/27-7:

*"Bentley's letter states the Chamber showed a $40,425 profit when it should have shown a $61,782 loss.   The numbers provided in Bentley's letter show that the Chamber showed the surplus by booking $63,903 in January 2008 revenue for 2007 and by deferring part of Carter's salary.   Carter's February 17th letter says including January 2008 revenue was consistent with the Chamber's accounting method, approved by the Board in September 2004.   He also said in his letter that the failure to record his salary deferral as a 2007 expense was a bookkeeping error."*

The statement is non-defamatory and substantially true.[229]

### viii.   Statement No. 2/27-8:

*"Carter also used $18,312 from the Chamber's building fund to pay operating expenses, according to the letter. He shifted the money to the Chamber's foundation, then billed the foundation for expenses in that amount. Carter's February 17th letter says he discussed the move with Thompson and Bentley before shifting the funds. The foundation has operated with overhead provided by the Chamber and the Chamber had never been reimbursed for those expenses, according to Carter's letter."*

---

[227]  Carter Dep., CR897-98.

[228]  CR112-13.

[229]  *See supra* notes 58, 64-67 and accompanying text.  Bentley letter to Freddie, CR112-13; Bentley letter to board, CR303-05; Carter's letter, CR240-43; Carter Dep., CR898-99; FY2007 adjustments, CR180-82; FY2007 audit report, CR260-65; Martinez Dep., CR1051.

The statement is non-defamatory and substantially true.[230]  Carter's affidavit contends the statement that he "shifted money to the Chamber's foundation" implies a felony on his part,[231] which again is an incompetent conclusion or opinion.  Importantly, Carter does not deny that the funds were shifted; in fact, he admitted he transferred funds from one account to another.[232]

### ix.    Statement No. 2/27-9:

> *"Among other concerns Bentley listed was the Chamber's lack of accounting for special events.  His letter described them as "off the books", with only net income presented to the executive committee.  Examples of special events in 2007 were the Mayor's State of the City address, Salute to the Military and the Conquer the Coast bicycle ride.  Bentley also stated in his letter that he was concerned that Carter authorizes "significant contracts" without seeking bids or consulting the executive committee or board."*

---

[230]  Carter letter, CR499; Carter Dep., CR899; Bentley Dep., CR845-46, 852-53; Martinez Dep., CR1045, 1051-52; Thompson Dep., CR1145; FY2007 audit report, CR245-66; FY2007 adjustments, CR180-83.

[231]  6CR12168.

[232]  Carter Dep., CR895, 899.

The statement is substantially true and non-defamatory.[233] Once again, the Article accurately recounted the content of Bentley's letter,[234] which Carter does not dispute.[235] Further, Carter admits that he may not have provided a full accounting of all special events to the board and that he typically presented special events on a net basis to the board.[236] Moreover, the Article makes clear that the phrase "off the books" is Bentley's characterization of the disclosed fact that only net income was presented to the Executive Committee.

Carter agreed that the examples of special events in 2007 cited in the letter and Article are not false or defamatory.[237] Carter also acknowledged he authorized certain contracts, including some around $50,000, without bids or executive committee or board approval.[238]

---

[233] Bentley letter to Freddie, CR112-13; Carter Dep., CR900-02; Martinez Dep., CR1039, 1062; Hawley Dep., CR1011-12, 1017; Bentley Dep., CR860-61; LRGlobal contract CR279-86; CR252.

[234] CR112-13.

[235] CR900.

[236] CR900-02.

[237] *Id.*

[238] *Id.*

**6. February 29 Article: Ex-Chair Airs Her Chamber Concerns.**

The February 29th Article is non-defamatory and substantially true as a whole.[239]

### i. Statement No. 2/29-1:

*"On the morning of Feb. 15, Carter and Huseman took Whitmore and Hawley behind closed doors and told them they were no longer eligible to serve on the committee. As Bentley waited outside, according to witness accounts, the two women endured shouting from Carter. They stayed to hear Bentley's report. Before leaving the room, Carter seized a tape recording of the meeting and left the building."*

The statement is non-defamatory and substantially true.[240] Although Carter's affidavit makes the conclusory assertion that it "is not true" that the two women endured shouting from him, the affidavit does not dispute the extensive record that Carter spoke "loudly" to Whitmore and "yelled" and "blew up" at Bentley in the meeting.[241]

### ii. Statement No. 2/29-2:

*"Bentley had been asked to review the Chamber's finances in anticipation of a raise, bonus and contract*

---

[239] Whitmore Dep., CR1208-09; Whitmore's letter, CR313-15; Aguilar Dep., CR824-27.

[240] *See supra* notes 190-93 and accompanying text. *See also* Carter Dep., CR902-03, 962; Martinez Dep., CR1040-41; Whitmore Dep., CR1203. *See also supra* note 195 and accompanying text.

[241] *See supra* notes 39-45 and accompanying text.

*extension for Carter. Bentley found that Carter shifted funds among accounts and deferred $19,992 of his 2007 salary. Without those moves, the Chamber's cash flow would have been negative, according to Bentley, adding that Carter's bonus is based on the Chamber's financial performance. According to Bentley, the Chamber accountant told him that the Chamber Foundation's nonprofit status could be in jeopardy because Carter shifted Chamber Foundation funds to pay operating expenses and Carter's bonus is linked to the Chamber's financial performance."*

The statement is non-defamatory and substantially true.[242]

### iii. Statement No. 2/29-3:

*"…denying the treasurer access to critical information and advice of financial professionals employed by the Chamber of Commerce."*

*\*\*\*\*\**

*"There was refusal of Chamber staff to cooperate with the treasurer on a task he was given by the board and the executive committee."*

The statement is non-defamatory and substantially true.[243] Carter admits the February 29th Article accurately reports that Whitmore's letter stated that the treasurer was denied access to critical financial

---

[242] *See* Carter Dep., CR903-04; Thompson Dep., CR1152; *see also* Part I.2.i. discussing Statement 2/16-1.

[243] Bentley letter, CR299-308; Bentley Dep., CR861-62; Whitmore's letter CR313-15; Carter Dep., CR904-05.

information.[244]  Carter admits he does not know for a fact whether Bentley was ever denied access to information.[245] Bentley's emails of February 15th and 18th confirm that he requested information from the Chamber, but was refused and told he must go through Carter.[246]  Carter's affidavit testimony of alleged instructions to a staff member to fully cooperate offers no actual proof that Bentley received the information he was seeking.[247]  Further, Bentley requested information from Chamber CPA Thompson, but was refused.[248]

### 7. March 2 Editorial: Chamber's CEO's Actions Raise Serious Questions.[249]

For the reasons set out above and below, the editorial in its entirety is protected under the First Amendment of the U.S. Constitution, Article 1,

---

[244] Whitmore letter, CR313-15; Carter Dep., CR904.

[245] Carter Dep., CR904-05.

[246] Bentley Dep., CR861-62.

[247] 6CR12169.

[248] Bentley Dep., CR852-54 (Chamber officials refused to sign a letter of indemnification, effectively silencing Thompson.); Thompson's indemnity letter to board, CR437-39.

[249] Appellants' motion inadvertently referred to the editorial as published March 3, which is corrected herein to the March 2 publication date.

Section 8 of the Texas Constitution and the common law as non-actionable opinion, and is non-defamatory and substantially true.[250]

### i. Statement No. 3/2 (Editorial)-1:

*"…highly questionable stewardship of the financial affairs of the chamber by Carter."*

This statement is non-defamatory, substantially true, and non-actionable opinion.[251]

### ii. Statement No. 3/2 (Editorial)-2:

*"Two executive committee members, former state Rep. Judy Hawley and bank executive Sylvia Whitmore, were removed from the committee by Carter after they attempted to bring transparency and accountability to the finances of the Chamber at a Feb. 15 meeting."*

The statement is non-defamatory and substantially true.[252]

### iii. Statement 3/2 (Editorial)-3:

*"…intimidation, secrecy and duplicity discredit a vital organization"*

This statement is non-defamatory, substantially true and non-actionable opinion.[253]

---

[250] Jimenez Aff., CR563-64; Jimenez Dep., CR1029-32.

[251] *See supra* notes 180, 184 and accompanying text. *See also* Jimenez Dep., CR1029; *see also* Carter Dep., CR910.

[252] *See supra* notes 36-37 and accompanying text. *See also* Jimenez Dep., CR1029-30.

[253] *See supra* notes 180, 184 and accompanying text. *See also* Jimenez Dep., CR1031-32.

#### iv. Statement No. 3/2(Editorial)-4:

*"The fund-shifting, including the deferring of Carter's salary, allowed the Chamber to show a profit, thus qualifying Carter for a bonus."*

The statement is non-defamatory and substantially true as discussed above.

#### v. Statement No. 3/2 (Editorial)-5:

*"The question mark remains over Carter until he fully explains his actions or until the Chamber chooses to move on without him."*

This statement is non-defamatory, substantially true and non-actionable opinion for the reasons set out above.

### 8. March 3 Article: **Petition Seeks Chamber Changes**.

The article is substantially true and non-defamatory.[254]

#### i. Statement No. 3/3 (Article)-1:

*"Treasurer Damon Bentley reported that Carter had deferred a portion of his salary and shifted other funds among Chamber accounts in a manner that turned what should have been a deficit into a surplus of operating funds. Carter's bonus is linked to the Chamber's financial performance."*

The statement is non-defamatory and substantially true as set out above.[255]

---

[254] Whitmore letter with petition, CR513-17; Scott Dep., CR1106, 1108-09.

**9.    March 4 Article:   <u>About 80 Sign Petition on Chamber Operation</u>.**

The March 4th Article as a whole is non-defamatory, substantially true and a fair report of a public meeting.[256]

### i.    Statement No. 3/4-1:

*"Never has the lack of financial transparency been an issue like it is now, Whitmore said."*

### ii.    Statement No. 3/4-2:

*"…I don't think the current leadership is transparent in its financial decisions."*

The statements are non-defamatory, non-actionable opinion, substantially true and a fair report of a public meeting.[257]

**10.    March 8 Article:  <u>Chamber Board, CEO to Enter Talks</u>.**

### i.    Statement No. 3/8-1:

*"Bentley was asked to look into the organization's finances as part of a review of a proposed raise, bonus and contract extension for Carter, whose bonus is linked to the Chamber's financial performance."*

The March 8th Article is non-defamatory and substantially true.[258]

---

[255] *See also* Carter Dep., CR907.

[256] *See* Aguilar Aff., CR457; Aguilar Dep., CR828; Scott Dep., CR1106, 1108-09; *see also* Tex. Civ. Prac. & Rem. Code § 73.002(b)(1)(D).

[257] *See* Whitmore letter, CR313-15; Whitmore Dep., CR1209; Carter Dep., CR907-08; Hawley Dep., CR1021; *see also* Tex. Civ. Prac. & Rem. Code § 73.002(b)(1)(D).

[258] *See* Carter Dep., CR908; Aguilar Dep., CR829; Scott Dep., CR1114.

**11. March 19 Article: <u>Chamber Treasurer Granted Temporary Restraining Order</u>**

The March 19th Article is substantially true. It is also a fair, true and impartial account of a judicial proceeding.[259]  As such, it is privileged against Carter's libel claim pursuant to Tex. Civ. Prac. & Rem. Code § 73.002(b)(1)(A) (the "fair report privilege" hereafter).

**i.  Statement No. 3/19-1:**

*"Corpus Christi Chamber of Commerce treasurer Damon Bentley has been granted a temporary restraining order against the chamber and CEO Terry Carter to prevent a tape recording from being destroyed."*

**ii.  Statement No. 3/19-2:**

*"Bentley's petition for the temporary restraining order says he has sought a copy of the tape but it has not been provided, and that Carter took the tape from the meeting."*

The statements are non-defamatory, protected by the fair report privilege and substantially true.[260]

**12.  March 20 Article:  <u>Chamber Unrest Ends Up In Court</u>.**

The March 20th Article is a fair, true and impartial account of judicial proceedings by Bentley and Carter. [261]

---

[259]  CR326-36.

[260]  *See* CR326-36; Carter Dep., CR963-64.

####### i.      Statement No. 3/20-1:

*"The restraining order, obtained Tuesday, prohibits Carter and the chamber from destroying a tape of a Feb. 15 chamber executive committee meeting at which Bentley and two others. . ."*

####### ii.      Statement No. 3/20-2:

*"One of the members' concerns, Scott and others have said, is that the chamber is losing membership but they couldn't verify it because the full member list was withheld."*

The statements are protected by the fair report privilege, non-defamatory and substantially true.[262]

### 13.     March 26 Article: <u>Chamber Puts CEO on Paid Leave</u> and March 27 Article:  <u>Chamber CEO on Paid Leave</u>.

####### i.      Statement No. 3/26-1 and 3/27-1:

*"Chamber CEO on Paid Leave"*

The statement is substantially true and non-defamatory.[263]

### 14.     March 27 Article:  <u>Judge Unifies Filings On Chamber Events</u>

The March 27th Article is a fair report of judicial proceedings.[264]

---

[261] *See* CR326-36; CR342-53; Scott Dep., CR1114-15.

[262] *See* Carter Dep., CR964-65; CR504-517.

[263] *See* Carter Dep., CR908, 965-66.

[264] Order of Consolidation, CR359-62.

### i. Statement No. 3/27(2)-1:

*"Bentley sought the consolidation, asserting that his and Carter's legal actions arose from the same set of events."*

### ii. Statement No. 3/27(2)-2:

*"That tape was removed by Terry Carter from the meeting and taken from the Corpus Christi Chamber of Commerce immediately after the meeting ended."*

The statements are protected by the fair report privilege, non-defamatory and substantially true.[265]

## 15. April 1 Article: Chamber Had Deficit, Board Tells Members.

The Article is a privileged as a fair report of a public meeting, non-defamatory and substantially true.[266] Reporter Aguilar attended the Chamber's public general membership meeting on March 31, 2008 and accurately reported on it.[267]

### i. Statement No. 4/1-1:

*"Further review of the books by the Chamber executive committee showed that a deferral of a part of the chief executive officer's salary and shifts of more than $142,000 in membership dues resulted in the surplus, according to treasurer Damon Bentley."*

---

[265] Carter Dep., CR966; *see also* CR354-58.

[266] *See* Aguilar Aff., CR457; Carter Dep., CR966-67; FY2007 adjustments, CR180-83; *see also* Tex. Civ. Prac. & Rem. Code § 73.002(b)(1)(D).

[267] Aguilar Aff., CR457.

The statement is privileged as a fair report of a public meeting, substantially true and non-defamatory.[268]

### ii.    Statement No. 4/1-2:

*"The membership meeting was a result of a petition drive started in late February to address concerns of members who said they had been denied financial information and membership rosters and who were concerned about the Chamber's accounting methods."*

The statement is privileged as a fair report of a public meeting, substantially true and non-defamatory.[269]

### 16.    April 29 Article:  <u>Chamber, In Need Of Audit, Renews Accountant Search</u>.

Carter complains about the following statement:

*"He said negotiations between Chamber attorney Van Huseman and Chamber President and CEO Terry Carter are ongoing."*

The statement is non-defamatory and substantially true.[270]

---

[268] *See* Carter Dep., CR967; Thompson Dep., CR1145; FY2007 adjustments, CR179-83.

[269] *See* Carter Dep., CR967-68; Scott Dep., CR1106, 1108.

[270] *See also* Carter Dep., CR968.

**17.** **May 2 Article:** <u>**Chamber Offers Contract Settlement to Carter, His Attorney Says**</u>**; May 3 Article:** <u>**Chamber Makes Offer, Carter's Attorney Says**</u>**; May 23 Article:** <u>**Chamber, Carter's Attorney Confirm Severance Agreement**</u> **and May 24 Article:** <u>**Carter's salary to be paid in full**</u>.

These Articles are non-defamatory and substantially true.[271]

**18.** **May 28 Article:** <u>**Release of Chamber Audio Recording Sought**</u>**; and May 30 Article:** <u>**Judge orders that chamber tape recording be released today**</u>.

Carter complains of the following statement in each article:

*"Carter has been on paid leave since March 26."*

The statement is substantially true and non-defamatory.[272]

**19.** **May 31 Article:** <u>**Chamber Tape Tells of Heated Exchange**</u>.

The May 31st Article as a whole is privileged as a fair report of a judicial proceeding, non-defamatory and is substantially true.[273]

### i. Statement No. 5/31-1:

*"Chamber tape tells of heated exchange."*

### ii. Statement No. 5/31-2:

*"A recording of a Corpus Christi Chamber of Commerce meeting obtained Friday by the Caller Times contains a*

---

[271] *See also* Carter Dep., CR968-69.

[272] *See also* Carter Dep., CR908; Carter's interrog. resp., CR795-800.

[273] *See also* CR324-25; transcript, CR707-94.

*contentious exchange between CEO Terry Carter and other chamber officials."*

### iii. Statement No. 5/31-3:

*"Early in the segment a contentious exchange between Carter and Bentley can be heard, as the chamber officials discuss whether to proceed with Bentley's financial report."*

### iv. Statement No. 5/31-4:

*"Bentley: It's not a question for me to answer right now. I'm going to give the findings of fact."*

The statements are a privileged as a fair report, non-defamatory and substantially true.[274]

### 20. June 13, 2008 Article: <u>Ex-Chamber CEO's Mediation to Continue</u>.

The Article is non-defamatory and substantially true.[275]

### F. The Articles Were Published Without Negligence[276]

A private figure plaintiff must prove negligence in a libel action against a media defendant.[277] Here, the record disproves negligence as the *Caller-Times* acted reasonably in checking the truth of the Articles before

---

[274] *See* CR711; Bentley Dep., CR849-50; Carter Dep., CR969-70.

[275] *See also* Carter Dep., CR970.

[276] The Court need not reach the issues of negligence or exemplary damages if it determines the Articles were non-defamatory or substantially true. *See Neely*, 418 S.W.3d at 61 (*citing McLemore*, 978 S.W.2d at 571).

[277] *See Foster v. Laredo Newspapers, Inc.*, 541 S.W.2d 809, 820 (Tex. 1976).

publication.[278] It is undisputed that the Articles were published with diligence, balance and in accord with standard journalistic practices and customs.[279] The *Caller-Times* submitted the expert opinion of Tony Pederson—former editor of the *Houston Chronicle* and journalism chair at SMU—that the Articles were prepared in accordance with usual journalistic standards and practices.[280]

Carter's response offers no evidence or expert opinion to raise a fact issue that the *Caller-Times* did not act reasonably in preparing and publishing the Articles or that they contained any misstatement whose content would warn a reasonably prudent editor of its defamatory potential.[281]

---

[278] *See Scripps Tex. Newspapers, L.P. v. Belalcazar*, 99 S.W.3d 829, 837 (Tex. App.—Corpus Christi 2003, pet. denied) ("Negligent conduct is determined by asking 'whether the defendant acted reasonably in checking the truth or falsity or defamatory character of the communication before publishing it.'") (internal quotation omitted).

[279] *See* Pederson Report, CR665; Pederson Dep., CR1068, 1070-79; Aguilar Aff., CR454-60; Cavazos Aff., CR518-22; Chirinos Aff., CR 530-34; Jimenez Aff., CR562-65; Malan Aff., CR608-11; Powell Aff., CR584-88; Wilson Aff., CR613-15; Whitehurst Aff., CR616-19; Birmingham Aff., CR624-28; Contreras Aff., CR636-40; Averyt Aff., CR620-23.

[280] CR664-65.

[281] *See Foster*, 541 S.W.2d at 819. *See also Holly v. Cannady*, 669 S.W.2d 381, 384-385 (Tex. App.—Dallas 1984, no pet.) (There was "simply no evidence indicating the existence of circumstances which would have prompted a reasonable person to question the statements made and conclusions drawn.").

Carter's response mistakenly asserted alleged evidence of actual malice was dispositive of negligence.[282] However, actual malice is not the same as negligence.[283] The two concepts are different fault standards in libel cases. A private figure plaintiff must prove negligence, not actual malice, on his case in chief.[284]

## G.  Carter Cannot Recover Exemplary Damages Because the Articles Were Published Without Actual Malice

A private figure plaintiff must prove actual malice in order to recover punitive or exemplary damages in a libel case arising out of reports of a matter of public concern.[285]

Here, the evidence establishes that the *Caller-Times* Appellants acted without actual malice.[286] Actual malice is "not ill will, spite or evil motive"; it is the making of a statement with either knowledge it is false or reckless

---

[282] 2CR1241.

[283] *See Foster*, 541 S.W.2d at 820 (refusing to assess negligence when only actual malice argued).

[284] *See Neely,* 418 S.W.3d at 61 (*citing McLemore,* 978 S.W.2d at 571) (public figure libel plaintiff must prove actual malice while private figure plaintiff must prove negligence).

[285] *See Burbage*, 447 S.W.3d at 259 (private figure plaintiff who does not prove actual malice may recover only damages for actual injury) (*citing Gertz*, 418 U.S. at 350).

[286]  *See* Aguilar Aff., CR454-60; Cavazos Aff., CR518-22; Chirinos Aff., CR530-34; Jimenez Aff., CR562-65; Powell Aff., CR584-88; Malan Aff., CR608-11; Wilson Aff., CR612-15; Whitehurst Aff., CR616-19; Averyt Aff., CR620-23; Birmingham Aff., CR624-28; Contreras Aff., CR636-40; Pederson Aff., CR646-48; Pederson Dep., *passim*; Reta Aff., CR451-53.

disregard—meaning it was made while entertaining serious doubts as to the truth of the statement.[287] The Articles were published without knowledge of any falsity and without doubts as to the truth of any allegedly defamatory statement.[288] Although Appellants negated actual malice, Carter's various arguments that malice is shown also fail as a matter of law.

1.  **Carter failed to show specific allegedly false statements were published with actual malice.**

Carter must demonstrate actual malice separately as to each allegedly false statement he claims libeled him.[289] Yet, Carter's discussion of actual malice in his response references specific statements in only a handful of the Articles.[290] Thus, the Court may disregard Carter's abstract discussion

---

[287] *Huckabee*, 19 S.W.3d at 420.

[288] *See* Aguilar Aff., CR459; Cavazos Aff., CR521; Chirinos Aff., CR533; Jimenez Aff., CR564-65; Powell Aff., CR587; Malan Aff., CR610; Wilson Aff., CR614; Whitehurst Aff., CR619; Averyt Aff., CR622-23; Birmingham Aff., CR627; Contreras Aff., CR639; Pederson Report, CR664-65.

[289] *See, e.g., Church of Scientology Int'l v. Time Warner, Inc.*, 903 F. Supp. 637, 641 (S.D.N.Y. 1995) (on summary judgment, "the Court considers each allegedly libelous statement individually to determine whether a rational finder of fact could find actual malice"), *aff'd*, 238 F.3d 168 (2d Cir. 2001); *Henry v. Nat'l Ass'n of Air Traffic Specialists, Inc.*, 836 F. Supp. 1204, 1212 (D. Md. 1993) ("The plaintiffs must produce [] evidence that the defendants uttered [each] challenged statement [] with actual malice"), *aff'd*, 34 F.3d 1066 (4th Cir. 1994).

[290] *See* Response, 2CR1244 (March 2 editorial); 2CR1252 (May 31 Article); 2CR1254 (February 27, 29, March 8 Articles); 2CR1259 (March 3 Article).

of malice regarding unspecified Articles.  As to the few Articles he actually specifies, Carter failed to establish actual malice as shown below.

### 2. There is no evidence of "reckless" preparation of the editorial.

Carter makes no attempt to examine whether the author of the editorial, Nick Jimenez, actually entertained serious doubts as to its truth. Carter's response and affidavit do not refer to Jimenez or attempt to rebut his uncontroverted affidavit that he believed that all facts stated in the editorial were true based on previously published articles in the *Caller-Times*.[291] Reliance on previously published reports in reputable news sources precludes a finding of actual malice.[292] Carter also claims the *Caller-Times* should have asked Thompson about Bentley's letter.[293] Yet it is undisputed that Aguilar, the author of the article which quoted the Bentley letter, attempted to do just that.[294]

Carter contends actual malice may be found because the editorial stated that Carter's actions "would" threaten the chamber's financial status

---

[291]  CR565.

[292]  *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1297 (D.C. Cir. 1988).

[293]  2CR1247.

[294]  CR458.

when the accountant had only said it "could" threaten it.[295]  However, the statement is substantially true[296] and therefore cannot support a finding of actual malice.[297]

### 3.    Alleged ill-will is no evidence of actual malice.

Carter alleges publisher Patrick Birmingham demonstrated "dislike," "distain (sic)," "animosity," "outrage," and "personal animus" towards him.[298]  But Birmingham did not write, assign, direct, edit or contribute to any of the articles,[299] and his alleged ill-will does not prove knowing or reckless falsity.[300] Statements that a defendant "didn't like" or "had it out" for the plaintiff are not proof of actual malice.[301]

---

[295]  2CR1247.

[296]  *See Dolcefino*, 19 S.W.3d at 921 (use of phrase "could not" when "would not" was actually correct was of secondary importance and statement was substantially true).

[297]  *See also Freedom Newspapers v. Cantu*, 168 S.W.3d 847, 855 (Tex. 2005) (mistaken but rational interpretation of statement is no evidence of actual malice).

[298]  2CR1248-50.

[299]  CR624-28.

[300]  *Huckabee*, 19 S.W.3d at 424–25.

[301]  *Cantu*, 168 S.W.3d at 857-58.

### 4. There is no omission or juxtaposition establishing actual malice.

As explained above, there was no omission or juxtaposition, as Carter's explanations and version of events were included in the Articles.[302] In any event, Carter offered no evidence of an omission or juxtaposition made with the intent of creating a false impression, which is required for actual malice.[303]

### 5. There was no avoidance of the truth or obviously unreliable sources.

Where a journalist seeks the truth from multiple sources, on both sides of an issue, there is no purposeful avoidance of truth evidencing actual malice.[304] It is undisputed that information was sought from numerous, knowledgeable sources—including Carter and his counsel. In addition, Carter's claims that the *Caller-Times* should not have believed Bentley and other persons with relevant knowledge is no evidence of actual malice.[305]

---

[302] *See supra* notes 150-51 and accompanying text.

[303] *Huckabee*, 19 S.W.3d at 436 ("in the absence of evidence that the defendant selected the material to portray the judge's record falsely, the First Amendment protects the organization's choice of which material to include in its broadcast").

[304] *Skeen*, 159 S.W.3d at 637-39.

[305] *See Lohrenz v. Donnelly*, 350 F.3d 1272, 1284 (D.C. Cir. 2003).

## H.     Tag-Along Tort Claims Also Fail

Carter testified that his non-defamation claims are based on the newsgathering for and publication of the Articles that he alleges defamed him.[306]   His response—which mentions only tortious interference and conspiracy among his non-libel actions—takes the same approach.[307]   But publication-based claims fail along with defamation claims arising from the same events.[308]

Carter argued in support of his conspiracy claim (without reference to the record) that the *Caller-Times* acted in concert with the people it interviewed for the Articles.[309]   But Carter offered no <u>evidence</u> to rebut testimony from Bentley and *Caller-Times* personnel negating any such conduct.[310] Therefore, the trial court erred in denying summary judgment to Appellants on the non-libel claims.

---

[306]  CR912.

[307]  2CR1268-70.  Carter's response does not mention or attempt to identify any evidence in support of his fiduciary duty or inducement claims.

[308]  *See, e.g.*, *Freedom Newspapers*, 168 S.W.3d at 852 n.3; *Rogers v. The Dallas Morning News, Inc.*, 889 S.W.2d 467, 474 (Tex. App.—Dallas 1994, writ denied).

[309]  2CR1269-70.

[310]  Bentley Dep., CR857; Cavazos Aff., CR521; Malan Aff., CR610; Averyt Aff., CR623; Birmingham Aff., CR628. *See Shunta v. Westergren*, No. 01-08-00715-CV, 2010 WL 2307083, at *7-8 (Tex. App.—Houston [1st Dist.] June 10, 2010, no pet.) (affirming no-

## I.  Appellant E.W. Scripps Has No Publisher Liability

The threshold element for a libel action is whether a false, defamatory statement was <u>published</u>.  The record is undisputed that Appellant E.W. Scripps had no involvement in publishing (or researching, preparing, writing, reviewing, or editing) any of the Articles or content on the website Caller.com.[311]  Accordingly, it was error to deny E.W. Scripps Co. summary judgment because it did not publish any allegedly defamatory statements concerning Carter.

## PRAYER

Appellants pray that the Court reverse the trial court order denying their second motion for final summary judgment and render judgment that Appellee Terry Carter take nothing.  Appellants further pray for any other relief to which they may justly be entitled.

---

evidence summary judgment on conspiracy because plaintiff failed to present evidence of requisite intent).

[311]  *See* Contreras Aff., CR636-40; Contreras Dep., CR988-98; Whitehurst Dep., CR1180-81; Carter Dep., CR979-80.

Respectfully submitted,

/s/ Paul C. Watler
Jorge C. Rangel
State Bar No. 16543500
Jaime S. Rangel
State Bar No. 24033759
Joseph M. Marcum
State Bar No. 12973000
THE RANGEL LAW FIRM, P.C.
615 N. Upper Broadway, Suite 2020
Corpus Christi, Texas 78401
Telephone: (361) 883-8500
Facsimile: (361) 883-2611
Email: jorge.c.rangel@rangellaw.com
Email: jaime.rangel@rangellaw.com
Email: joe.marcum@rangellaw.com

- and -

Paul C. Watler
State Bar No. 20931600
Andrew D. Graham
State Bar No. 24041002
JACKSON WALKER, LLP
2323 Ross Avenue, Suite 600
Dallas, Texas 75201
Telephone: (214) 953-6000
Facsimile: (214) 953-5822
Email: pwatler@jw.com
Email: agraham@jw.com

**Attorneys for Appellants Scripps NP Operating, LLC, a Wisconsin Limited Liability Company, Successor in Interest to Scripps Texas Newspapers, LP d/b/a *Corpus Christi Caller-Times*, and The E.W. Scripps Company**

## CERTIFICATE OF SERVICE

On December 17, 2015, I electronically filed Appellants' Brief with the Clerk of Court using the File & eFileTexas electronic filing system, which will send notification of the filing to the following:

Rene Rodriguez
LAW OFFICE OF RENE RODRIGUEZ
433 S. Tancahua St.
Corpus Christi, Texas 78404
361-882-1919 / 361-882-2042 *fax*
Email: rene.rodriguez@rdrlaw.com
***Attorney for Plaintiff Terry Carter***

Craig Smith
Law Offices of Craig S. Smith
14493 S.P.I.D. Suite A; P.M.B. 240
Corpus Christi, Texas 78418
361-728-8037
Email: csslaw@stx.rr.com
***Attorney for Plaintiff Terry Carter***

Angelica E. Hernandez
AEH Law Firm
410 Peoples Street
Corpus Christi, Texas 78401
361-400-2966 / 866-759-9272 *fax*
Email: aehlawfirm@yahoo.com
***Attorney for Plaintiff Terry Carter***

/s/ Paul C. Watler
Paul C. Watler

**CERTIFICATE OF COMPLIANCE**

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(2)(B), I hereby certify that the above styled document contains 14,431 words, excluding the caption, identity of parties and counsel, table of contents, index of authorities, statement of the case, issues presented, and statement of oral argument, signature, certificate of service, certificate of compliance and appendix. In making this certification, counsel is relying on a word-count computer program used to prepare the document.

/s/ Paul C. Watler
Paul C. Watler

## APPENDIX

| TAB | DESCRIPTION |
|-----|-------------|
| 1. | Order denying Second Motion for Final Summary Judgment, 6CR12748 |
| 2. | The Articles, CR462-78, 481-82, 485-92, 524-27, 538, 541, 567 |
| 3. | Bentley's February 26 letter to Chamber board, CR299-08 |
| 4. | Bentley's PowerPoint presentation to the Chamber board, CR156-72 |
| 5. | Carter's February 17 letter to Chamber board, CR240-43 |
| 6. | Affidavit of reporter Elvia Aguilar, CR454-60 |
| 7. | Whitmore's February 28 letter to Chamber board, CR313-15 |

# TAB 1

| | | |
|---|---|---|
| TERRY CARTER<br>Plaintiff, | §<br>§<br>§ | IN THE DISTRICT COURT |
| vs. | §<br>§ | |
| | § | 214th JUDICIAL DISTRICT |
| CORPUS CHRISTI CHAMBER OF<br>COMMERCE, SCRIPPS NP<br>OPERATING, LLC, A WISCONSIN<br>LIMITED LIABILITY COMPANY,<br>SUCCESSOR IN INTEREST TO SCRIPPS<br>TEXAS NEWSPAPERS, L.P., d/b/a<br>CORPUS CHRISTI CALLER TIMES,<br>and THE E.W. SCRIPPS COMPANY | §<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Defendants. | § | NUECES COUNTY, TEXAS |

### ORDER DENYING *CALLER-TIMES* DEFENDANTS' SECOND MOTION FOR FINAL SUMMARY JUDGMENT

On the 4th day of September, 2015 came on to be heard *Caller-Times* Defendants' Second Motion for Final Summary Judgment filed by Scripps NP Operating, LLC, A Wisconsin Limited Liability Company, Successor In Interest To Scripps Texas Newspapers, LP d/b/a Corpus Christi *Caller-Times* ("*Caller-Times*") and The E.W. Scripps Company ("*E.W. Scripps*")(collectively, "*Caller-Times* Defendants"). After considering the *Caller-Times* Defendants' Second Motion for Final Summary Judgment ("Motion"), the pleadings, the response, the reply, affidavits and other competent summary judgment evidence on file, the Court finds that the Motion should be and it is hereby DENIED.

SIGNED this 21 day of October, 2015

HONORABLE JOSE LONGORIA

12748

97

# TAB 2

**February 15, 2008**

*Financial, management questions raised at CC Chamber*

**Jaime Powell**

**CR 462 – 463**

**Exhibit M-1 to Aguilar Affidavit**

**Exhibit Q-1 to Powell Affidavit**

99


**caller.com**
CORPUS CHRISTI, TEXAS

## Financial, management questions raised at CC Chamber

### Two members of chamber of commerce's executive committee, who asked for meeting to discuss the issues, told they are no longer eligible to serve

By Jaime Powell

Originally published 05:00 p.m., February 15, 2008
Updated 05:00 p.m., February 15, 2008

EXHIBIT

tabbies "M-1"

CORPUS CHRISTI — Three high-ranking Corpus Christi Chamber of Commerce officials raised what they describe as serious financial and management issues Friday.

After demanding an emergency meeting Friday of the chamber's executive committee to air their concerns, two of the three officials, Judy Hawley and Sylvia Whitmore, were told they are no longer eligible to serve on the executive committee, Hawley said. However, they were asked to present their information, in a meeting that lasted most of Friday morning and from which chamber President Terry Carter could be heard shouting.

No chamber officials would discuss the nature of the financial issues. The concerns arose after chamber chairman-elect Robert Gonzalez recommended a raise, bonus and contract extension for Carter in January and executive committee treasurer Damon Bentley was asked to review the chamber's financial standing, Hawley said.

At the meeting, chamber chairman Freddie Martinez Jr., legal counsel Van Huseman and Carter told Hawley she was no longer on the board because she was an appointee of the Port of Corpus Christi and the port did not contribute money to the chamber this year. They told Whitmore, a banker and a past chamber chairman, that she was no longer eligible because she is no longer immediate past chairman.

Carter declined to comment. Attempts to reach Martinez and Whitmore were unsuccessful. Huseman said he reviewed Hawley's and Whitmore's status at Martinez's request. Huseman said Carter's contract runs through the end of the year, and described the financial questions as business practice-related, not improprieties.

Bentley said Carter's review was continuing.

"We agreed from a statement standpoint to say we are continuing the process of our

1 C.R. 462

100

**February 16, 2008**
*Chamber pulls two off panel*
**Jaime Powell**
**CR 464 – 465**
**Exhibit M-1 to Aguilar Affidavit**
**Exhibit Q-1 to Powell Affidavit**

101

## FROM THE COVER

### CHAMBER from 1A

The financial concerns arose after chamber chairman-elect Robert Gonzalez recommended a raise, bonus and contract extension for Carter in January and executive committee treasurer Damon Bentley was asked to review the chamber's financial standing, Hawley said Friday.

Bentley, Gonzalez, Hawley and Whitmore would not describe the financial and management concerns. Attempts to reach chamber chairman Freddie Martinez Jr. were unsuccessful.

Chamber legal counsel Van Huseman, who attended the meeting Friday, described the financial questions as business practice-related, not improprieties. He said Carter's contract runs through the end of the year.

The executive board, with all five members present, met two weeks ago in Martinez's office and agreed to put off making a decision and to continue looking into the finances, Hawley said.

Had there been a vote, it would have been 3-2 to refrain from a raise, bonus and contract extension, with Bentley, Hawley and Whitmore in the majority, until a complete financial picture could be put together, Hawley said.

"We did not have enough information, so Damon continued to go through the books and look at all of the accounts," she said. "A week and a half ago he tried to call Freddie, he called me and called Sylvia ... He said, 'there are some irregularities I am concerned about. We need a full executive committee meeting as soon as possible.'"

Since that meeting, Whitmore, Bentley and Hawley took turns calling Martinez and Gonzalez repeatedly and got no response, Hawley and Bentley said.

"At that point, Damon had shared those things and each message we left was more strident than the last," Hawley said. "Finally we sent hand-delivered letters to Bobby and Freddie requesting that they cancel other meetings to hold an executive session as an executive board to discuss the irregularities."

Martinez sent an e-mail calling for an emergency meeting at 8 a.m. Friday. When Hawley arrived 10 minutes early, with Whitmore and Bentley following a short time later, Martinez was behind closed doors in Carter's office with Huseman.

"Then Terry and Freddie come in and talk to Sylvia and me," Hawley said. "We are the only ones in the room. They tell us, Terry says, 'in anticipation that there may be action taken today, we want you to know we have been looking at the bylaws and it appears you and Sylvia are not voting members because after our attorney scrutinized the bylaws y'all are not eligible to sit on the executive board.'"

Huseman said Martinez asked for legal advice because the question had been raised whether Whitmore and Hawley were legal members of the executive committee. Based on the chamber's bylaws, the executive committee is made up of the chairman, chair-elect, immediate past chair, vice chairs if any, and the treasurer, Huseman said. Under those rules, Bentley, Martinez and Gonzalez are the only members, Huseman said.

Hawley has been the Port of Corpus Christi's representative on the chamber board, but this year, the port didn't renew its funding of the chamber, which last year was $45,000. For that reason, Huseman said Hawley, a port commissioner, no longer should be on the chamber board.

Port Chairman Ruben Bonilla said the chamber had been spearheading a community advisory committee to deal with the closing of Naval Station Ingleside. When it became obvious the port didn't need such a committee, it eliminated the need for the port to have a service agreement with the chamber, which included the funding.

The agreement also called for the chamber and the port to cross-promote each other and included a plan for chamber functions at the port's Solomon P. Ortiz International Center. The chamber had begun using the center less, so neither of the reasons for the original service agreement with the chamber applied, and the port decided not to renew it or the funding, Bonilla said.

After the port's decision in January not to renew, Hawley said she asked Martinez if he wanted her to resign and he indicated that she should stay on the committee because the chamber still was trying to negotiate a deal with port.

Whitmore is past chair, but not immediate past chair.

"The bylaws are clear and they wanted to do this as the bylaws specify," Huseman said.

Whitmore was chairman two terms ago, but remained on the committee in place of refinery manager Dave Allen, who resigned as chairman early after Koch Industries, which owns Flint Hills refinery in Corpus Christi, transferred him from the city. Whitmore remained on the committee at Martinez's request, she, Hawley and Bentley said.

Hawley said their abrupt dismissal Friday, after having been asked to stay, came as a shock.

"I said 'You have got to be kidding.' And Sylvia said, 'What are you talking about?' Our status was fine until today."

Hawley said it was significant that she and Whitmore were the first order of business Friday, instead of their concerns about financial practices.

"I said, 'OK, I guess we will kiss you goodbye.' Then Freddie says you can't vote on anything but let's go ahead and hear what you have to say."

Gonzalez wouldn't comment on Friday's events because, he said, they happened in closed session.

Bentley was outside in a hallway when Hawley and Whitmore were dismissed because Carter had denied him entrance to the meeting.

"I was not privy to the meeting because I was asked not to come in," Bentley said. "He went inside and closed the door. They (Hawley and Whitmore) explained to me what happened. It was a strange scenario. I was saddened and I'm still confused on why two chamber executive board members had been removed from the executive committee after being asked to assist in the evaluation process of our CEO."

Hawley and Whitmore stayed to listen after Bentley came in to report on the financial concerns.

"We wanted full and complete audits of special events, contracts, the building fund, the foundation fund and chamber funds, because there were enough irregularities and according to bylaws we are supposed to have an audit every year," Hawley said. "Last year we had a spot audit. We felt very strongly that we ought to have a full audit."

Regarding the financial matters, Bentley told the *Caller-Times*:

"We agreed from a statement standpoint to say we are continuing the process of our evaluation and that there are both serious financial and management issues that we need to address."

After Bentley delivered his report, Hawley and Whitmore left the meeting.

"I am still very committed and willing to serve as immediate past chair, as I thought I was serving," Whitmore said. "But Judy and I did leave the chamber office after we told Freddie and Bobby that we recommended a full audit because I no longer had a vote."

Gonzalez said a full audit of chamber finances is in the works. He would not elaborate.

"We are going to conduct our yearly audit of the chamber and that will give us the results of 2007," Gonzalez said. "Frankly I am going to rely on the audit to answer any further questions. In the end the audit will tell us the real facts behind the chamber's 2007 year."

---

*'We are going to conduct our yearly audit of the chamber and that will give us the results of 2007. Frankly I am going to rely on the audit to answer any further questions.'*

**Robert Gonzalez,** *chairman elect*

---

*Staff writers Elvia Aguilar and Fanny S. Chirinos contributed to this report. Contact Powell at 886-3716 or powellj@caller.com*

1 C.R 465

102

**February 20, 2008**

*CC Chamber meeting to*
*discuss financial irregularities*

**Elvia Aguilar**

**CR 466**

**Exhibit M-1 to Aguilar Affidavit**

103



Printer-friendly story
Read more at caller.com

## CC Chamber meeting to discuss financial irregularities

By Elvia Aguilar

Originally published 01:24 p.m., February 20, 2008
Updated 01:24 p.m., February 20, 2008

CORPUS CHRISTI — The Corpus Christi Chamber of Commerce executive committee is meeting to discuss financial irregularities discovered during a performance review of president Terry Carter after a raise and bonus for Carter had been proposed. The financial questions led to a decision to conduct a full audit. Today's meeting is a special-called meeting, to be followed by a meeting of the chamber's full board.



© 2009 Scripps Newspaper Group — Online

1 C.R. 466

104

**February 21, 2008**

*Financial questions lead to call for audit*

**Elvia Aguilar**

**CR 467**

**Exhibit M-1 to Aguilar Affidavit**

CORPUS CHRISTI

# Caller Times

50 CENTS          THURSDAY, FEBRUARY 21, 2008          CITY EDITION

## CHAMBER OF COMMERCE

# Financial questions lead to call for audit

**BY ELVIA AGUILAR**
*Caller-Times*

The Corpus Christi Chamber of Commerce decided Wednesday to conduct a full audit, after what have been described as financial irregularities were uncovered while reviewing a proposed raise and bonus for chamber president/CEO Terry Carter.

Three top chamber officials, chairman Freddie Martinez Jr., attorney Van Huseman and vice president Ken Treviño, said they did not know when the last chamber audit was conducted. Carter did not respond to a message left on his cell phone.

The chamber's bylaws from 2006 state that an audit is required annually.

The audit decision occurred at a special called meeting of the executive committee, followed by a full board meeting. Martinez, who also chairs the executive committee, said no auditor has been chosen and

*Please see* **CHAMBER 7A**

---

★ CALLER-TIMES • February 21, 2008 • **Thursday** • **7**A

## FROM THE COVER

### CHAMBER *from* **1A**

no audit deadline has been set. An audit committee will be appointed but no deadline is set for those appointments, he said.

Wednesday's special called meeting resulted from a special called meeting Friday of the executive committee, when two significant developments occurred: 1) Three of the committee's five members brought the financial concerns to the full committee's attention, and 2) Carter and Huseman informed two of the three that they were no longer eligible to serve on the committee.

Those two, Judy Hawley and Sylvia Whitmore, did not attend Wednesday's meeting. The third, board treasurer Damon Bentley, declined to answer questions after Wednesday's meeting.

People familiar with Wednesday's proceedings saw Bentley deliver a PowerPoint presentation on the financial issues, with paper copies distributed to board members. Afterward, Treviño was observed collecting those paper copies from board members, and Bentley was observed declining to surrender his copy.

Martinez described Wednesday's proceeding as "a very positive meeting where we discussed issues concerning the chamber's financial process and we agreed to form an audit committee to move forward with the audit process."

Martinez said no one has been appointed to replace Hawley and Whitmore on the executive committee and he did not know when that would occur. He said Bentley and chairman-elect Robert Gonzalez, who also is a member of the executive committee, would serve on the audit committee.

According to the chamber's bylaws from 2006, "accounts of the chamber shall be audited annually as of the close of business Dec. 31 by a Certified Public Accountant. The audit shall at all times be available to members of the organization within the offices of the chamber." Martinez said an annual audit is still a requirement.

No chamber officials have disclosed the nature of the financial issues, which Bentley, Hawley and Whitmore raised after reviewing a recommendation by the chairman-elect, Gonzalez, that Carter receive a raise and bonus. Bentley, Hawley and Whitmore insisted on Friday's meeting via certified letter to Gonzalez and Martinez after they did not respond to several phone messages seeking a meeting.

Carter made $137,000 plus $8,220 in

benefits and $6,000 in expenses in 2006, the latest figures available through the organization's tax forms required of nonprofit groups. That tax form also shows the chamber in the black — $942,886 in 2006 revenue against $880,838 in expenses.

Several board members who attended the meeting Wednesday declined to answer questions about what was discussed. The meeting was not tape recorded, a departure from the usual practice.

Laurie Cook, a recently appointed board member and former chamber chairwoman, offered perspective on why there may not be a set schedule for the audit. Cook, a certified public accountant, pointed out that this is income tax season, the busiest time for practicing CPAs. A CPA hired to audit the chamber on a strict schedule during tax season would be likely to charge a premium rate, she said. The standard practice for an organization conducting an audit would be to advertise for requests for proposals from potential auditors, she said.

Butch Escobedo, a new board member and owner of Butch Escobedo Insurance, said he was pleased with the results of the meeting and looks forward to seeing the results of the audit.

"I came in here with some concerns that individuals with an agenda were trying to let politics get involved in an organization," Escobedo said. "I came away with something I think will be good for the chamber and those businesses who are members."

Some prominent longtime members have chosen in recent months not to renew their chamber memberships, including the local chapter of Associated General Contractors; Bank of America; the *Caller-Times*; Fulton-Coastcon Construction; San Jacinto and Stewart title companies; and Wood, Boykin & Wolter law firm. That firm includes John D. Bell, the chamber's former longtime attorney, who served free of charge.

Mark Scott, president and chief operating officer of San Jacinto Title Services, had been a longtime chamber member and his wife, Carol, served as the chamber board's chairwoman in 2003.

"At this point due to the concerns we have with the Chamber of Commerce, we did not renew our membership," said Mark Scott, also a former City Council member.

*Staff writer Denise Malan contributed to this report. Contact Elvia Aguilar at 886-3678 or aguilare@caller.com*

1 C.R. 467

**February 27, 2008**

*Chamber CEO shifted funds, letter says*

**Elvia Aguilar**

**Exhibit M-1 to Aguilar Affidavit**

**Exhibit Q-1 to Powell Affidavit**

CORPUS CHRISTI

# Caller-Times

50 CENTS     WEDNESDAY, FEBRUARY 27, 2008     CITY EDITION

# Chamber CEO shifted funds, letter says



## Move makes loss appear to be profit, treasurer writes

**BY ELVIA AGUILAR**
*Caller-Times*

**Carter's 2006 salary was $137,000 plus benefits and expenses.**

The Corpus Christi Chamber of Commerce chief executive, whose bonus is based on financial performance, shifted funds to make a loss look like a profit, according to a letter by the chamber's treasurer.

Chamber CEO Terry Carter also deferred part of his and his second-in-command's 2007 salary to 2008, chamber treasurer Damon Bentley said in a letter Tuesday to board members. Carter, in a Feb. 17 letter to board members, said he deferred part of his salary in 2006 and 2007 for tax purposes. Attempts to reach Carter Tuesday were unsuccessful.

Bentley was asked to review the chamber's finances in anticipation of a raise, bonus and contract extension for Carter. The *Caller-Times* did not acquire the letter from Bentley, but has verified it as what he sent and board members received.

Bentley disclosed his concern about the chamber's books at a Feb. 15 meeting of the chamber executive committee that included a shouting match with Carter and the dismissal of two committee members, Judy Hawley and Sylvia Whitmore. Bentley, Hawley and Whitmore had demanded the meeting via certified letter after committee members Freddie Martinez Jr., the chairman, and Robert Gonzalez, the

*Please see* **CHAMBER 7A**

1 C.R. 468

108

## FROM THE COVER/NATION

### CHAMBER *from* 1A

chairman-elect, did not respond to phone calls for more than a week.

During the meeting, which was tape-recorded, Carter seized the tape and left the building, according to Bentley's letter and witness accounts. Bentley's letter details his unsuccessful attempts to obtain a copy of the tape.

The letter says chamber executive vice president Ken Treviño also was asked to defer salary "because the chamber was 'in a cash crunch' and they needed to pay bills," according to Bentley's letter. Treviño, reached Tuesday, acknowledged that he deferred part of his salary for that reason.

The amount Carter deferred last year was $19,992, according to Bentley's letter.

Carter's 2006 salary, the most recent available through a financial report required by government rules for nonprofit organizations, was $137,000 plus $8,000 in benefits and $6,000 in expenses.

The link between Carter's bonus and the chamber's financial performance was a red flag for the chamber's accountant, Darrell Thompson, according to Bentley's letter. The accountant told the chamber executive committee that "use of Building Fund dollars to supplement the chamber operating expenses could possibly forfeit the (chamber) foundation's (nonprofit) status because of the link between the CEO's bonus to the financial performance of the chamber."

The building fund was set up to pay for the chamber's eventual move from its current building, now owned by the federal government as part of the deal that allowed the federal courthouse to be built next door. The chamber will have to move by 2011.

The letter also said the accountant "no longer will discuss this matter and that the chamber has become a 'high risk' engagement that he may no longer want to be associated with."

Thompson did not return phone calls Tuesday.

An e-mail exchange between Bentley and Thompson verifies Bentley's description of Thompson's concerns and shows that the description of the chamber as "high risk" was Thompson's. The e-mail exchange obtained by the *Caller-Times* did not come from either Bentley or Thompson.

Thompson had sought but never received a letter authorizing him to give Bentley a written account of his recollections of the Feb. 15 meeting, according to both the letter and the e-mails. Bentley also sought but never received a copy of the tape seized by Carter.

Bentley's letter states the chamber showed a $40,425 profit when it should have shown a $61,782 loss. The numbers provided in Bentley's letter show that the chamber showed the surplus by booking $63,903 in January 2008 revenue for 2007 and by deferring part of Carter's salary. Carter's Feb. 17 letter says including January 2008 revenue was consistent with the chamber's accounting method, approved by the board in September 2004. He also said in his letter that the failure to record his salary deferral as a 2007 expense was a bookkeeping error.

Carter also used $18,312 from the chamber's building fund to pay operating expenses, according to the letter. He shifted the money to the chamber's foundation, then billed the foundation for expenses in that amount. Carter's Feb. 17 letter says he discussed the move with Thompson and Bentley before shifting the funds. The foundation has operated with overhead provided by the chamber and the chamber had never been reimbursed for those expenses, according to Carter's letter.

Among other concerns Bentley listed was the chamber's lack of accounting for special events. His letter described them as "off the books," with only net income presented to the executive committee. Examples of special events in 2007 were the mayor's State of the City address, Salute to the Military and the Conquer the Coast bicycle ride.

Bentley also stated in his letter that he was concerned that Carter authorizes "significant contracts" without seeking bids or consulting the executive committee or board.

He also said a comparison of year-end membership lists "reflects a significant decline in member organizations in 2007."

An audit of the chamber is pending. The organization's bylaws call for an annual audit but Bentley and other top chamber officials have said they're not sure when the last audit was done.

"In the end," Bentley's letter says, "this comes down to trust and accountability. Removing executive committee members who voice sincere concerns, keeping taped meetings from other board members, yelling in an attempt to intimidate board volunteers, leadership refusing to sign a letter of indemnification that silenced the accountant and attempting to justify a raise based on disputable numbers do not change my fiduciary responsibility. Unfortunately they do make it much harder to perform my duties, but my duties still remain."

*Staff writer Dan Kelley contributed to this report. Contact Elvia Aguilar at 886-3678 or aguilare@caller.com*

1 C.R. 469

109

**February 29, 2008**

*Ex-chair airs her*

*chamber concerns*

**Elvia Aguilar**

**CR 470 – 471**

**Exhibit M-1 to Aguilar Affidavit**

110


## Ex-chair airs her chamber concerns

### Leaders say they are pushing for audit soon

**BY ELVIA AGUILAR**
*Caller-Times*

The Corpus Christi Chamber of Commerce hasn't taken sufficient steps to address "very credible" financial concerns raised by its treasurer, who has been denied access to critical information, a former chairwoman said in a letter Thursday to board members.

Former chairwoman Sylvia Whitmore also disputes the validity of her removal Feb. 15 from the chamber executive committee. That was the day of an emergency meeting of the five-member committee demanded by her, Judy Hawley and treasurer Damon Bentley to disclose the financial concerns.

The other two executive committee members, Chairman Freddie Martinez Jr. and Chairman-elect Robert Gonzalez, said Thursday they are moving as quickly as they can to hire an auditor to conduct a full audit. They said they defer to chamber attorney Van Huseman's legal interpretation of chamber bylaws in the removal of both Whitmore and Hawley from the executive committee. Phone messages left on Huseman's cell phone and home phone after business hours Thursday were not returned.

*Please see* **CHAMBER 7A**

C.R. 470

111

**CHAMBER** *from* **1A**

Chamber CEO Terry Carter, whose handling of chamber financial matters raised the concerns, could not be reached Thursday afternoon at his office or cell phone.

On the morning of Feb. 15, Carter and Huseman took Whitmore and Hawley behind closed doors and told them they were no longer eligible to serve on the committee. As Bentley waited outside, according to witness accounts, the two women endured shouting from Carter. They stayed to hear Bentley's report. Before leaving the room, Carter seized a tape recording of the meeting and left the building.

Bentley had been asked to review the chamber's finances in anticipation of a raise, bonus and contract extension for Carter. Bentley found that Carter had shifted funds among accounts and deferred $19,992 of his 2007 salary. Without those moves, the chamber's cash flow would have been negative, according to Bentley, adding that Carter's bonus is based on the chamber's financial performance. According to Bentley, the chamber accountant told him that the chamber foundation's nonprofit status could be in jeopardy because Carter shifted chamber foundation funds to pay operating expenses and Carter's bonus is linked to the chamber's financial performance.

In an e-mail Tuesday, Bentley informed board members that he sought a written account of what transpired at the Feb. 15 meeting from the accountant, Darrell Thompson, but Thompson declined because Martinez didn't grant him a letter releasing him to do so.

In her letter Thursday, Whitmore said she was concerned about "denying the treasurer access to critical information and advice of financial professionals employed by the chamber of commerce."

"The treasurer's concerns are very credible and appeared to be mostly ignored," Whitmore wrote. "There was continued refusal of the chair and chair-elect to respond to attempts to schedule an executive meeting immediately to work together to address irregularities. There was refusal of chamber staff to cooperate with the treasurer on a task he was given by the board and executive committee. Finally, refusal of the chamber CEO to release the tape of the executive committee meeting which was held Feb. 15."

Martinez said Thursday he had not been able to respond to Bentley's requests to meet because of work commitments and illness.

"The first I heard about the concerns was during a Jan. 31 meeting in my offices with the five executive committee members," Martinez said. "During that meeting we decided it would be discussed again. I was out of town Feb. 7 and 8 on business and was ill Feb. 11 and 12. When I returned to work on Feb. 13 I had a letter from Damon, Sylvia and Judy requesting the Feb. 15 meet-

Martinez said the committee already had been scheduled to meet that day.

Gonzalez said he talked to Hawley in person and returned a call from Whitmore before the meeting.

Gonzalez and Martinez said Carter's seizure of the tape would be dealt with as a staff personnel matter. Until that matter is resolved, Martinez said, the tape should remain in Huseman's custody.

Bentley, in the e-mail to board members, said he sent a certified letter to Huseman and Martinez demanding a copy of the tape. Bentley said Huseman refused to surrender the tape without Martinez's consent, and Martinez declined to release it on Huseman's advice.

Martinez said Thursday he sought legal advice of Huseman in these instances and those were Huseman's legal interpretations of what needed to be done according to the chamber's bylaws.

"I also want to make it clear that I have no personal problem whatsoever with Sylvia," Martinez said. "In fact, in my business here at Freddie Records we do business with Frost Bank."

Whitmore is employed at Frost Bank.

Whitmore said in the letter she still is bothered by the legality of her removal from the executive committee.

"The interpretation that I am not officially a member of the executive committee especially in light of the fact that the chairman (Freddie Martinez Jr.) had requested that I stay on when the 2007 chairman (Dave Allen) left the city is a concern to me," Whitmore said in the letter.

Martinez said he may have asked Whitmore to remain on the board with Allen's departure but has no clear recollection of a conversation with her on the matter.

"I think I may have had a conversation with her when I was first appointed as chair," he said, "but what was said, I'm not sure."

Whitmore cites chamber bylaws which state that all officers shall take office on the first day of the new year and serve for a term of one year or until their successors assume office.

"Since no one has assumed the duties of immediate past chair, that person would be me," Whitmore said.

Whitmore also said she is concerned with correspondence by Carter to the board and chamber members "glossing over financial irregularities and the declining membership numbers."

She was referring to an e-mail Monday by Carter to chamber members, in which he wrote: "The articles which recently ran in our local newspaper are an over dramatized account of nothing more than our board's routine and normal review of the Chamber fi-

nancial records. There are absolutely no allegations or suggestions of any misappropriation or misuse of funds. ... The Chamber of Commerce is in excellent financial condition and will continue to be good stewards of our funds."

Whitmore offered some words of advice to the chamber board members.

"The chamber needs to strengthen and follow its accounting procedures and its accountability to its members. As stated previously, the action taken by the chamber board to establish an audit committee is a great step, but is not sufficient to reassure me and others that the chamber's operations are transparent and open," she wrote. "Executing contracts without executive committee or board authorization, moving funds to other accounts, running special events off the books, arbitrarily filling board seats, all of these issues are about trust, confidence in the leadership, procedures in place which ensure transparency and accountability of the chamber CEO to the board and the membership."

Whitmore, contacted Thursday, declined to go into specific details about her concerns on arbitrarily filling board seats, but said she has heard concerns from former board members who have left the chamber about how they were replaced.

*Business writer Fanny S. Chirinos contributed to this report. Contact Elvia Aguilar at 886-3678 or aguilare@caller.com*

1 C.R. 471

**March 2, 2008**

*Chamber CEO's actions raise serious questions*

**CR 567**

**Exhibit P-1 to Jimenez Affidavit**

# OPINION ●



## EDITORIAL

# Chamber CEO's actions raise serious questions

### Funds were shifted that made a loss look like a profit, entitling CEO to a bonus

The *Caller-Times* Publishing Company resigned from the Corpus Christi Chamber of Commerce last year. That was a decision prompted by the divisive leadership of Terry Carter, chief executive of the chamber. As Publisher and President Patrick Birmingham stated at the time, the company could no longer be a part of an organization "with a president who engages in name calling and shows favoritism toward one business over another." The company had been a member of the Chamber of Commerce for 75 years.

The business side of the newspaper and the opinions expressed in this editorial page space are separate. That point must be emphasized following reports about highly questionable stewardship of the financial affairs of the chamber by Carter. The reports, including allegations by the chamber's treasurer, were laid out in a series of news stories. These news accounts describe duplicitous dealings by Carter in his relations with the membership and the executive committee.

Two executive committee members, former state Rep. Judy Hawley and bank executive Sylvia Whitmore, were removed from the committee by Carter after they attempted bring transparency and accountability to the finances of the chamber at a Feb. 15 meeting. A subsequent Feb. 17 letter to members from the chamber's treasurer, Damon Bentley, laid out the questionable shifting of funds on the books of the chamber. The fund-shifting, including the deferring of Carter's salary, allowed the chamber to show a profit, thus qualifying Carter for a bonus. The letter as well as those involved in that key Feb. 15 meeting say an angry Carter seized an audiotape record of the meeting during the course of the encounter. Bentley's attempts to obtain a copy of that record have been fruitless. The shifting of funds also involved using money from the chamber's foundation meant for capital projects for operating expenses, possibly risking the chamber's nonprofit status. These high-handed tactics have done severe damage to a very important civic organization.

The Corpus Christi Chamber of Commerce is supposed to speak for the business community of the city, not just on business matters, but on all issues that affect its economic well-being. The chamber can be, and has been in its history, a tremendous force for the progress of the city. But when the conduct of its chief executive is under question, as it is now, then that transfers to the organization as well. That is the damage that has inflicted on the chamber by Carter's actions.

It was a courageous step taken by Bentley, Hawley and Whitmore in forcing the issue of accountability. The removal of Hawley and Whitmore, by a convenient, for Carter, rereading of the bylaws is nothing less than an attempt to intimidate critics of his conduct.

Carter's explanation, made in a letter to board members, is that the fund-shifting was allowed by the chamber's accounting methods, that the deferral of salary was for tax purposes with the failure to show deferral properly on the books explained as a bookkeeping error. The use of capital money from the chamber's foundation for operating expenses, Carter said, had been discussed with the chamber's accountant. But that accountant, Darrell Thompson, Bentley wrote, warned that the use of foundation money in such a way would threaten the chamber's nonprofit status.

The chamber can be an effective and creditable voice for the business community only if its leadership conducts itself in an ethical and professional manner, accountable to its members and holding itself to the same businesslike standards that its members expect of themselves. Intimidation, secrecy and duplicity discredit a vital organization. The question mark remains over Carter until he fully explains his actions, or until the chamber chooses to move on without him.

**EXHIBIT** "P-1"

1 C.R. 567

114

**March 3, 2008**

*Petition seeks chamber Changes*

**Elvia Aguilar**
**CR 472 – 473**
**Exhibit M-1 to Aguilar Affidavit**



50 CENTS MONDAY, MARCH 3, 2008 CITY EDITION

# Petition seeks chamber changes

## Members call for increased clarity, accounting switch

BY ELVIA AGUILAR
*Caller-Times*

Some Corpus Christi Chamber of Commerce members, including three former chairmen, are circulating a petition to address concerns about recent financial moves by top executive Terry Carter, and to reverse his changes in the chamber's accounting procedures.

The petition is a reaction to financial moves cited by the chamber treasurer, who was asked to look into the organization's finances as part of a review of a proposed raise, bonus and contract extension for Carter. Treasurer Damon Bentley reported that Carter had deferred a portion of his salary and shifted other funds among chamber accounts in a manner that turned what should have been a deficit into a surplus of operating funds. Carter's bonus is linked to the chamber's financial performance.

Attempts to reach Carter and chamber chairman Freddie Martinez Jr. Sunday afternoon were unsuccessful.

Organizers of the petition are scheduled to meet at 11 a.m. today at Brewster Street Ice House to distribute the petition and explain its purpose.

*Please see* CHAMBER 5A

1 C.R. 472

116

## CHAMBER from 1A

The petition asks for:

■ A general meeting of the membership.

■ A printed financial report from the board of directors including the audited or unaudited balance sheet for the chamber accounts or special funds of the chamber.

■ Profit and loss statement for the chamber's funds.

■ A listing of professional services contracts to which the chamber is party either as a contractor or customer.

■ A printed report of the membership in good standing including total number of members and actual company names and point of contact for all members.

■ A detailed listing of current directors including contact information, date of election or appointment to the board, date of term expiration and classification of board membership.

The petition also asks for an amendment of the bylaws to read that the finances of the chamber shall be reported using the accrual method of accounting, rather than the modified accrual method instituted by Carter after he started in 2004. According to Jerry Love, a certified public accountant from Abilene and a member of the Texas Society of CPAs, under an accrual method, expenses and revenues are booked as they occur in order to have the most accurate comparison of the revenues to expenses. Under the modified system used by the chamber, revenue is booked immediately. For example, 2008 chamber dues collected in 2007 were booked in 2007 though they were paid for a 2008 expense.

### AUDIT COMMITTEE

The board should appoint an audit committee of at least five chamber members including the sitting chamber treasurer, two past chairs and two other members selected by a majority vote of the board, according to the petition.

The petition also asks that the chamber publish its annual audit and distribute it to all members within 120 days of the close of the fiscal year.

Former chairwoman Carol Scott, a partner in Kailo Communications, and Bill Durrill of Durrill properties and Brewster Street Ice House, will have the petition available at their businesses for chamber members to sign.

Scott said signatures from 10 percent of the membership are needed to have the meeting. One of the issues that illustrates the petitioners' concerns, she said, is that they as members don't know how many members the chamber has. She estimates 80 to 100 signatures would be needed. Late Sunday, she had 56 signatures from current chamber members representing a diverse group of businesses in Corpus Christi, she said.

"Some of them are some of the largest employers in Corpus Christi, real estate agents, and basically across the board rank and file members of the chamber," Scott said.

### MEETING SOUGHT

When Scott, who served as chairman in 2003, moved to Corpus Christi in 1984, the first major event she attended was sponsored by the chamber.

"The Corpus Christi Chamber of Commerce helped me cut my business and political teeth," Scott said. "This institution is very near and dear to me and I don't want this institution's reputation to suffer. I think the only way we can fix this is by having an open conversation with the entire membership."

Scott said the questions Bentley raised in a letter to the chamber's board need to be answered not only by an audit, but by a meeting that includes the chamber's leadership, membership and board.

Steve Woerner, CEO at Driscoll Children's Hospital and chamber chairman in 2004, said he signed the petition because he is worried about the chamber's future.

"Once you are a chairman you are part of the informal leadership of the chamber and because of that I have a vested interest in its success," Woerner said. "I want to see it succeed and frankly I have heard enough concerns where we were going to see an exodus of the membership and I don't want to see that."

Notable departures in the past year included Fulton-Coastcon construction, whose partners include former chamber chairman Jim Barnette; Bank of America; L&F Distributors, the Budweiser beer distributor; San Jacinto Title Co., whose president Mark Scott is Carol Scott's husband and a former city councilman; Stewart Title, whose president Foster Edwards is the chairman of the Corpus Christi Convention and Visitors Bureau; Wood Boykin & Wolter, a law firm that includes John Bell, who for years was the chamber's attorney free of charge; and the Caller-Times, a member for at least 75 years.

The petition's drivers include former chairwoman Sylvia Whitmore who on Friday disputed the validity of her removal Feb. 15 from the chamber executive committee. That was the day of an emergency meeting of the five-member committee demanded by her, Judy Hawley and Bentley to disclose the financial concerns. Carter and chamber attorney Van Huseman informed Hawley and Whitmore before the meeting started that they were no longer eligible to serve on the committee, according to Whitmore and Hawley.

Woerner expressed concern about Hawley and Whitmore's removal – and he wanted more transparency from the leadership on the financial concerns raised by Bentley.

"In the course of time prominent members have left and I have heard concerns," he said. "I don't think the membership can keep confidence in the chamber if it's not transparent. The purpose of this meeting won't be to focus on personalities, but on what's best for the chamber. I think a dialogue definitely is needed."

### UPSET WITH REMOVAL

Durrill, who has five companies that are chamber members, also said he signed the petition and got involved in the process because he was upset about Hawley and Whitmore's removal as well as concerned about Bentley's financial questions.

"I think it was quite rude how two of the most respected women in the community were treated and I think we as members need to have more transparent and frequent financial reports," he said. "We also need to have clear goals and a mission for the chamber."

Chamber member Tom Dobson, chairman and CEO of Whataburger Inc., is among the petition's signers.

"As a longtime member and past director of the Corpus Christi Chamber of Commerce," Dobson said, "I'm very concerned about the accounting questions raised recently. I strongly encourage the chamber leadership to call this meeting to publicly resolve these issues quickly so the chamber can get back to business and maintain and grow their membership."

*Contact Elvia Aguilar at 886-3678 or aguilare@caller.com*

1 C.R. 473

**March 4, 2008**

*About 80 sign petition*

*on chamber operation*

**Elvia Aguilar**

**CR 474 – 475**

**Exhibit M-1 to Aguilar Affidavit**

CORPUS CHRISTI
Caller-Times

50 CENTS          TUESDAY, MARCH 4, 2008          CITY EDITION

1 C.R. 474

## About 80 sign petition on chamber operation

**Concerns heard, chairman says**

BY ELVIA AGUILAR
*Caller-Times*



First reported on

Some of Corpus Christi's largest employers have signed a petition of Corpus Christi Chamber of Commerce members seeking to address concerns about top executive Terry Carter's recent financial moves and the departures of longtime members.

About 60 members, including 11 former chairmen, attended a news conference Monday at Brewster Street Ice House to show their support for the petition drive.

Carter could not be reached, but chairman Freddie Martinez Jr. attended the conference to say the petitioners' concerns are being heard and would be addressed by the chamber board.

The petition organizers are asking the chamber's leadership for a list of the full membership so they know how many signatures they need to collect. Carol Scott, a petition organizer and former chairwoman, said she also needs the list to confirm which businesses that have signed actually are members. Ten percent of the membership is needed to force the meeting, but Scott said one of the issues that illustrates

1512

*Please see* **CHAMBER 7A**

119

# FROM THE COVER

## WHO SIGNED

Companies that signed petition as of 4 p.m. Monday

- Access Ford
- Advanced Acoustic Concepts
- AEP Texas
- AGCM Inc.
- Alamo Concrete Products
- American Bank
- Amistad Community Health Center
- B.E. Beecroft Co. Inc.
- Baytree Ocean Drive Apartments
- Bleu Frog Mercantile
- Bonilla & Chapa
- Branscomb Realty LLC
- Braselton Homes
- Brewster Street Ice House
- C.C. File Pro
- CCG Group Inc.
- Chateau Santa Fe Apartments
- Coastal A.D.S. Inc
- Cobb, Lundquist & Atnip
- Coldwell Banker Pacesetter Steel Realtors
- Concrete Street Amphitheater
- Cooper Outdoor Advertising
- Corporate Express
- Corpus Christi Association of Realtors
- Corpus Christi Builders Hardware
- Corpus Christi Hooks
- Corpus Christi Stamp Works Inc.
- Corpus Christi Transfer Co.
- Country Club Manor Apartments
- Dickson Builders
- Driscoll Children's Hospital
- Driscoll Foundation
- Dunnam Design Group Inc.
- Durrill Properties
- Ed Hicks Imports
- Epic Sports & Entertainment
- Evins Glass
- FastSigns
- Fields, Nemec & Co., CPAs
- Flint Hills Resources
- FYI
- Gary Bushell
- Gene Guernsey/Remax Metro
- Haeber Roofing Co.
- HomeVestors
- Identity Theft Solutions
- Joe Adame & Associates Inc.
- Kailo Communications Studio
- Ken Bridges Audio Video
- KJM Commercial
- Large & Sons Foundation Drilling Inc.
- Lone Star Real Estate
- M.E. Allison & Co.
- Mark Whitmore
- Mathieu Electric Co. Inc.
- Merrill Lynch
- Miller & Miller Mechanical Contracting
- Morehead Dotts & Associates
- Ocean Palms Apartments
- Omni Hotel
- Otto Dukes
- Padre Island Business Association
- Realty World Island Properties
- ReMax Metro Properties
- Repcon Inc.
- Ridgeways
- Royal Exploration Co.
- RSSS, LP
- Solka Nava Torno
- Susser Holdings Corp.
- URS Corp.
- Utopia World Cuisine
- Valero
- ValueBank Texas
- W.H. Hammonds Apartment & Commercial Services
- Weldinghouse Inc.
- Western Steel
- Whataburger
- Wilkerson & Sanders Inc.
- Wood Boykin & Wolter
- Workforce Network

Source: Carol Scott, Kailo Communications

## CHAMBER *from 1A*

the petitioners' concerns is that they as members don't know how many members the chamber has. She estimates 80 to 100 signatures would be needed. She had about 80 Monday afternoon.

The petition is a reaction to financial moves cited by the chamber treasurer, who was asked to look into the organization's finances as part of a review of a proposed raise, bonus and contract extension for Carter. Treasurer Damon Bentley reported that Carter had deferred a portion of his salary and shifted other funds among chamber accounts in a manner that turned what should have been a deficit into a surplus of operating funds. Carter's bonus is linked to the chamber's financial performance.

The chamber's board has agreed to a full audit in response to the concerns. The chamber is supposed to undergo an audit annually, according to chamber bylaws, but chamber officials have said they don't know when the last audit was done.

Martinez said that by the end of the week, the chamber's audit committee would narrow the list of outside auditors who responded to a request for proposal and select one for the audit.

Martinez said board members Laurie Cook, Bud Harris and Leon Loeb had been selected to serve on the committee. Cook is a certified public accountant and former chamber chairwoman.

Martinez also suggested that the chamber create a financial committee in charge of reporting the chamber's finances and a bylaws review committee charged with updating the bylaws, which he described as antiquated.

"I have had very few phone calls from members who are concerned, so I want to let you know I am here to listen," Martinez told those gathered.

"We hope to have the chamber's annual meeting before the end of the month. I don't have all the answers here today, but I am listening to your concerns and I hope everyone knows you can come to me with those concerns."

He said questions on the chamber's finances are nothing new.

"In early 2003 and 2004 the chamber's finances were in question," Martinez said.

Sylvia Whitmore, who was chairwoman in 2006, disputes that assertion. She is one of two chamber executive committee members who were told they were dismissed from the committee on Feb. 15, the day they were prepared to join Bentley in disclosing his financial concerns to the five-member committee.

"Never has the lack of financial transparency been



**LEFT: Judy Hawley with Advanced Acoustic Concepts signs** *a petition addressing recent financial moves within the Corpus Christi Chamber of Commerce before a news conference on Monday about the issue at Brewster Street Ice House.*

**BELOW: Chamber of Commerce chairman** *Freddie Martinez Jr. (left) talks with Ken Griffin of AEP Texas after Monday's news conference. Martinez says members' concerns were heard.*

Photos by Michelle Christenson/ Caller-Times

## WHAT THE PETITION SEEKS

- A general meeting of the membership.
- A printed financial report from the board of directors including the audited or unaudited balance sheet for the chamber accounts or special funds of the chamber.
- Profit and loss statement for the chamber's funds.
- A listing of professional services contracts to which the chamber is party either as a contractor or customer.
- A printed report of the membership in good standing, including total number of members and actual company names and point of contact for all members.
- A detailed listing of current directors, including contact information, date of election or appointment to the board, date of term expiration and classification of board membership.

- An amendment of the bylaws to read that the finances of the chamber shall be reported using the accrual method of accounting, rather than the modified accrual method instituted by Carter after he started in 2004. According to Jerry Love, a certified public accountant from Abilene and a member of the Texas Society of CPAs, under an accrual method, expenses and revenues are booked as they occur. Under the modified system used by the chamber, revenue is booked immediately.
- An audit committee of at least five chamber members including the sitting chamber treasurer, two past chairs and two other members selected by a majority vote of the board.
- Publication and distribution of the chamber's annual audit and distribute it to all members within 120 days of the close of the fiscal year.

an issue like it is now," Whitmore said.

Port commissioner and former state Rep. Judy Hawley, the other executive committee member dismissed Feb. 15, said the news conference Monday accomplished the first step in what the members were trying to do, open a dialogue with a chamber leadership that is not being transparent.

"My concerns are that this member hemorrhage needs to stop," Hawley said. "We need a chamber that is viable, that is a strong spokesperson for the business community and respected both in and out of this community. I don't think the current leadership is transparent in its financial decisions."

Former chairmen who attended Monday's meeting were Mike Bertuzzi, Tony Bonilla, Marshall Boykin, Mike Carrell, Joe Fulton, Alex Harris, Al Jones, Scott, Whitmore, Ivan Wilson and Steve Woerner.

Fulton's construction company, which includes former chamber chairman Jim Barnette as a partner, and Boykin's law firm, which includes longtime former chamber attorney John D. Bell, have quit the chamber.



Scott said chamber members who wanted to sign the petition could do so at Brewster Street Ice House, FastSigns or Kailo Communications.

---

*Contact Elvia Aguilar at 886-3678 or aguilare@caller.com*

1 C.R. 475

120

**March 8, 2008**

*Chamber board, CEO*

*to enter talks*

**Elvia Aguilar**

**CR 476**

**Exhibit M-1 to Aguilar Affidavit**

121

CORPUS CHRISTI

# Caller·Times

50 CENTS    SATURDAY, MARCH 8, 2008    CITY EDITION

# Chamber board, CEO to enter talks

## Concerns about leadership lead to discussion

**BY ELVIA AGUILAR**
*Caller-Times*

The Corpus Christi Chamber of Commerce board of directors decided Friday to enter discussions with the chamber's president and CEO after chamber members raised concerns this week about his leadership.

Chairman Freddie Martinez Jr. would not say what issues would be discussed between president and CEO Terry Carter and the 27-member board or when those meetings will occur.

Carter did not return calls to his work and cell phone Friday.

"It wouldn't be appropriate for me to say what we will be talking about because they are personnel issues," Martinez said, "but we expect whatever is decided will lead to a decision from the board in the near future."

The board on Friday scheduled its annual general membership meeting in response to a request this week by members, but Martinez said the board may meet sooner if needed. The full membership meeting is scheduled for March 31 but a location and time have not been set.

When contacted after Friday's board meeting, several board members deferred comment to Martinez.

Martinez would not say whether the planned discussions with Carter were in response to concerns raised by chamber treasurer Damon

*Please see CHAMBER 7A*

---

**CHAMBER** *from* **1A**

Bentley in a Feb. 26 letter that stated Carter deferred a portion of his salary and shifted other funds among chamber accounts in a manner that turned what should have been a deficit into a surplus of operating funds. Carter stated in a Feb. 17 letter to board members that those accounting methods were acceptable under accounting methods approved by the board.

Bentley was asked to look into the organization's finances as part of a review of a proposed raise, bonus and contract extension for Carter, whose bonus is linked to the chamber's financial performance.

Carter came to Corpus Christi in 2004 from Pascagoula, Miss., where he was president and CEO of the Jackson County Chamber of Commerce. In 2006, the most recent year for which figures were available through the organization's tax forms required of nonprofit groups, Carter made $137,000 plus $8,220 in benefits and $6,000 in expenses.

Martinez said he called Friday's board meeting in response to questions raised by Bentley and other chamber members, who have been circulating a petition seeking detailed financial and membership information.

More than 60 chamber members had a news conference Monday announcing the petition drive and stating concerns about departures of several long-time members. By Friday evening, more than 85 signatures from some of Corpus Christi's largest employers had been collected, said former chamber chairwoman and current member Carol Scott, who helped organize the petition drive.

Scott said she was pleased a date had been set for a full membership meeting, something the petition requested, and hoped the remaining requests would be addressed in the annual meeting's agenda.

"I would like to challenge the chamber leadership to address the level of detail we asked for in our petition," Scott said. "If not, we may ask for a second full membership meeting."

At Friday's meeting, the chamber board heard from an audit committee formed Feb. 20 and also appointed board members to two other committees formed in response to Bentley's concerns.

The audit committee set a March 28 deadline to receive proposals from auditing firms for a full audit. The chamber is supposed to undergo an audit annually, according to chamber bylaws, but chamber officials have said they don't know when the last audit was done.

Board members Leon Loeb, a developer, and Laurie Cook, a certified public accountant and a former chairwoman, said Friday they hope to hear back from auditors by the end of March. Former chairman Bud Harris, Del Mar College's dean of Workforce & Economic Development, also is on the audit committee.

"At that point we will make a recommendation to the board and then have them select a firm to do the audit for us," Cook said. "Overall, it was a very positive meeting that I think is putting us in the right direction."

The chamber's board on Friday also established a financial committee in charge of reporting the chamber's finances and a bylaws, policies and procedures review committee charged with updating the chamber's bylaws.

Bentley will lead the finance committee, which also includes board members Gary Malone of Wells Fargo Bank, Butch Escobedo of Butch Escobedo Insurance, Trent Hill of Texas A&M University-Corpus Christi and Robert Blair of Bay Ltd.

Hill also was appointed to the bylaws, policies and procedures committee along with board members Jenna Davidson of Analytical Testing, the chamber's attorney Van Huseman and Pat Townsend of Del Mar College. John Michael of Naismith Engineering will lead that committee.

*Staff writer Beth Wilson contributed to this report. Contact Elvia Aguilar at 886-3678 or aguilare@caller.com.*

1 C.R. 476

122

**March 19, 2008**

*Chamber treasurer granted temporary restraining order protecting tape of meeting*

**Elvia Aguilar**

**CR 477**

**Exhibit M-1 to Aguilar Affidavit**

123



# Chamber treasurer granted temporary restraining order protecting tape of meeting

By Elvia Aguilar

Originally published 11:49 a.m., March 19, 2008
Updated 03:00 p.m., March 19, 2008

CORPUS CHRISTI — Corpus Christi Chamber of Commerce treasurer Damon Bentley has been granted a temporary restraining order against the chamber and CEO Terry Carter to prevent a tape recording from being destroyed. The recording is of a meeting at which Bentley and two other chamber officers reported their concerns about the chamber's financial practices.

In a petition filed in Judge Jose Longoria's 214th District Court, Bentley also requests Carter to be called in for a deposition in anticipation of a lawsuit against him and the chamber.

The tape recording Bentley is seeking to preserve comes from a Feb. 15 meeting of the chamber's executive committee, where three of the committee's five members brought the financial concerns to the full committee's attention, and Carter and chamber legal counsel Van Huseman informed two of the three, Sylvia Whitmore and Judy Hawley, that they were no longer eligible to serve on the committee.

Bentley's petition for the temporary restraining order says he has sought a copy of the tape but it has not been provided, and that Carter took the tape from the meeting. Bentley's petition includes an affidavit from Whitmore, who said she also has sought a copy of the tape.

Bentley's concerns about the chamber's financial practices arose after the chamber board asked him to review the chamber's financial standing in anticipation of a raise, bonus and contract extension for Carter.



© 2009 Scripps Newspaper Group — Online

1 C.R. 477

**March 20, 2008**

*Chamber unrest ends*

*up in court*

**Elvia Aguilar**

**CR 478**

**Exhibit M-1 to Aguilar Affidavit**

CORPUS CHRISTI

# Caller Times

50 CENTS    THURSDAY, MARCH 20, 2008    CITY EDITION

# Chamber unrest ends up in court

## Treasurer, CEO each make filings

BY ELVIA AGUILAR
*Caller-Times*

Dissatisfaction within the Corpus Christi Chamber of Commerce has moved to the court system.

Chamber treasurer Damon Bentley has obtained a temporary restraining order against the chamber and its chief executive, Terry Carter. Carter has filed a separate lawsuit seeking damages against Bentley, the chamber, the *Caller-Times* and others.

The restraining order, obtained Tuesday, prohibits Carter and the chamber from destroying a tape of a Feb. 15 chamber executive committee meeting at which Bentley and two other officers raised concerns about how the chamber has conducted its financial matters under Carter's direction. Bentley says he has sought unsuccessfully to obtain a copy of that tape since the meeting.

Carter, in a lawsuit filed Wednesday afternoon by attorney Rene Rodriguez, accuses Bentley, the chamber, the newspaper and others of "false and defamatory" statements "without regard to the truth." Carter claims he and chamber members were in discussions "to extend his employment contract to Dec. 31, 2010, at an annual salary, excluding benefits, of $150,000" and that because of the actions of

*First reported on*

*Please see* **CHAMBER 6A**

Please see CHAMBER 6A

---

6A · Thursday · March 20, 2008 · CALLER-TIMES ★

## FROM THE COVER

### CHAMBER *from* 1A

the accused, "plaintiff's employment with the chamber is in jeopardy and any chance of continued employment with the chamber through Dec. 31, 2010, is essentially nonexistent."

Chamber attorney Van Huseman described Bentley's petition as frivolous. He said Bentley knows that the tape "is under lock and key in my care." Chamber chairman Freddie Martinez Jr. "took the tape from Mr. Carter and gave it to me. There aren't any dangers to the tape." Huseman added that he would seek a hearing to address Bentley's action.

Asked late Wednesday about Carter's lawsuit, Huseman said, "I heard at 5:15 that there might be a lawsuit, but I don't know what it says."

Asked about Carter's current employment status, Huseman said, "nothing has changed. He is the chamber's president and CEO."

Both petitions were filed in Judge Jose Longoria's 214th District Court. After Rodriguez filed Carter's lawsuit, stamped by the court at 4:28 p.m. Wednesday, he provided a copy to the *Caller-Times* at the request of a reporter. *Caller-Times* attorney Jorge Rangel said the newspaper has not been served officially with the lawsuit.

Bentley's petition also asks that Carter be called to answer questions in a deposition in anticipation of a lawsuit against Carter and the chamber. A hearing is scheduled 1:30 p.m. March 26.

Carter's lawsuit disputes Bentley's assertions that Carter deferred a portion of his salary and transferred funds among accounts in a manner that showed a surplus when, according to Bentley, the chamber should have shown a deficit. Carter also disputes Bentley's statements that Carter's bonus was linked to the chamber's financial performance, and that Carter's shifting of funds among chamber accounts jeopardized the chamber foundation's nonprofit status. Carter's lawsuit also offers justification for the chamber accounting method questioned by Bentley.

According to Carter's lawsuit, his bonus "would not have been related to any chamber

condition or status. In addition, since the bonus was not linked to the financial performance of the chamber, use of Building Fund dollars to supplement the chamber operating expenses would not have forfeited the foundation's 501(c)3 status as stated by defendant Damon Bentley and reported by defendant *Caller-Times*."

Bentley could not be reached late Wednesday for reaction to Carter's lawsuit.

The lawsuit says Bentley, executive committee members Judy Hawley and Sylvia Whitmore, and the newspaper "made it appear that the plaintiff was illegally 'cooking the books' to justify a raise, bonus and employment extension contract." The suit, which includes Hawley and Whitmore among defendants, says the chamber's accounting method "in fact had been a proper, legitimate and legal method of accounting, bookkeeping used and specifically approved by the chamber for several years."

Carter's lawsuit also takes issue with *Caller-Times* accounts, based on descriptions by witnesses to the Feb. 15 meeting, that he seized the tape of the meeting and left the building, "implying deceitful and dishonest behavior by the plaintiff." According to the suit, "It was in fact Freddie Martinez Jr., chamber board chairman, who seized the tape recording and left the meeting to give it to the plaintiff."

Chamber members, including several former chairmen and led by former chairwoman Carol Scott, have circulated a petition requesting a full disclosure of the chamber's financial situation, a complete list of its membership, directors and officers, a meeting of the chamber's full voting membership and a change in its accounting method.

One of the members' concerns, Scott and others have said, is that the chamber is losing membership but they couldn't verify it because the full member list was withheld. In response to that concern, the chamber has disclosed a list showing 872 voting members and 167 non-voting honorary members. That totals 1,039.

In December, Carter told the *Caller-Times* the chamber had 1,400 members.

*Contact Elvia Aguilar at 886-xxxx or aguilare@caller.com*

1 C.R. 478

126

**March 26, 2008**

*Chamber puts CEO*
*on paid leave*

**Elvia Aguilar**

**CR 481**

**Exhibit M-1 to Aguilar Affidavit**



caller.com
CORPUS CHRISTI, TEXAS

Printer-friendly story
Read more at caller.com

## Chamber puts CEO on paid leave

By Elvia Aguilar

Originally published 05:25 p.m., March 26, 2008
Updated 05:25 p.m., March 26, 2008

CORPUS CHRISTI — Terry Carter, president and CEO of the Corpus Christi Chamber of Commerce, has been put on administrative leave with pay effective immediately and the chamber is "working on a process of disengagement," the chamber's attorney said Wednesday.

The chamber board members decided Wednesday in a special meeting to put Carter on administrative leave with pay and make Ken Trevino, the chamber's executive vice president, the acting president and CEO, said chamber attorney Van Huseman.

"The board did this to get all this discord and dissension behind us," Huseman said. " We are trying to put an end to all of this."

Carter's attorney Rene Rodriguez said he had informed his client of the decision late Wednesday afternoon and his client did not have any comment on the matter. Rodriguez said he did not know the reason for Carter's suspension and had no further details.

Carter has been with the chamber since 2004.

The chamber board last month agreed to a full audit of the chamber's finances in response to concerns raised by chamber treasurer Damon Bentley, who looked into the chamber's financial matters in conjunction with a proposed raise and contract extension for Carter.

Carter filed a lawsuit March 19 against Bentley, the chamber, executive committee members Judy Hawley and Sylvia Whitmore, the Caller-Times and others, alleging actions that he said jeopardized his continued employment with the chamber.

"We're still working on the process of disengagement," Huseman said Wednesday afternoon. "We want something that's fair with everyone involved in it."



© 2009 Scripps Newspaper Group — Online

1 C.R. 481

# March 27, 2008
## *Chamber puts CEO on paid leave*
**Elvia Aguilar**
**CR 482**
**Exhibit M-1 to Aguilar Affidavit**

129

# Chamber CEO on paid leave



**Moves aim to end dissension, group's attorney explains**

**BY ELVIA AGUILAR**
*Caller-Times*

**Carter** *has been with the chamber since 2004.*

**INSIDE:** Judge consolidates filings on Corpus Christi Chamber of Commerce. 6A

Terry Carter, president and CEO of the Corpus Christi Chamber of Commerce, is on administrative leave with pay and the chamber is "working on a process of disengagement," the chamber's at-torney said Wednesday.

The chamber board decided Wednesday in a special meeting to put Carter on administrative leave with pay and make executive vice president Ken Trev-iño the acting president and CEO, chamber attorney Van Huseman said.

"The board did this to get all this discord and dissension be-


First reported on

hind us," Huseman said. "We are trying to put an end to all of this."

Carter's attorney, Rene Rodriguez, said he in-formed his client of the decision late Wednesday afternoon and Carter would decline to com-ment. Rodriguez said he did not know the reason for the board's decision and he had no further details.

Chamber chairman Freddie Martinez Jr. said that because of pending litigation he didn't want to comment any further on Carter's employment status with the chamber.

"I don't know what can and can't be said right now so I would rather not elaborate," Martinez said.

Carter has been with the chamber since 2004.

*Please see* **CARTER 6A**

**CARTER** *from* **1A**

Carter filed a lawsuit March 19 against chamber treasurer Damon Bentley, the chamber, executive com-mittee members Judy Haw-ley and Sylvia Whitmore, the *Caller-Times* and others, seeking damages for actions he claims jeopardized his employment with the cham-ber.

Asked about Carter's employment status, Huse-man responded: "We're still working on the process of disengagement. We want something that's fair with everyone involved in it."

The chamber has sched-uled an annual membership meeting at 4 p.m. Monday at the Del Mar College Center for Economic Development at Staples Street and Kos-toryz Road.

At the meeting chamber officials will discuss issues raised in a petition signed by about 95 chamber mem-bers, who sought the meet-ing to discuss the chamber's finances and other matters.

*Contact Elvia Aguilar at 886-3678 or aguilare@ caller.com*

1 C.R. 482

130

# March 27, 2008
## *Judge unifies filings on chamber events*
**Mary Ann Cavazos**
**CR 524**
**Exhibit N-1 to Cavazos Affidavit**

131

**FROM THE COVER**

# Judge unifies filings on chamber events

### Court's action also preserves tape of meeting

BY MARY ANN CAVAZOS
*Caller-Times*

A judge Wednesday agreed to consolidate legal actions filed by Corpus Christi Chamber of Commerce treasurer Damon Bentley and chief executive Terry Carter, and to preserve a tape recording sought by Bentley.

Bentley sought the consolidation, asserting that his and Carter's legal actions arose from the same set of events. Judge Jose Longoria of the 214th District Court signed the order consolidating the cases.

In motions filed on Bentley's behalf, attorney Robert Anderson says Bentley will be able to take a deposition from Carter because Carter has sued him and others in a separate action, and that a tape recording of a chamber meeting sought by Bentley will be protected. Bentley on March 18 obtained a temporary restraining order protecting the tape.

The tape is a recording of a Feb. 15 chamber executive committee meeting at which Bentley gave a report "concerning the financial activities of Terry Carter and the Corpus Christi Chamber of Commerce," according to Bentley's March 18 petition.

"There was a tape of all of the activities while Damon Bentley was in the room," according to that petition. "That tape was removed by Terry Carter from the meeting and taken from the Corpus Christi Chamber of Commerce immediately after the meeting ended."

Carter disputes this in his lawsuit filed March 19 against Bentley, the chamber, the *Caller-Times* and others. Carter says chamber chairman Freddie Martinez Jr. took the tape "and left the meeting to give it to" Carter, who was in another office with two other people, according to the lawsuit, which seeks damages for actions Carter says jeopardized his employment with the chamber.

Bentley's March 18 petition seeks to question Carter in a deposition Bentley could use in a lawsuit against Carter, if Bentley chooses to file one. "As a result of the filings of the claims of Terry Carter, Damon Bentley will be allowed to take the deposition of Terry Carter and, therefore, there is no necessity for an order authorizing the deposition without suit," according to the motion filed Tuesday.

Anderson also sent a letter Tuesday to the chamber's attorney, Van Huseman, to confirm that Huseman had the tape and that "it would not be altered or erased." Huseman acknowledged possession of the tape and agreed to safeguard it.

The judge's order consolidating the two actions states that "each of the parties in this cause of action shall be provided with a copy of the tape."

*Contact Mary Ann Cavazos at 886-3623 or cavazosm@caller.com*



1 C.R. 524

132

**April 1, 2008**

*Chamber had deficit, board tells members*

**Elvia Aguilar**
**Fanny Chirinos**
**CR 485-487**
**Exhibit M-1 to Aguilar Affidavit**

133



CORPUS CHRISTI, TEXAS

Printer-friendly story
Read more at caller.com

# Chamber had deficit, board tells members

## $95,377 deficit cited at meeting contrasts with earlier surplus report

By Elvia Aguilar, Fanny S. Chirinos

Originally published 03:25 a.m., April 1, 2008
Updated 03:25 a.m., April 1, 2008

The Corpus Christi Chamber of Commerce finished last year with a $95,377 deficit, not a $40,425 surplus, the board told members Monday in a meeting that had been sought by petition.

An end-of-the-year report given to the board earlier this year by chamber staff showed a profit. Further review of the books by the chamber executive committee showed that a deferral of part of the chief executive officer's salary and shifts of more than $142,000 in membership dues resulted in the surplus, according to treasurer Damon Bentley. Bentley in February reported that the deficit was $61,782 but adjustments by chamber staff raised the number.

Despite the deficit, Bentley said, the chamber is doing fine.

"We are financially sound, and we're ready to move on," he said.

About 120 people attended the meeting, held at Del Mar College's Center for Economic Development, including 96 voting chamber members, said C. Michelle Peters, a chamber spokeswoman. Fifteen of those 96 also represented 15 members by proxy.

The membership meeting was a result of a petition drive started in late February to address concerns of members who said they had been denied financial information and membership rosters, and who were concerned about the chamber's accounting methods.

The chamber's recently appointed audit committee reported that on March 26, the board voted to return to the accrual method of accounting instead of the modified method of accounting instituted in 2004. The modified accrual method is one under which revenues are recognized in the period they become available and measurable and expenditures are recognized in the period the associated liabilities are incurred. The accrual method is one under which revenue is recognized or recorded when earned and expenses are recognized when incurred.

1 C.R. 485

134



The last annual audit the chamber had conducted was in 2003, according to audit committee member Laurie Cook, a certified public accountant and former chamber chairwoman.

The audit committee set a March 28 deadline to receive proposals from auditing firms for a full audit. Other audit committee members are Leon Loeb, a developer, and former chairman Bud Harris, Del Mar College's dean of Workforce & Economic Development.

Cook said the committee has heard from three auditors. Two said they were not interested and one said it could perform the audit at a later time. The request for proposals had been sent to 10 local firms, Cook said, but because of the tax season she suggested sending additional requests after April 15, which could push back the process.

"We may have to go to another market," she said, "but we were trying to be conservative with our money because we estimate an audit will cost anywhere from $10,000 to $15,000."

The chamber members voted to approve the proposed amendments to the bylaws asked for in the petition.

The approved amendments include:

n The finances of the chamber shall be reported utilizing the accrual method of accounting. The accounts of the chamber shall be audited annually as of the close of business on Dec. 31 by a certified public accountant. The board shall appoint an audit committee of at least five chamber members, three current board members, two past chairs and two other members selected by a majority vote of the chamber.

n A printed annual report will be published and distributed to all members of the chamber within 120 days of the close of the fiscal year. The annual report will include a balance sheet, profit and loss statement and a reporting of the number of members in good standing.

San Jacinto Title Company recently rejoined the chamber, said company president Mark Scott, a former city councilman. He asked the board to reinstate Sylvia Whitmore to the executive committee. Scott's wife, Carol, is a former chamber chairwoman who helped organize the petition.

On Feb. 15, Whitmore and Judy Hawley, members of the executive committee, were told they no longer were eligible to serve on the executive committee.

Chamber attorney Van Huseman said Monday that the board would consider reappointing Whitmore, but the matter could not be brought to a vote Monday because it was not on the agenda.

C.R. 486

135

Carol Scott said Monday's meeting was a positive step by the board, but she hoped another membership meeting would be called soon for updates without the membership having to sign a petition to request it.

Acting chamber president and CEO Ken Treviño and board member Harris welcomed the idea and said a dialogue must continue.

Contact Elvia Aguilar at 886-3678 or aguilare@caller.com. Contact Fanny S. Chirinos at 886-3759 or chirinosf@caller.com.



© 2009 Scripps Newspaper Group — Online

136

**April 29, 2008**

# *Chamber, in need of audit, renews accountant search*

**Elvia Aguilar**

**CR 488**

**Exhibit M-1 to Aguilar Affidavit**

# BUSINESS&OPINION

Caller-Times | Tuesday, April 29, 2008

## Chamber, in need of audit, renews accountant search



First reported on

**BY ELVIA AGUILAR**
*Caller-Times*

With income tax filing deadline passed, the Corpus Christi Chamber of Commerce has renewed its quest for an accountant to conduct a full audit.

The chamber's previous attempt to hire an auditor in March failed and chamber officials blamed the tax season for keeping accountants too busy to take on an audit on short notice. The board voted in February to conduct a full audit after questions about the chamber's finances arose from Treasurer Damon Bentley and other chamber members.

On Monday, after a board meeting, chamber interim President and CEO Ken Treviño said the audit committee had resubmitted requests for proposals for a full audit. Treviño said a deadline for this process has not been set.

The chamber's board also went into executive session. Treviño said he was not aware of what was discussed because he was not present. Attempts to reach board members Monday were unsuccessful.

He said negotiations between chamber attorney Van Huseman and chamber President and CEO Terry Carter are ongoing.

In March, Carter filed a lawsuit against Bentley, the chamber, the *Caller-Times* and others, seeking damages for actions he claims jeopardized his employment with the chamber. All named defendants have filed responses denying his allegations. Carter is on administrative leave with pay.

*Contact Elvia Aguilar at 886-3675 or aguilare@caller.com*

1 C.R. 488

138

**May 2, 2008**

*Chamber offers contract settlement to Carter, his attorney says*

**Elvia Aguilar**
**Dan Kelley**
**CR 489**
**Exhibit M-1 to Aguilar Affidavit**

139



Printer-friendly story
Read more at caller.com

## Chamber offers contract settlement to Carter, his attorney says

By Elvia Aguilar, Dan Kelley

Originally published 05:09 p.m., May 2, 2008
Updated 05:09 p.m., May 2, 2008

CORPUS CHRISTI — The Corpus Christi Chamber of Commerce has made an offer to president and CEO Terry Carter to settle a contract dispute, according to his attorney.

Carter has been on paid leave since late March, and he had been in talks with the chamber over what insiders termed the process of disengagement.

Carter's attorney, Rene Rodriguez, said the chamber has offered a sum of money and he is waiting to speak with his client, who is traveling in Tennessee. Rodriguez would not disclose the offer.

Chamber attorney Van Huseman would neither confirm nor deny existence of a settlement offer.

"A deal is not done," Huseman said. "This is a work in progress at this point and it ain't over till it's over."

Ken Treviño, acting chamber president and CEO, said Carter's contract extended through Dec. 31 and Carter was seeking severance that amounted to what he would have been paid under the contract, or some middle ground.

On March 19, Carter filed a lawsuit against the chamber, its treasurer, two members of its executive committee, the Caller-Times and others, seeking damages for actions he claims jeopardized his employment with the chamber. The Caller-Times and the other defendants deny Carter's claims.



© 2009 Scripps Newspaper Group — Online

1 C.R. 489

# May 3, 2008

## *Chamber makes offer, Carter's attorney says*

**Elvia Aguilar**

**Dan Kelley**

**CR 490**

**Exhibit M-1 to Aguilar Affidavit**

# Chamber makes offer, Carter's attorney says



**Carter** *is traveling in Tennessee.*

### Chamber won't confirm, deny proposed deal to end dispute

BY ELVIA AGUILAR
AND DAN KELLEY
*Caller-Times*

The Corpus Christi Chamber of Commerce has made an offer to president and CEO Terry Carter to settle a contract dispute, according to his attorney.

Carter has been on paid leave since late March, and he had been in talks with the chamber over what insiders termed "the process of disengagement."

Carter's attorney, Rene Rodriguez, said the chamber has offered a sum of money and he is waiting to speak with his client, who is traveling in Tennessee. Rodriguez would not disclose the offer.

Chamber attorney Van Huseman would neither confirm nor deny the existence of a settlement offer.

"A deal is not done," Huseman said. "This is a work in progress at this point and it ain't over till it's over."

Ken Treviño, acting chamber president and CEO, said Carter's contract extended through Dec. 31 and Carter was seeking severance that amounted to what he would have been paid under the contract, or some middle ground.

On March 19, Carter filed a lawsuit against the chamber, its treasurer, two members of its executive committee, the *Caller-Times* and others, seeking damages for actions he claims jeopardized his employment with the chamber. The *Caller-Times* and the other defendants deny Carter's claims.

*Contact Dan Kelley at kelleyd@ caller.com or 886-4316. Contact Elvia Aguilar at aguilare@ caller.com or 886-3678.*

1 C.R. 490

142

# May 23, 2008
# *Chamber, Carter attorney confirm severance agreement*
## Fanny Chirinos
## CR 491 – 492
## Exhibit M-1 to Aguilar Affidavit

143



CORPUS CHRISTI, TEXAS

Printer-friendly story
Read more at caller.com

## Chamber, Carter's attorney confirm severance agreement

By Fanny S. Chirinos

Originally published 07:10 p.m., May 23, 2008
Updated 07:10 p.m., May 23, 2008

CORPUS CHRISTI — The Corpus Christi Chamber of Commerce and CEO Terry Carter's attorney gave conflicting reports Friday about a severance agreement, but confirmed that it included paying his full 2008 salary and benefits and accepting his resignation. The proposal does not include an agreement by Carter to end his lawsuit against the chamber and others, including the *Caller-Times.*

Chamber attorney Van Huseman and Carter's attorney, Rene Rodriguez, also confirmed that the resignation would be effective April 30. Carter has been on paid leave since March 26 after disagreements over chamber financial practices.

Huseman and Rodriguez differed Friday on whether the agreement to settle Carter's 2008 contract was concluded. Huseman said it was and Rodriguez said some details remained to be resolved. Those details involved the final compensation amount, federal payroll taxes and Social Security.

Huseman said the chamber has issued a check and it has been cashed. Rodriguez said the check is deposited in an escrow account. Neither would identify the amount, but interim CEO Ken Treviño said it was in the $132,000 range. A copy of the contract, provided by Huseman, calls for a $136,500 salary and various benefits. Treviño said the $132,000 represented salary and benefits not already paid this year.

Attempts to reach Carter were unsuccessful Friday.

Huseman said Carter's contract was so favorable to him that the chamber was not in a position to obtain an agreement not to sue in exchange for the severance.

According to a copy of the employment contract Carter signed in 2004 when he was hired, he could be terminated without cause only after a 90-day written notice and a vote of at least 75 percent of the voting members of the board of directors. In such an event, Carter would be compensated for 100 percent of the remaining salary and benefits.

If there was cause for termination, Carter would be released from his contract only if a

1 C.R. 491

144

90-day written notice was given along with vote of at least 75 percent of the board and only if Carter flagrantly violated policy adopted by the chamber. In such a case, Carter still would receive full compensation for salary and benefits.

Huseman said the chamber had no choice but to pay the remainder of Carter's contract.

"He had an employee contract that was entirely one-sided in his favor," Huseman said. "It did not help our bargaining position any."

Huseman declined to name who drew up the contract on behalf of the chamber. Steve Woerner, the chamber's board chairman at the time Carter was hired, said he didn't remember the details of the contract or who wrote the contract.

John Bell, a former, longtime chamber attorney, said he was the chamber's attorney in 2004 but wasn't involved in the contract.

"I asked for a copy of that contract several times and never got one," said Bell, who is representing two defendants in Carter's lawsuit, chamber executive committee members Judy Hawley and Sylvia Whitmore.

Carter filed a lawsuit March 19 against the chamber, its treasurer Damon Bentley, Hawley, Whitmore, the *Caller-Times* and others, seeking damages for actions he claims jeopardized his employment with the chamber. All defendants deny Carter's allegations.

Huseman said the chamber tried to persuade Carter to drop the lawsuit as part of the contract settlement, but he wouldn't agree to it.

"Had the chamber not settled the remainder of the contract, it would have had to wait until the lawsuit ran its course," the attorney added.

"The chamber got rid of what it could and what he was willing to settle," Huseman said.



© 2009 Scripps Newspaper Group — Online

1 C.R. 492

**May 24, 2008**

*Carter's salary to be paid in full*

**Fanny S. Chirinos**
**CR 538**
**Exhibit O-1 to Chirinos Affidavit**

146

CORPUS CHRISTI

# Caller Times

**50 CENTS**   **SATURDAY, MAY 24, 2008**   **CITY EDITION**

# Carter's salary to be paid in full

### Chamber will accept resignation effective April 30

**BY FANNY S. CHIRINOS**
*Caller-Times*

The Corpus Christi Chamber of Commerce and CEO Terry Carter's attorney gave conflicting reports Friday about a severance agreement, but confirmed that it included paying his full 2008 salary and benefits and accepting his resignation. The proposal does not include an agreement by Carter to end his lawsuit against the chamber and others, including the *Caller-Times*.

Chamber attorney Van Huseman and Carter's attorney, Rene Rodriguez, also confirmed that the resignation would be effective April 30. Carter has been on paid leave since March 26 after disagreements over chamber financial practices.

Huseman and Rodriguez differed Friday on whether the agreement to settle Carter's 2008 contract was concluded. Huseman said it was and Rodriguez said some details remained to be resolved. Those details involved the final compensation amount, federal payroll taxes and Social Security.

Huseman said the chamber has issued a check and it has been cashed. Rodriguez said the check is deposited in an escrow account. Neither would identify the amount, but interim CEO Ken Treviño said it was in the $132,000 range. A copy of the

*First reported on*



*Please see* **CHAMBER 11A**

**Carter** *is former CEO of the Chamber of Commerce.*

---

## FROM THE COVER

### CHAMBER *from* 1A

contract, provided by Huseman, calls for a $136,500 salary and various benefits. Treviño said the $132,000 represented salary and benefits not already paid this year.

Attempts to reach Carter were unsuccessful Friday.

Huseman said Carter's contract was so favorable to him that the chamber was not in a position to obtain an agreement not to sue in exchange for the severance.

According to a copy of the employment contract Carter signed in 2004 when he was hired, he could be terminated without cause only after a 90-day written notice and a vote of at least 75 percent of the voting members of the board of directors. In such an event, Carter would be compensated for 100 percent of the remaining salary and benefits.

If there was cause for termination, Carter would be released from his contract only if a 90-day written notice was given along with vote of at least 75 percent of the board and only if Carter "flagrantly violated" policy adopted by the chamber. In such a case, Carter still would receive full compensation for salary and benefits.

Huseman said the chamber had no choice but to pay the remainder of Carter's contract.

"He had an employee contract that was entirely one-sided in his favor," Huseman said. "It did not help our bargaining position any."

Huseman declined to name who drew up the contract on behalf of the chamber. Steve Woerner, the chamber's board chairman at the time Carter was hired, said he didn't remember the details of the contract or who wrote the contract.

John Bell, a former long-time chamber attorney, said he was the chamber's attorney in 2004 but wasn't involved in the contract.

"I asked for a copy of that contract several times and never got one," said Bell, who is representing two defendants in Carter's lawsuit, chamber executive committee members Judy Hawley and Sylvia Whitmore.

Carter filed a lawsuit March 19 against the chamber, its treasurer Damon Bentley, Hawley, Whitmore, the *Caller-Times* and others, seeking damages for actions he claims jeopardized his employment with the chamber. All defendants deny Carter's allegations.

Huseman said the chamber tried to persuade Carter to drop the lawsuit as part of the contract settlement, but he wouldn't agree to it.

Had the chamber not settled the remainder of the contract, it would have had to wait until the lawsuit ran its course, the attorney added.

"The chamber got rid of what it could and what he was willing to settle," Huseman said.

---

*Contact Fanny S. Chirinos at 886-3759 or chirinosf@caller.com.*

1 C.R. 538

147

**May 28, 2008**

*Release of chamber
audio recording sought*

**Fanny Chirinos**

**CR 541**

**Exhibit O-1 to Chirinos Affidavit**

148

## LOCAL

# Release of chamber audio recording sought

**BY FANNY S. CHIRINOS**
*Caller-Times*

The *Caller-Times* has asked a judge to compel release of an audio recording of a Corpus Christi Chamber of Commerce meeting at which the chamber treasurer aired concerns about the chamber's financial practices.

The tape, in the custody of chamber attorney Van Huseman, is evidence in a lawsuit by chamber president and CEO Terry Carter against the chamber, some chamber officials and the *Caller-Times*.

A hearing on the *Caller-Times*' motion is set for 8:30 a.m. Friday in Judge Jose Longoria's 214th District Court. Longoria on March 26 ordered release of the tape to all parties to the lawsuit. Since then, *Caller-Times* attorney Jorge Rangel has requested a copy from Huseman several times by mail.

Carter's lawsuit, filed March 19, alleges actions that jeopardized his employment with the chamber. The defendants deny the allegations.

Carter has been on paid leave since March 26 and last week his and the chamber's attorneys gave conflicting reports as to whether a settlement involving his resignation was concluded. The settlement is separate from the lawsuit and does not include an agreement not to sue the chamber, or to drop the pending lawsuit.

At the tape-recorded meeting Feb. 15, chamber treasurer Damon Bentley aired concerns about the chamber's financial practices. Also at that meeting, two members of the executive committee, Judy Hawley and Sylvia Whitmore, were told they were being removed from the executive committee. All three are defendants in Carter's lawsuit.

Rangel, who filed the motion to compel release of the tape Tuesday, said all other attorneys involved in the case have received notice of the hearing. Huseman said Tuesday afternoon that he had not received notice of the hearing.

Huseman said Bentley's attorney, Robert Anderson, informed him that lawyers involved in the lawsuit would hear the tape together.

"I thought he had (Rangel's) blessing on it, but maybe I misunderstood," Huseman said. "I told Rangel that as soon as we got this Carter (settlement) wrapped up, we would make it available. We didn't want to jeopardize the negotiations."

Huseman said he didn't know if he would appear at Friday's hearing as he had just been informed of it.

*Contact Fanny S. Chirinos at 886-3759 or chirinosf@caller*

1 C.R. 541

149

# May 30, 2008
## *Judge orders that chamber tape recording be released today*

**Mary Ann Cavazos**
**CR 525**
**Exhibit N-1 to Cavazos Affidavit**

150



CORPUS CHRISTI, TEXAS

Printer-friendly story
Read more at caller.com

## Judge orders that chamber tape recording be released today

By Mary Ann Cavazos

Originally published 10:51 a.m., May 30, 2008
Updated 10:51 a.m., May 30, 2008

CORPUS CHRISTI — District Judge Jose Longoria signed an order this morning ordering release Friday of a tape recording of a Corpus Christi Chamber of Commerce meeting at which the chamber treasurer voiced concerns about the chamber's financial practices.

The tape is to be released today to all parties in a lawsuit by chamber president and CEO Terry Carter against the chamber, some chamber officials and the *Caller-Times*. Longoria first ordered release of the tape to all parties on March 26. Today's order precluded the need for a hearing scheduled at 10:30 a.m. today to consider a motion by *Caller-Times* attorney Jorge Rangel to compel release of the tape.

Since March 26, Rangel has made several requests for the tape, which has been in the custody of chamber attorney Van Huseman since shortly after the Feb. 15 chamber meeting. It is evidence in the lawsuit by Carter, who accuses the defendants of actions jeopardizing his employment with the chamber. All parties deny the allegations.

Carter has been on paid leave since March 26. Last week, his and the chamber's attorneys gave conflicting reports as to whether a settlement involving his resignation had been finalized. That settlement is separate from the lawsuit and does not include an agreement to drop the pending lawsuit.

At the tape-recorded meeting on Feb. 15, chamber treasurer Damon Bentley discussed his concerns about the chamber's financial practices. Also during the meeting, Judy Hawley and Sylvia Whitmore, were told they were being removed from the chamber executive committee. All three are defendants in Carter's lawsuit.



© 2009 Scripps Newspaper Group — Online

1 C.R. 525

# May 31, 2008

# *Chamber tape tells of heated exchange*

**Mary Ann Cavazos**
**CR 526**
**Exhibit N-1 to Cavazos Affidavit**

152

CORPUS CHRISTI

# Caller Times

50 CENTS     SATURDAY, MAY 31, 2008     CITY EDITION

# Chamber tape tells of heated exchange

## Recording released after a legal battle

**BY MARY ANN CAVAZOS**
*Caller-Times*

A recording of a Corpus Christi Chamber of Commerce meeting obtained Friday by the *Caller-Times* contains a contentious exchange between CEO Terry Carter and other chamber officials.

The *Caller-Times* obtained the recording at 5:20 p.m. Friday after legal wrangling. A judge on March 26 first ordered that the recording be made available to all parties in a lawsuit by Carter against the chamber, some chamber officials, the *Caller-Times* and others. Carter, who has been on paid leave since that date, filed suit March 19 alleging actions jeopardizing his employment. The defendants deny all claims.

The recording contains numerous chamber meetings, including a Feb. 15 meeting referenced in the lawsuit.

The total recording indicates a length of five hours, 29 minutes. The segment containing the Feb. 15 meeting is one hour, nine minutes. It gives no indicator as to when the meeting began or ended.

The Feb. 15 segment was identified based on interviews, correspondence among chamber officials, and allegations contained in the suit.

The voices of chamber treasurer Damon Bentley, Carter, chamber

*Please see CHAMBER 5A*

---

CALLER-TIMES • May 31, 2008 • **Saturday** • **5**A

## FROM THE COVER

**CHAMBER** *from* **1A**

chairman-elect Robert Gonzalez, chamber attorney Van Huseman, chairman Freddie Martinez Jr. and executive committee members Judy Hawley and Sylvia Whitmore were recognizable on the recording. Bentley, Hawley and Whitmore are named defendants in Carter's lawsuit.

Early in the segment a contentious exchange between Carter and Bentley can be heard, as the chamber officials discuss whether to proceed with Bentley's financial report.

Bentley: "I really don't want Terry sitting here staring me down."

Carter: "Why? If you've got a problem with me, get in my face and say 'Terry, here it is.' ... Lieutenant commander ... Are you making any accusations that I have misappropriated any funds for personal use?"

Bentley: "No."

Carter: "Are you making any accusations that I have intentionally, intentionally misled an executive committee or members of this board of directors? Intentionally?"

Bentley: "I'm not going to answer that."

Carter: "Why not?"

Bentley: "It's not a question for me to answer right now. I'm going to give the findings of facts. There's no opinions that I have. There's just facts, Terry. ... I have a fiduciary responsibility ... Don't call me lieutenant commander and don't stare me down."

Carter also can be heard in an exchange with Hawley, in which he asks why she won't look him in the face.

"Oh, I have a problem," Hawley replied. "I have a big problem, Terry. ... I have a problem with trusting your leadership with this organiza-

tion. That's the problem."

Carter later left the room and Bentley could be heard giving his financial report.

The recording's release Friday resulted from a motion by the *Caller-Times* to compel its release in accordance with 214th District Judge Jose Longoria's March 26 order that it be made available to all parties.

*Caller-Times* attorney Jorge Rangel filed the motion Tuesday after he made several requests for the recording after March 26.

Since Feb. 15, the recording had been in Huseman's custody.

On Friday morning, the parties reached an agreement on the release of the recording, heading off a scheduled 10:30 a.m. hearing on the issue in Longoria's court.

---

*Contact Mary Ann Cavazos at 886-3623 or cavazosm@caller.com*

1 C.R. 526

153

**June 13, 2008**

*Ex-Chamber CEO*

*mediation to continue*

**Mary Ann Cavazos**

**CR 527**

**Exhibit N-1 to Cavazos Affidavit**

# TAB 3

# Exhibit A-23

299

157

larger clients have called me with serious concerns that I don't have answers for. I am very uncomfortable with the Chamber's method of accounting and lack of information getting to the board.
Does anyone have any suggestions on how to proceed with this?
Kent Cooper

---

**From:** Damon Bentley [mailto:dbentley@utopiaworldcuisine.com]
**Sent:** Tuesday, February 26, 2008 2:05 PM
**To:** 'Freddie Martinez Jr.'; 'Judy Hawley'; 'Robert Gonzalez'; 'Sylvia Whitmore'; 'Bud Harris'; 'Butch Escobedo'; 'Chuck Cazalas'; 'Dan Garza'; 'Debbie Lindsey-Opel'; 'Dick Drilling'; 'Gary Eifler'; 'Gary Eifler x2 copy'; 'Gary Malone'; 'Howard Ainsley'; 'Howard Ainsley x2 copy'; 'Joanna Davidson'; 'Joe Guzman'; 'John Michael'; 'Kent Cooper'; 'Laurie Cook'; 'Leon Loeb'; 'Manuel Ugues'; 'Pat Townsend'; 'Ralph Coker'; 'Ralph Diaz'; 'Robert Blair'; 'Sandra Alvarez'; 'Sean Murphy'; 'Trent Hill'; 'Trent Hill X2 copy'
**Subject:** Attention Chamber Board of Directors

February 26, 2008

Corpus Christi Chamber of Commerce Board of Directors,

I sincerely appreciate all of the Board members that have contacted and thanked me for the review I provided at the Board meeting last Wednesday. Many of you also have given me sound advice on how to proceed forward with my fiduciary duties to the Chamber Board and its members.

It was unfortunate that the CEO's letter sent to the members of the Board prior to my presentation at the called meeting on 20 Feb, misrepresented both the intent and the facts to be presented in the Treasurer's report. The CEO's letter, which quickly became public, may have compromised our membership's clear understanding of the severity of issues with which the Board of Directors must deal with in the coming weeks.

Two additional pieces of correspondence, purportedly sent from us, the Board of Directors, to our members misrepresent a number of findings to our members and may pose potential issues of liability. In order to articulate my concerns to those of you who were not present at the 20 Feb Board meeting, and to address the misrepresentations included in the two subsequent letters from the Chamber leadership, I provide the following facts for your consideration.

158

· I was asked by the Board and our Chairman to review our financials in connection with our CEO's request for a raise, performance bonus increase and contract extension. The timeline was set by the Board and our Chairman. I had no malicious intent or political agenda as the CEO has inferred in both private and public venues. I simply was conducting my fiduciary duty as your Treasurer. As soon as I felt there were issues with the financials, I contacted the Chairman. After I later discovered what I thought was a crucial problem with the use of Building Fund dollars to supplement the Chamber's operating expense account, I once again immediately contacted the Chairman. Due to the persistent avoidance of calling an Executive Committee meeting to address the issue by the Chairman, I contacted two other Executive Committee members and shared the information with them. After still not receiving a response from our Chairman or Chair-Elect, the three of us requested, via certified letter, that the Chairman use the scheduled 15 Feb meeting to address these issues. The letter is included as an attachment to this email.

· In the Executive Committee meeting on 15 Feb, our accountant confirmed that, based on his review of the information presented, all of the "financial adjustments" about which I had questions were valid concerns. He went on to further say that the use of Building Fund dollars to supplement the Chamber operating expenses could possibly forfeit the Foundation's 501c3 status because of the link between the CEO's bonus to the financial performance of the Chamber. In closing, I asked the accountant if he felt the Chamber of Commerce has "financial problems", to which he replied, "Yes". As your Treasurer, it was my duty at that point to report this to you.

· The Executive Committee meeting on 15 Feb was taped. I requested after the meeting that I receive a copy of the tape to accurately and completely disseminate the information discussed for my presentation to the Board. Unfortunately, the CEO took the tape and immediately left the premises. Attempts to immediately contact him were unsuccessful. I received a call from the Chairman later that day confirming that the CEO was bringing the tape back and that I would receive a copy. I made several attempts to obtain the tape over the weekend without success. On Monday, I was told by the Chamber's attorney, that the recording was too divisive and that unless the Chairman directed him, he was not going to release it to me. I called the Chairman who stated he was not going to authorize the release of the tape due to counsel by our attorney. I sent a registered letter to the Chairman on 23 Feb asserting my right to this tape and demanding a

301

159

copy within 24 hours of the receipt of the letter. More than 24 hours have lapsed after the letter was received by the Chairman and the copy has still not been made available. I have included this demand letter for your review. It is my assumption that if the accountant had stated in the Executive Committee meeting that the Chamber financials were fine, the tape would have been readily available for your review at the full Board meeting last Wednesday.

· After learning that I wouldn't receive a copy of the tape for my presentation on Wednesday, I contacted the accountant and requested a letter with his recollection of the main points of the meeting. He stated that he would provide such letter, but that he required a letter of indemnification prior to doing this. I requested the Chairman sign this letter and facilitate this process, but the accountant never received the letter of indemnification. Since that time, the accountant has sent me an email stating that he no longer will discuss this matter and that the Chamber has become a "high risk" engagement that he may no longer want to be associated with. This is very troubling considering this is coming from a person who the CEO considered the Chamber's CPA at the time of the 15 Feb meeting.

· To respond to the CEO's letter to the Board that has now been made public, I offer the following responses to his "three immediate concerns." 1) The timeline for the CEO's evaluation was set by the Chamber Board of Directors and the Chairman called the evaluation meeting as a direct response from the CEO's request for a raise, performance bonus and contract extension. As unfortunate as it was that the CEO had surgery, the timeline was set without any knowledge that the CEO was scheduled for surgery. 2) The statement I made to the paper was the statement that the Chairman, Chair-Elect and I agreed would be made to any press inquiries and that anything above and beyond that would be directed to the Chairman. If the tape were available from the meeting, this could be confirmed; unfortunately it is not. I have stated, "No comment" to all and any other inquiries about this issue to all media sources and have continued that practice up to this date. The CEO is the one who made this information public by sending a letter to the Chamber Board of Directors in an attempt to discredit the findings prior to the presentation. 3) I never hid anything from the CEO and at the Executive Committee meeting, I invited the CEO to respond to the points I had raised. It was our attorney who recommended to the CEO to take pause and respond in writing at a later date.

It is undeniable the financials for 2007 as presented to the Executive

Committee and Board are inaccurate, inconsistent with the process used in previous years and a misrepresentation of the Chamber's bottom line. My main concerns after our 31 Jan evaluation meeting were that 1) the CEO's performance bonus is directly linked to the financial performance of the Chamber, 2) suspected irregularities in booking expenses and revenues that created the "Net Operating Income" for 2007, and 3) these irregularities had the effect of justifying a performance bonus under his Contract. At the core of this matter are three very obvious findings:

**o The CEO deferred his pay for Nov and Dec 2007 without booking it as an expense in 2007: $19,992**

In the CEO's preemptive letter to the Board, he states that his deferred pay should have been booked in 2007 and that he brought this to my attention at the Executive Committee meeting on 18 Jan. This is not true. Judy Hawley, an Executive Committee member before she was expelled on 15 Feb, was at this meeting and can attest to this statement. The CEO did state that he had deferred a portion of his pay for personal tax purposes. I found this odd, but made the assumption that the booking of this entry was done correctly. He further states in his letter to the Board, "I immediately went to the bookkeeper to see what had happened and instructed him to contact our CPA and get the correct entries and make them to the books, which he did. This was simply a bookkeeping error that was immediately corrected." This also is not true. The financials on 28 Jan, 10 days after the Executive Committee meeting, still did not reflect the deferred pay as a 2007 expense. The adjustment wasn't made until after I questioned whether the deferred pay was recorded as an expense in 2007 at our evaluation meeting on 31 Jan. Our book keeper stated that it wasn't. I wasn't brought an adjusted financial until 4 Feb, a full 17 days after the CEO claims he "immediately corrected" this error on 18 Jan. Regardless of when it was corrected, the undeniable fact is that the financials presented to the Executive Committee and the Board of Directors were inaccurate and the request for a raise, performance bonus and contract extension were done so on the basis of an inaccurate financial report.

**o The CEO used Building Fund dollars to supplement the Chamber financials: $18,312**

After the Building Fund was moved from the Chamber to the Chamber Foundation in Oct 2007, a check was written to the Foundation from the Building Fund account for $18,312 on 14 Nov. A check was then drafted for $18,312 from the Foundation to pay the Chamber for "overhead" based on

an Oct invoice from the Chamber for telephone expense ($9,800), services/ utilities expense ($7,732) and office printing expense ($780). At a meeting I had with the accountant in his office, he stated to me that the CEO should have never shifted the Building Fund from the Chamber books to the Foundation books for the use of supplementing the Chamber's financials. This contradicts the CEO's claim in his letter to the Board that the CPA's firm was consulted about the transfer of the Building Fund for the use of operating expenses. In a statement provided by the Chamber staff to me on 4 Feb, it reports that our accountant felt that our Building Fund "should be used for the original intentions of building maintenance, property upkeep and capitalized equipment."

Needless to say, whether this is an accounting problem or not, the use of Building Fund dollars in its most liberal interpretation could not possibly be thought to be used for Chamber operating expenses. If this were the case, the CEO could simply unilaterally charge the Foundation whenever he wants and dwindle down that account to zero and post a profit each and every year. Transfer of the Building Fund to the Foundation was represented by the CEO for the intent of providing a tax deduction for those who gave to the Building Fund in our upcoming building campaign. One would have to believe that if someone donated money to this account they would expect that money to be used for the new building, not to pay for current operating expenses of the Chamber.

I want to be clear that the movement of the Building Fund from the Chamber of Commerce to the Foundation does not automatically give the CEO unilateral authority to use these funds for whatever he wishes. The Building Fund is still held in a separate account and was not lumped into the operating account of the Foundation. Even though the Board was informed of the movement of the Building Fund to the Foundation, the Executive Committee or the Board never approved the funds to be available for unilateral use by the CEO for operating expenses.

o The CEO booked January 2008 membership renewals in 2007: $63,903

This is a matter of fact. I am not questioning whether modified accrual, accrual or cash basis should be used. I am simply pointing out the fact that by using this "modified accrual" system, and doing so when it benefits the bottom line, you open up the possibility for manipulation of the numbers. Any and all adjustments that are made should be disclosed when it directly affects the financial performance and subsequently the CEO's bonus. In

162

fact, 2007 received the benefit of most of Jan 2007 renewed dues ($58,336 booked on 3 Jan 2007) and most of Jan 2008 renewed dues ($63,903). This creates a distorted view of our financial performance for the past year.

If you make the above adjustments to the 2007 P&L, you receive a much different picture of our 2007 performance, which is undeniably more accurate when comparing year-to-year performance from 2006 to 2007 based on consistent methods of accounting.

Original Net Operating Income:                                         +
$40,425

Pay Adjustment:                                                        -
$19,992

Building Fund Adjustment:                                              -
$18,312

2008 Renewed Dues Adjustment:                                         ±
$63,903

-

Adjusted Net Operating Income:                                        -
$61,782

(Total Swing of $102,207)

In addition, there are several miscellaneous findings that I neither have the resources or expertise to investigate further but that I feel need to be scrutinized. They are as follows:

· Foundation financials have never been presented to the Executive Committee since I have been on the Executive Committee as required in the by-laws.

· Special events (Salute to the Military, Conquer the Coast, State of the City, etc.) are kept "off the books" and only net income is presented to the Executive Committee even though full accounting has been requested by at

least one Executive Committee member.

· A comparison of the year-end membership lists provided by staff reflects a significant decline in member organizations during 2007.

· The by-laws require an audit each year. A review was conducted last year without approval from the Executive Committee to deviate from the by-laws. Not one member of the Chamber leadership can say when the last audit was conducted.

· The CEO's explanation for not conducting an audit was that of cost and availability. It is hard to believe that we do not have enough money to conduct an audit, but during this same time period, we have requests by the CEO for a raise and bonus.

· Our accountant conducted the 2006 "review" and stated in that review (and still thought this was the case as of the meeting on 15 Feb) that the Chamber was on an accrual basis of accounting.

· I have been told several times when I have questioned the use of modified accrual basis that the accountant knew we were on this form of accounting and approved it. This contradicts the previous point that the accountant thought we were using accrual basis.

· The Executive Vice President reported to the Executive Committee on 31 Jan that he was "asked" to defer his pay in Oct 2007 because the Chamber was in a "cash crunch" and they needed to pay bills. Our fragile cash position and need to ask staff to withhold pay was never reported to the Executive Committee or the Board at any time by the CEO.

· $77,630 of the Building Fund was used from 1 Jan to 31 Oct, 2007 for the purpose of moving to the CVB side of the Chamber building. The original budget for this move was estimated by the CEO to be $36,000 according to the Board minutes of 24 Sep. $55,847 of these funds were capitalized. Some of the capitalized expenses are suspect such as a $255 "lunch" expense.

· Significant contracts are signed and authorized by the CEO without RFPs or knowledge by the Executive Committee or the Board.

In the end, this comes down to trust and accountability. Removing Executive Committee members who voice sincere concerns, keeping taped meetings from other Board members, yelling in an attempt to intimidate

CC00555

306

164

Board volunteers, leadership refusing to sign a letter of indemnification that silenced the accountant and attempting to justify a raise based on disputable numbers do not change my fiduciary responsibility. Unfortunately, they do make it much harder to perform my duties, but my duties still remain.

An audit has now been called for. I have not been appointed to the audit committee as was reported to the Caller Times. My overarching concern is that while an audit is demanded in this situation, an overhaul of our financial policies and procedures is also of utmost importance. An audit will address how we may or may not have complied with generally accepted accounting principles, but it will not address the policy questions regarding early booking of revenue, deferment of expenses, transfer of funds between the various Chamber entities and other procedural matters. I urge all Board members to immediately and diligently secure all records relating to the business of the Corpus Christi Chamber of Commerce so that critical information is safeguarded.

In closing, I would like to thank all of you for your courage and friendship. The truth is sometimes difficult to interpret and I hope that the facts above assist you in finding that truth. I leave you with the following quote from Winston Churchill, "The truth is incontrovertible, malice may attack it, ignorance may deride it, but in the end, there it is."

With Respect and Devotion to Duty,


Damon L. Bentley

Treasurer, Corpus Christi Chamber of Commerce




**Terry H. Carter**
President & Chief Executive Officer
Corpus Christi Chamber of Commerce
361-881-1800

165

tcarter@theccchamber.org

=================================================================================
==============================

Disclaimer: This e-mail message and all information enclosed, including any attachments, is for the sole use of the intended recipient(s) and may contain confidential and privileged information. Any unauthorized review, use, disclosure, or distribution of the information enclosed, in its entirety or in part, is strictly prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and immediately destroy all copies of the message. For further assistance or questions please contact the email administrator at Corpus Christi Chamber of Commerce, 361-881-1800.

=================================================================================
==

CC00557

166

# TAB 4

# Exhibit A-10

# Treasurer's Due Diligence at Request of Executive Committee

- After the meeting, I reviewed the following documents from the Chamber

    - 2006/2007 Financials
    - 2006 Audit Review
    - Salaries of all Staff for 2007
    - Building Fund P&L
    - Chamber and Foundation By-laws
    - Accounting policies and procedures
    - Personnel policies and procedures
    - Stand alone budgets for the last 3 special events
    - 2006/2007 membership reports
    - December 2007 dues report (early pay)
    - Statement of Building Fund (purposes and intentions)

CC00580

157

169

# Findings: Payroll Reporting

- CEO withheld his pay for Nov & Dec 2007. He had stated that this was for tax reasons in his presentation to the Exec Committee.

- The withheld pay was not shown on the 2007 books as a payable.

- After the CEO evaluation meeting (not after our exec committee meeting), Waller (Finance Director) stated he contacted our CPA (Thompson) via phone and was told that the salary should have been booked in Nov & Dec. Waller made an adjustment to the books for a minus $19,992.

CC00581

158

170

# Findings: Payroll Continued

- Executive Director (Trevino) stated prior to our evaluation meeting that the CEO told him that they were in a "cash crunch" in October and that he needed to withhold his pay to pay bills. He did so.

- This led me to look at October's financials closer (where we supposedly showed a net ordinary income of -8,307.62).

CC00582

159

# Findings: Foundation Books

- On 31 October, the Chamber invoiced the Chamber Foundation for $18,312.87 to pay Jan – Oct expenses for the following percentages, categories and amounts:

- 60% of Chamber's Telephone Exp of: $16,334.43

- 60% of Chamber's Services/Utilities of: $12,886.10

- 10% of Chamber's Office Printing of: $7,805.41

- Total Billing: $18,312.87

CC00583

160

# Findings: Foundation Books

- At no time did the Executive Committee or the Board vote to bill the Foundation for these expenses.

- Billing the Foundation for these expenses did not occur in 2006 according to Trevino (Pres of Foundation).

- This is what led me to the Foundation financials…

CC00584

161

173

# Foundation Findings:
# Use of Building Fund

- On 14 November, $18,312.87 in funds were disbursed from the Building Fund to the Foundation in order to pay the Chamber of Commerce the utilities expense invoice. This was previously booked as an expense reimbursement in October on the Chamber financials.

- The Building Fund was established with proceeds from the sale of the Chamber's property to the GSA to be used for building improvements or a new location for the Chamber.

- Using Building Funds for utilities expenses is inconsistent with this objective.

CC00585

162

174

# Building Fund Findings

- At no time did the Executive Committee or the Board of Directors vote for the Building Fund's movement to the Foundation.

- At no time did the Executive Committee or the Board of Directors vote for the Building Fund to be used for operating expenses of the Chamber.

- From Jan 1 to Oct 31, 2007, the Building Fund was depleted by $77,630.

- $51,847 of this was capitalized for various move-in expenses to the old CVB space.

CC00586

163

175

# Findings: Building Fund

- At no time did the Executive Committee or Chamber Board vote to expend $77,630 to move from one side of the building to the other or authorize use of the Building Fund for this purpose.

- Use of Building Fund dollars from a 501c could be a "serious problem" if used to increase the NOI that is linked to a performance bonus according to the CPA (Thompson). The CPA will no longer speak on this subject and the tape from the meeting has not been made available to review his comments.

CC00587

164

176

# 2008 Renewals

- $63,903 of renewed 2008 dues were booked in December 2007 vs 2008.

- This was $53,000 over budget. When asked if this was normal, the Finance Director stated that it was and that this happened in 2006 as well. After reviewing the Dec 2006 P&L, this is not the case. Only $10,589 were received…$5,811 under budget for that month.

- In Dec 2006, $2,076 of Jan 2007 renewed dues were booked for 2006 and $58,336 were booked on Jan 3. Therefore, 2007 received the benefit of both Jan 2007 and Jan 2008 renewed dues.

CC00588

165

177

# Summary of 2007 Adjustments

- Original NOI: +$40,425

- Pay Adjustment: - $19,992
- Building Fund Adjustment: - $18,312
- 2008 Renewed Dues Adj: - $63,903

- Adjusted NOI: - $61,782

**This is a $102,207 swing…**

CC00589

166

178

# Accrual – Cash – Modified Accrual

Withholding of pay & not booked during time period
**Cash basis for expense**

Foundation charged for expenses (actually building fund)…books it in Oct, but receives in November
**Accrual basis for an expense reimbursement…even if acceptable, entire time period (Jan – Oct) should have been accrued. We also didn't continue to bill the foundation (inconsistent)**

$63,903 renewed dues received and booked in December
**Cash basis for income**

CC00590

167

179

# Miscellaneous Findings

- Foundation Financials have never been presented to the Executive Committee as required in the By-Laws

- Special Events are kept "off the books" and only net income is presented to the Executive Committee even though full accounting has been requested

- A comparison of the end of year membership lists provided by staff reflects a significant decline in member organizations during 2007.

CC00591

168

180

# Miscellaneous Findings

- The by-laws require an audit each year. A <u>review</u> was conducted last year without approval from Exec. Com.

- Dove -Thompson conducted the review and stated in their review (and still thought this was the case as of the meeting last Friday) that we were on accrual basis at that time.

- I have been told several times when I have brought up the modified accrual basis that the CPA knew we were on this form of accounting and approved it.

- Checks for the Chamber of Commerce have never been signed by the Treasurer (Accounting policies and procedures contradict by-laws)

CC00592

169

## CEO's 2006 Evaluation:
## Performance Objectives for 2007

The Executive Committee was unable to reach consensus on the CEO's achievement of these Performance Objectives from his 2006 Evaluation:

- Maintain the level of the Chamber's media coverage at 2006 levels or better.

- Continue to foster a working relationship with the area's other business organizations (CCREDC, CCHCC, PICC, etc.)

- Set an aggressive goal for membership retention, and lead effort to attain it.

- Develop and foster a professional, working relationship with the City, County, and Port leadership.

- Coordinate at least (2) joint information-sharing meetings with the Hispanic Chamber of Commerce.

CC00593

170

# Analysis and Recommendations

- The Chamber of Commerce and Chamber Foundation need a complete and thorough audit from an outside accounting agency (full audit vs. a review).

- The audit should include the building fund, special events, and contracts.

- Best accounting practices need to be implemented to ensure transparent financial transactions.

- Policies and procedures for all aspects of operating the Chamber of Commerce need to be developed and followed.

CC00594

171

183

CC00595

# Questions?

184

# TAB 5

# Exhibit A-15

240

# MEMORNDUM

**FOR:** Board of Directors, Corpus Christi Chamber of Commerce

**FROM:** Terry Carter, CEO

**DATE:** February 17, 2008

**SUBJECT:** Allegations concerning inappropriate business practices

Ladies and Gentlemen:

The specially called meeting for Wednesday, February 20th was called at Board Direction for the singular purpose of receiving a recommendation from the Executive Committee regarding my employment contract. The Executive Committee will report that they have been unable to make a recommendation.

I would appreciate your consideration at that meeting to consider the following facts in response to allegations that have been made both privately and publicly regarding my job performance. Up until this time I have not been afforded an opportunity to address the allegations and may not be given that opportunity during Wednesday's Board meeting.

As I understand, there are four allegations:

1. That I with malice favorably affected the net operating profit on the year-end P&L statement by deferring my November and December income and not showing it as an expense.

   RESPONSE: I differed compensation in 2006 (documentation is available to support this deferral) and elected to do so again in 2007 for tax reasons. My wife made approximately 50k more this year than last year. None of her additional income had taxes withheld during 2007. I am happy to provide the documentation to support this fact.

   The Chairman was notified in October 2007 of my intention to defer my income. The correct bookkeeping entries are to expense on the P&L the deferred compensation and show it as a liability on the balance sheet at the time that the compensation should have been paid. Our bookkeeper failed to make these entries and I failed to check the entry before they were presented. I am the one that found the error during the January Executive Committee meeting and brought it to the attention of our Treasurer, Damon Bentley. Following the meeting, I immediately went to the bookkeeper to see what had happened and instructed him to contact our CPA, Darryl Thompson, and get the correct entries and make them to the books, which he did. This was simply a bookkeeping error that was immediately corrected.

2. That I am using a modified accrual accounting method that according to Damon Bentley should not be used.

CC00559

241

RESPONSE: We are using a modified accrual basis of accounting that has been approved by the Board of Directors. When I was employed in August 2004, I inherited an organization that had very inconsistent accounting and financial controls and practices. My instructions from the Board was to fix it and do so fast. In consultation with our then Treasurer, Darron Bergstrom, and our then CPA, Kendra Kennison, we put into place a modified accrual basis of accounting. This treats revenue on a cash basis so that you record the revenue when you receive it and accrue certain expenses. This basis of accounting was approved by the Board of Directors in September 2004 and has been in place since that time. One of our current Board members was present at the meeting and will validate this fact.

3. Transfer of the building fund from the Chamber of Commerce (a 501(c)(6) corporation) to the Chamber Foundation (a 501(c)(3)) without Board approval.

RESPONSE: The transfer of these funds was done in consultation with our CPA. We had a discussion with our CPA about both the propriety of making the transfer, the reason for doing so, and the exact entries to affect the transfer. During the course of the conversation, we discussed if there were any restrictions that would preclude making the transfer. Ken Trevino researched archived documents relating to the building and building fund and could not find any restrictions of any nature on the building fund. We concluded that not being able to find restrictions was insufficient. Therefore, our CPA talked with his senior partner, Mr. Joe Dove, who set up the building fund. Mr. Dove confirmed that there never were any restrictions placed on the "building" fund. During the December Board meeting, Leon Loeb asked about the funds. I fully explained to the Board what we had done.

4. That I used a portion of the building fund after it was transferred to the Foundation to pay certain operating expenses.

RESPONSE: That is correct. The Chamber of Commerce has for many years housed the Foundation and its operations, which include among other things Leadership Corpus Christi. The Chamber has never sought any reimbursement from the Foundation for the cost of providing space, administrative, overhead and managerial support. I caused to be invoiced the Foundation for about $18,000 for telephone and utility support. During FY 07, that represented about 60% of the total cost of telephone and electricity. The Foundation has never been charged for space allocation, bookkeeping services, managerial oversight or administrative support. This was discussed with our Treasurer, Damon Bentley, during a two-hour FY'08 operating budget meeting. My field notes developed in preparing the budget, reflect that I had some question as to whether 60% was a reasonable number. At no time, did Damon Bentley ever question or contribute any dialogue to that conversation. If he had raised any exceptions during the budget meeting, the percentage would have been adjusted.

CC90560

242

188

5 There seems to be some concerns raised as to whether the by-laws of the Chamber are being followed to the letter of the law. Specifically, were there 5 members on the 2008 Nominating Committee as opposed to the required 7?

RESPONSE: Ladies and gentlemen, we as management and you as our Directors make every effort to comply with our Bylaws as closely as possible. There is no way that I can attest that in every single case and instance that the bylaws are complied with 100% of the time. What I can say is that we make a very good effort to comply with the bylaws and its intentions. If we are to comply with 100% of the bylaws, you as directors must approve every prospective member before they join the Chamber. You must also approve every member that is dropped for non-payment of dues. This distracts from your ability to work at a strategic level. My recommendation is that the bylaws should be reviewed, edited and in some cases rewritten to reflect the modern operations of a chamber of commerce that represents a mid-size American city.

CLOSING COMMENTS: I am not calling into question the motives of any individual that questions the operations of our Chamber. Our records have always been open to any director or officer of the corporation. I have insisted on complete transparency with respect to all aspects of the management of the Chamber of Commerce.

However, never in my professional career has my integrity been called to question as right now. There is NO Allegation that any illegal activity or misappropriation of money has taken place. That leaves this essentially as a matter of bookkeeping practices. I have three immediate concerns:

1. What was of such critical and grave urgency that these discussions had to take place while I was in Cardiac Intensive Care at Shoreline Hospital 18 hours after having undergone a 5-hour open-heart surgery?

2. Who provided unauthorized information to the local newspaper that was clearly one-sided and seemed very much designed to embarrass the Chamber, the Chamber staff, Chamber Directors and our families.

3. I have not been allowed to respond or otherwise defend any of these allegations at any meeting to date. The chairman has advised me that I may not be allowed to be present at the entire Board meeting in Wednesday and so I present these facts to you in advance.

CC00561

189

# TAB 6

# EXHIBIT "M"

454

CAUSE NO. 08-1360-F

| | | |
|---|---|---|
| TERRY CARTER | § | IN THE DISTRICT COURT |
| | § | |
| vs. | § | 214th JUDICIAL COURT |
| | § | |
| CORPUS CHRISTI CHAMBER OF | § | |
| COMMERCE, SCRIPPS TEXAS | § | |
| NEWSPAPERS, LP d/b/a CORPUS | § | |
| CHRISTI CALLER TIMES, DAMON | § | |
| BENTLEY, JUDY HAWLEY, SYLVIA | § | |
| WHITMORE, et al. | § | NUECES COUNTY, TEXAS |

**STATE OF TEXAS** §
§
**COUNTY OF NUECES** §

### AFFIDAVIT OF ELVIA AGUILAR

BEFORE ME, the undersigned authority, personally appeared Elvia Aguilar, who, after being duly sworn by me, upon her oath, testified as follows:

1. "My name is Elvia Aguilar. I am over the age of 18 years and competent to make this Affidavit. All statements contained in this Affidavit are within my own personal knowledge and are true and correct.

2. I graduated from Baylor University with a Bachelor of Arts degree in 2005, with a major in journalism. After graduating from Baylor, I worked as a reporter for the San Antonio Express-News' bilingual publication, Conexion, from June, 2005 until June, 2006. At that time, I started working for the Caller-Times as a business reporter. As such, I was in charge of covering banking, tourism, real estate, business and finance issues in the Coastal Bend area. This included the Corpus Christi Convention and Visitors Bureau, the Corpus Christi Chamber of Commerce, and Corpus Christi Regional Economic Development Corporation's 4A board, among other groups and organizations. In July or August, 2008, I began my current position with the Caller-Times as an education reporter.

3. Since I was the business reporter for the Caller-Times, sometime during the morning of February 15, 2008, my direct editor, Tom Whitehurst, assigned me to assist with a story regarding the Corpus Christi Chamber of Commerce. As a result of my news-gathering activities regarding the matter, I authored or contributed to the following articles regarding Terry Carter and the Corpus Christi Chamber of Commerce between February 15, 2008 and June 13, 2008, which is the time period during which the articles about which Terry Carter is complaining in the above referenced lawsuit, were published by the Corpus Christi Caller-Times:

EXHIBIT

M

455

192

a. "Financial, Management Questions Raised at Corpus Christi Chamber", published on February 15, 2008;
b. "Corpus Christi Chamber Pulls Two Off Panel", published on February 16, 2008;
c. "Corpus Christi Chamber Meeting to Discuss Financial Irregularities", published on February 20, 2008;
d. "Chamber of Commerce: Financial Questions Lead to Call for Audit", published on February 21, 2008;
e. "Chamber CEO Shifted Funds, Letter Says", published on February 27, 2008;
f. "Ex-Chair Airs Her Chamber Concerns", published on February 29, 2008;
g. "Petition Seeks Chamber Changes", published on March 3, 2008;
h. "About 80 Sign Petition on Chamber Operation", published on March 4, 2008;
i. "Chamber Board, CEO to Enter Talks", published on March 8, 2008;
j. "Chamber Treasurer Granted Temporary Restraining Order Protecting Tape of Meeting", published on March 19, 2008;
k. "Chamber Unrest Ends up in Court", published on March 20, 2008;
l. "Chamber to Discuss Petitioners' Concerns, published on March 21, 2008;
m. "Chamber Puts CEO on Paid Leave", published on March 26, 2008;
n. "Chamber CEO on Paid Leave", published on March 27, 2008;
o. "Chamber Finances Move to Forefront", published on March 31, 2008;
p. "Chamber Had Deficit, Board Tells Members", published on April 1, 2008;
q. "Chamber, in Need of Audit, Renews Accountant Search", published on April 29, 2008;
r. "Chamber Offers Contract Settlement to Carter, his Attorney Says", published on May 2, 2008;
s. "Chamber Makes Offer, Carter's Attorney Says", published on May 3, 2008;
t. "Chamber, Carter's Attorney Confirm Severance Agreement", published on May 23, 2008;
u. "Chamber's Acting CEO Resigns", published on May 27, 2008; and
v. "Chamber Acting CEO Resigns", published on May 28, 2008.

True and correct copies of the foregoing articles are attached hereto and incorporated herein by reference as Exhibit "M-1".

4. As part of my research and news-gathering activities in connection with my preparation of the foregoing articles, I interviewed the following individuals:

a. Lucy Reta, Van Huseman and Judy Hawley as sources for the February 15th article;
b. Sylvia Whitmore and Van Huseman as sources for the February 16, 2008 article;

2

456

193

c. Butch Escobedo, Laurie Cook, Freddie Martinez and Mark Scott as sources for the February 21, 2008 article;

d. Lucy Reta and Kendra Kinnison as sources for the February 27, 2008 article;

e. Freddie Martinez, Robert Gonzalez and Sylvia Whitmore as sources for the February 29, 2008 article;

f. Steve Woerner, Tom Dobson, Dusty Durrill and Carol Scott as sources for the March 3, 2008 article;

g. Freddie Martinez, Sylvia Whitmore, Carol Scott and Judy Hawley as sources for the March 4, 2008 article;

h. Freddie Martinez, Carol Scott, Leon Loeb, and Laurie Cook as sources for the March 8, 2008 article;

i. Van Huseman and Carol Scott as sources for the March 20, 2008 article;

j. Freddie Martinez and Carol Scott as sources for the March 21, 2008 article;

k. Van Huseman and Rene Rodriguez as sources for the March 26, 2008 article;

l. Freddie Martinez, Van Huseman and Rene Rodriguez as sources for the March 27, 2008 article;

m. Ken Trevino, Carol Scott and Freddie Martinez as sources for the March 31, 2008 article;

n. Michelle Peters, Damon Bentley, Laurie Cook, Carol Scott, Bud Harris, Ken Trevino and Van Huseman as sources for the April 1, 2008 article; and my attendance at the Chamber of Commerce general membership meeting on March 31, 2008;

o. Ken Trevino as source for the April 29, 2008 article;

p. Van Huseman, and Rene Rodriguez as sources for the May 2, 2008 article;

q. Van Huseman, Rene Rodriguez and Ken Trevino as sources for the May 3, 2008 article;

r. Van Huseman as source for the May 23, 2008 article;

s. Freddie Martinez as source for the May 27, 2008 article; and

t. Freddie Martinez as source for the May 28, 2008 article

5. Additionally, as part of my research and news-gathering activities in connection with my preparation of the foregoing articles:

a. I attempted to reach Plaintiff, Terry Carter, for his comments for the stories published on February 16th, February 20th, February 21st, February 27th, February 29th, March 3rd, March 4th, March 8th. I was unsuccessful in my attempts as Plaintiff did not respond to my messages. Further, per Plaintiff's attorney, Rene Rodriguez, Plaintiff had no comment for the March 26th article and declined to comment for the March 27th article.

b. I attempted to reach Sylvia Whitmore for comments for the February 15th article. I was not successful in contacting her.

3

457

194

c. I attempted to reach Freddie Martinez, the chairman of the Corpus Christi Chamber of Commerce, for his comments for the stories published on February 16th and March 3rd. Mr. Martinez did not respond to my messages.

d. I, together with my co-worker, Denise Malan, attempted to reach all of the Chamber of Commerce Board members on or about February 18th.

e. I attempted to reach Darrell Thompson, the Chamber of Commerce's CPA during the time period in question, did not return my telephone calls for the February 27th article.

f. I attempted to reach Van Huseman, the attorney for the Chamber of Commerce. He did not return my telephone messages for his comments for the February 15th and 29th articles.

g. I attempted to reach Damon Bentley for his reaction to the Plaintiff's lawsuit for the March 20th article. He did not return my calls.

6. Additionally, as part of my research and news-gathering activities in connection with my preparation of the foregoing articles, I reviewed and relied upon the following written sources, all of which are attached hereto and incorporated herein by reference as Exhibit "M-2":

   a. Plaintiff Terry Carter's memorandum to the Chamber of Commerce Board of Directors dated February 17th;
   b. Darrell Thompson's e-mail to Damon Bentley dated February 20th;
   c. The Chamber of Commerce Board of Directors' letter to its members dated February 22nd;
   d. Damon Bentley's e-mail to the Chamber of Commerce Board of Directors dated February 26th;
   e. Sylvia Whitmore's letter to the Chamber of Commerce Board of Directors dated February 28th;
   f. Damon Bentley's lawsuit filed on March 18th, styled: *Damon Bentley v The Corpus Christi Caller-Times and Terry Carter*; responsive pleadings and Orders;
   g. Terry Carter's lawsuit filed on March 19th, styled: *Terry Carter v Corpus Christi Chamber of Commerce, et al.*, responsive pleadings and Orders;
   h. The Chamber of Commerce Petition; and
   i. Chamber of Commerce invitation to the March 31, 2008 Annual Membership Meeting.

Additionally, on May 30, 2008, I listened to a portion of an audiotape containing the February 15, 2008 Corpus Christi Chamber of Commerce meeting which the Caller-Times had obtained on May 30, 2008 pursuant to a Motion to Compel that had been filed by the Corpus Christi Caller-Times' attorney.

4

458

195

7. In addition to my own newsgathering in connection with the aforementioned articles that I authored, Dan Kelley, Beth Wilson, Denise Malan and Fanny Chirinos, reporters at the Caller-Times, contributed to the articles based on information they had gathered during their own newsgathering activities.

8. In interviewing the above-named persons, I asked them to elaborate on the matters raised in Mr. Bentley's e-mail of February 26, 2008 to the Chamber Board of Directors, Ms. Whitmore's letter of February 28, 2008 to the Chamber Board of Directors, and Mr. Carter's memorandum to the Chamber Board of Directors on February 17, 2008. They were unwilling to do so. In researching and writing the aforementioned articles, I relied in good faith on the sources and information listed in paragraphs 4 and 6 because they, particularly, Damon Bentley, Sylvia Whitmore and Judy Hawley, were high-ranking Chamber officials who, by virtue of their then and former positions with the Chamber of Commerce, were in a position to be knowledgeable about the matters and issues involved, regarding the Corpus Christi Chamber of Commerce and Terry Carter. At all times I believed that the matters about which I was writing were newsworthy because they involved a controversy between high-ranking officials of a significant local organization, the Corpus Christi Chamber of Commerce, and its high-profile CEO and President, Terry Carter. I also relied on information I obtained from a long-time Chamber employee, Lucy Reta, who was known by me to be reliable.

9. At no time did Terry Carter contact me, or to my knowledge, anybody else at the Caller-Times, to point out that any statement contained in the articles listed above in paragraph 3 was inaccurate or incorrect.

10. Prior to and at the time of the publication of the articles listed above in paragraph 3: *(a)* I had no knowledge that any of the statements in said articles, including, but not limited to, the statements about which Terry Carter is complaining in the above referenced lawsuit, was false; *(b)* I never entertained any doubts as to the truth of any of the statements contained in said articles, including, but not limited to, the statements about which Terry Carter is complaining in the above referenced lawsuit; *(c)* I had no knowledge nor suspected that any of the statements in said articles, including, but not limited to, the statements about which Terry Carter is complaining in the above referenced lawsuit, nor each article as a whole, nor the totality of said articles, could create a false or substantially false impression regarding Terry Carter in the minds of the ordinary reader of said articles.

11. Prior to and at the time of the publication of the articles listed above in paragraph 3, I believed that all of the statements contained in said articles, including but not limited to, the statements about which Terry Carter is complaining in the above referenced lawsuit, were true and correct.

5

459

196

12. Prior to and at the time of the publication of the articles listed above in paragraph 3, I did not and do not now, bear any personal ill will toward Terry Carter."

"FURTHER AFFIANT SAYETH NAUGHT."

_Elvia Aguilar_
Elvia Aguilar

SWORN TO AND SUBSCRIBED BEFORE ME, the undersigned authority, on the 24th day of September, 2009.

> ROXANE MARIE IGLESIAS
> Notary Public, State of Texas
> My Commission Expires
> August 24, 2010

_Roxane Iglesias_
Notary Public, State of Texas

6

460

197

# TAB 7

# Exhibit A-25

February 28, 2008

Corpus Christi Chamber of Commerce Board of Directors

Ladies and Gentlemen:

The action taken by the Chamber of Commerce Board to establish an audit committee is a great step. At this time, I am still very concerned about three issues:

- The interpretation that I am not officially a member of the Executive Committee, especially in light of the fact that the Chairman had requested that I stay on when the 2007 Chairman left the city. Furthermore, Article V, Section I: of the Corpus Christi Chamber of Commerce Bylaws states..."All officers shall take office on the first day of the new year and serve for a term of one (1) year *or until their successors assume the duties of office"*. Since no one has assumed the duties of Immediate Past Chair, that person would be me.

- The correspondence which has been sent by the Chamber CEO to the Board and Chamber Members glossing over the financial irregularities and the declining membership numbers.

- The obstruction of duties by denying the treasurer access to critical information and advise of financial professionals employed by the Chamber of Commerce. The Treasurer's concerns are very credible, and appeared to be mostly ignored. There was continued refusal of the Chair and Chair Elect to respond to attempts to schedule an executive meeting immediately to work together to address irregularities. There was refusal of Chamber staff to cooperate with the Treasurer on a task he was given by the Board and Executive Committee. Finally, refusal of the Chamber CEO to release the tape of the Executive Committee meeting which was held on February 15.

The Chamber needs to strengthen, and follow, its accounting procedures and its accountability to its members. As stated previously, the action taken by the Chamber Board to establish an audit committee is a great step, but is not sufficient to reassure me and others that the Chamber's operations are transparent and open. Executing contracts without Executive Committee or Board authorization, moving funds to other accounts, running special events off the books, arbitrarily filling board seats . . . all of these issues are about trust, confidence in the leadership, procedures in place which ensure transparency and accountability of the Chamber CEO to the Board and the Membership

I love the Corpus Christi Chamber of Commerce. I have devoted many of my years of volunteerism to this organization beginning in the 1970s. It is, and

CC00576

314

should continue to be, a member-driven organization. Those of us who have worked for years to strengthen the Chamber want to insure it is financially secure.

I know I speak for myself, Damon Bentley and Judy Hawley in that we did everything we could to have the Executive Committee function as it should; to move forward with the performance evaluation and recommendation back to the full Board as we requested. By "kicking" Judy Hawley and I off the Executive Committee, we all now know what chaos that has created.

When the Treasurer identified areas of financial concern, his first call was to the Chamber Chairman, requesting that we convene to move forward immediately with a full audit. His position was that it would take that level of scrutiny to provide the Board and Chamber Members with an accurate assessment of the Chamber's financial status, membership levels, etc.

It is incumbent on the Board of Directors to insure that this 85+ year organization continues to speak for the entire business community of our city; that the voice is an advocate for a pro-business elected leadership, a pro-business environment, and that it is an information resource for issues that are important to businesses, both large and small. Somehow, we seem to have forgotten our mission, and we need to speak it loud and clear. *Prosperity. Together.*

Respectfully,

Sylvia A. Whitmore

CC00577

15062286 135934/00001